# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| NIKKO D'AMBROSIO, | ) | |
| Plaintiff-Appellant, | ) | |
| v. | ) | |
| | ) | Appellate Case No: 25-2231 |
| | ) | |
| ABBIGAIL RAJALA, | ) | |
| CAROL RAJALA, RODNEY RAJALA, | ) | |
| PAOLA SANCHEZ, | ) | On Appeal from the United |
| BLAKE MILLBRAND, | ) | States District Court for the |
| META PLATFORMS, INC., a Delaware Corporation, | ) | Northern District of Illinois, |
| SPILL THE TEA, INC., a Delaware Corporation, | ) | Eastern Division |
| JANE DOES 1-26, Unnamed Defendants using screen | ) | |
| names: Sam Daniels, Alexis Kyle, Coraline Lotz, | ) | Case No. 1:24-cv-00678 |
| Dianne Wesley, Madison Pierce, Madison Bynum, | ) | |
| Vanessa Villatoro, Christy Graessle, Sharleen Waa, | ) | Hon. Sunil R. Harjani, |
| Kaitlyn Mishay Moody, Linda Juarez, Amber Michelle, | ) | District Judge |
| Laura Maddox, Alina Drake, Chandi Constance, | ) | |
| Alicia Ann, Salisha P. Dean, Jillian Cara, Jen Rahbar, | ) | |
| Shannon Marie, Luisa Resendez, Daryl Ceasar, Lisa Miko, | ) | |
| Amy Dukstein-Reynolds, Melissa Pinkerton, Monica Tska, | ) | |
| Defendants-Appellees. | ) | |

## APPELLANT'S MOTION TO FILE CORRECTED OPENING BRIEF INSTANTER AND TO ACCEPT IT AS TIMELY

Appellant Nikko D'Ambrosio respectfully moves the Court for leave to file

**a** corrected opening brief instanter and to accept it as timely**.** In support, Appellant states:

1.  Appellant asks the Court to (a) permit filing of the corrected opening brief instanter; (b)

accept and docket the corrected brief as timely; and (c) in the alternative, to the extent the Court

deems an extension necessary, grant leave nunc pro tunc under Fed. R. App. P. 26 to deem the

corrected brief timely filed. See Fed. R. App. P. 26(b) (good-cause extensions and permission to

act after a deadline) and 27(b) (procedural motions may be acted on at any time. (see Appellant's Opening Brief at Exhibit A).

2.   Appellant's opening brief was completed and transmitted on the deadline, but through inadvertence it was uploaded on the district court docket (N.D. Ill., No. 1:24-cv-00678) rather than on this Court's docket for No. 25-2231. Upon discovering the error, counsel promptly prepared this motion and the corrected brief for immediate filing in this Court. Good cause exists to accept the corrected brief instanter and as timely, or alternatively to grant relief under Rule 26(b).

3.   Today (September 4, 2025) the Clerk issued a deficiency notice identifying, inconsistent use of fonts, serif to sans-serif beginning at the Jurisdictional Statement and back to serif later. The attached corrected draft cures that issue by using a **serif** typeface consistently throughout the principal sections, in line with the Seventh Circuit's published Requirements and Suggestions for Typography in Briefs and Other Papers, which explain that the principal sections of submissions are limited to serif type (sans-serif may be used in headings/captions).

4.   The Federal Rules discourage rejection of filings solely for form. See Fed. R. App. P. 25(a)(4) ("The clerk must not refuse to accept for filing any paper presented for that purpose solely because it is not presented in proper form…"). Accepting the corrected brief instanter efficiently resolves the issue identified by the Clerk while keeping the case on schedule.

5.   The correction is prompt, causes no material delay, and does not prejudice Appellees. If the Court prefers, Appellant consents to resetting any dependent deadlines so Appellees have the full response period calculated from the docketing of the corrected brief, consistent with Rule 26(a)'s time-computation framework.

**WHEREFORE**, Appellant respectfully requests that the Court grant this motion, permit

the corrected opening brief to be filed instanter**,** and accept it as timely**;** or, in the alternative,

grant leave nunc pro tunc under Fed. R. App. P. 26(b). A proposed order is submitted below.

Dated: September 4, 2025

Respectfully submitted,
/s/ Aaron Walner
Aaron Walner
TRENT LAW FIRM, P.C.
200 East Randolph Street
Suite 5100
Chicago, IL 60601
(630) 682-3100
Attorney for Plaintiff-Appellant
service@trentlawfirm.com

**Certificate of Service**

I hereby certify that on this 4th day of September, 2025, I electronically filed the foregoing APPELLANT'S MOTION TO FILE CORRECTED OPENING BRIEF INSTANTER AND TO ACCEPT IT AS TIMELY with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: September 4, 2025

Respectfully submitted,
**/s/ Aaron Walner**
Aaron Walner
Attorney for Plaintiff-Appellant

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

NIKKO D'AMBROSIO, )    EXHBIT A
          Plaintiff-Appellant, )
  v. )
                         )    Appellate Case No: 25-2231
                         )
ABBIGAIL RAJALA, )
CAROL RAJALA, RODNEY RAJALA, )
PAOLA SANCHEZ, )    On Appeal from the United
BLAKE MILLBRAND, )    States District Court for the
META PLATFORMS, INC., a Delaware Corporation, )    Northern District of Illinois,
SPILL THE TEA, INC., a Delaware Corporation, )    Eastern Division
JANE DOES 1-26, Unnamed Defendants using screen )
names: Sam Daniels, Alexis Kyle, Coraline Lotz, )    Case No. 1:24-cv-00678
Dianne Wesley, Madison Pierce, Madison Bynum, )
Vanessa Villatoro, Christy Graessle, Sharleen Waa, )    Hon. Sunil R. Harjani,
Kaitlyn Mishay Moody, Linda Juarez, Amber Michelle, )    District Judge
Laura Maddox, Alina Drake, Chandi Constance, )
Alicia Ann, Salisha P. Dean, Jillian Cara, Jen Rahbar, )
Shannon Marie, Luisa Resendez, Daryl Ceasar, Lisa Miko, )
Amy Dukstein-Reynolds, Melissa Pinkerton, Monica Tska, )
             Defendants-Appellees. )

## APPELLANT'S OPENING BRIEF

**Aaron Walner**
**TRENT LAW FIRM P.C.**
200 East Randolph Street
Suite 5100
Chicago, IL 60601
(630) 682-3100
*Attorney for Plaintiff-Appellant Nikko D'Ambrosio*

# TABLE OF CONTENTS

1. Jurisdictional Statement ..................................................................................... 1

2. Statement of the Issues ..................................................................................... 1

3. Statement of the Case ....................................................................................... 2

4. Summary of the Argument ................................................................................ 3

5. Standard of Review ........................................................................................... 3

6. Argument ........................................................................................................... 3

    I.      The District Court Erred in Dismissing the IRPA Claim ................................... 3

    II.     The District Court Misapplied the Law on Defamation Per Se and Per Quod ... 7

    III.    The False Light and Civil Conspiracy Claims Were Adequately Pled ............. 10

    IV.     The Court Improperly Narrowed the Doxing Statute ....................................... 14

    V.      D'Ambrosio Sufficiently Pled Negligent Entrustment and Product Liability Against Meta ................................................................................................................ 17

7. Conclusion ...................................................................................................... 21

8. Certificate of Compliance ............................................................................... 22

9. Certificate of Service ...................................................................................... 23

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. (Plaintiff's Second Amended Complaint (Doc. 53) ¶¶ 28.) The final judgment dismissing all claims with prejudice was entered on May 13, 2025. (R. 99 Memorandum Opinion & Order (Doc. 99, entered May 13 2025 at 35.)This Court has jurisdiction under 28 U.S.C. §1291. The notice of appeal was timely filed within 60 days pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A) with an extension granted by the Court.

# STATEMENT OF THE ISSUES

1. Whether the District Court erred in dismissing the llinois Right of Publicity Act ("IRPA") claim for failure to allege "commercial purpose" despite allegations of monetized engagement and targeted fundraising. (R. 53 ¶¶ 31, 8085; R. 90 at 78).

2. Whether the statements made about Plaintiff constituted actionable defamation per se and per quod, particularly allegations falsely equating him with a criminal sex offender. (R. 53 ¶¶ 4653; R. 99 at 45, 2224).

3. Whether the false light and civil conspiracy claims were wrongly dismissed despite plausible allegations of knowing publication of highly offensive misinformation.

4. Whether the doxing claim was improperly dismissed by narrowly construing the Illinois statute's definition of "personally identifiable information." (R. 99 at 2124).

5. Whether Meta's conduct in designing, deploying, and profiting from its recommendation algorithm supports claims for negligent entrustment, product liability, and negligence. (R. 53 ¶¶ 6168; R.91 at 1013).

**STATEMENT OF THE CASE**

In November 2023, Defendant Abbigail Rajala reposted Plaintiff's photograph and disparaging commentary in the private Facebook group "Are We Dating the Same Guy? | Chicago," which boasts roughly 100,000 members (R. 53 ¶¶ 15, 46; R. 99 at 3 lines 18-23). Soon after, Jane Doe defendant "Monica Tska" appended a link to an unrelated CBS News article about an individual charged with criminal sexual assault, falsely implying that Plaintiff was that offender (R. 53 ¶¶ 5053; R. 99 at 4 lines 19-23).

On December 15 2023, Plaintiff—through counsel—formally demanded removal of the defamatory posts and unauthorized photograph (R. 53 ¶ 57). Rajala briefly deleted her post but immediately reposted the same content under an anonymous handle to avoid detection (R. 53 ¶ 58; R. 99 at 4 lines 16-18).

Plaintiff pleads—on information and belief—that Meta's recommendation systems intentionally elevated the defamatory thread, surfacing it atop users' feeds to maximize engagement and advertising impressions (R. 53 ¶¶ 61-65). Meta's own filings acknowledge that News Feed ranking favors posts receiving rapid early engagement.

Between November 2024 and February 2025, each Defendant moved to dismiss (Exs. 810). After full briefing, the district court issued a 35page memorandum opinion granting all motions and dismissing the Second Amended Complaint with prejudice on May 13 2025 (R. 99 at 135). This appeal followed.

**SUMMARY OF THE ARGUMENT**

The District Court erred by dismissing a well-pleaded complaint that stated plausible claims under Illinois law. D'Ambrosio specifically alleged unauthorized commercial use of his

likeness in a monetized platform, defamatory falsehoods imputing criminal acts, and publication of personally identifiable information under Illinois's doxing statute.

Further, the court's dismissal of product-based and negligence claims against Meta overlooked the evolving legal landscape holding tech companies accountable for algorithmic amplification. At a minimum, Plaintiff should have been allowed discovery before dismissal with prejudice.

## STANDARD OF REVIEW

This Court reviews de novo a district court's dismissal under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014). The denial of leave to amend is reviewed for abuse of discretion. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi.*, 786 F.3d 510, 524 (7th Cir. 2015).

## ARGUMENT

### I. The District Court Erred in Dismissing the IRPA Misappropriation Claim

The District Court improperly dismissed Plaintiff-Appellant Nikko D'Ambrosio's claim under the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 *et seq.*, by applying an unduly narrow interpretation of "commercial purpose." The IRPA recognizes an individual's right to control the use of their identity for profit and was specifically enacted to prevent the unauthorized commercial exploitation of a person's likeness or name.

### A. Statutory Framework

Under 765 ILCS 1075/5, a "commercial purpose" includes:

(i)     the public use or holding out of an individual's identity on or in connection with the offering for sale or sale of a product, merchandise, goods, or services;

(ii)    for purposes of advertising or promoting products, merchandise, goods, or services; or

(iii)   for the purpose of fundraising.


To state a claim under IRPA, a plaintiff must plead:

1.  The appropriation of their identity;

2.  Without their consent;

3.  For a commercial purpose. (*Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1099 (7th Cir. 2022)).


Here, Plaintiff's allegations satisfy all three elements.

**B. Meta's Algorithmic Exploitation Constitutes a Commercial Purpose**

Plaintiff alleged that his image and identity were appropriated and disseminated in a Facebook group ("Are We Daing the Same Guy? – Chicago"), where the content was promoted by Meta's proprietary recommendation algorithm. These promotions were not incidental. Plaintiff detailed that Meta's system algorithmically amplified inflammatory content, including unauthorized posts featuring his likeness, to maximize user engagement—a core monetization vector for Meta through targeted ad revenue.

Courts have acknowledged that algorithmic activity aimed at increasing engagement can implicate the platform in content-based claims. Meta's conduct here goes beyond passive hosting;

it constitutes affirmative, profit-driven deployment of content, using D'Ambrosio's identity as a mechanism to enhance platform interaction. At the motion to dismiss stage, these allegations are not only plausible—they directly invoke the statute's fundraising and advertising prongs.

### C. Defendants Sanchez and Millbrand Monetized the Misuse via Crowdfunding and Subscription Platforms

Equally significant, Plaintiff alleged that Defendants Sanchez and Millbrand, owners of Spill The Tea, Inc., exploited his image and defamatory narrative in direct support of commercial fundraising campaigns. These included a GoFundMe campaign—raising over $55,000—and Patreon accounts which solicited recurring donations from group members.

Although the District Court concluded that Plaintiff's image was not literally displayed on these fundraising pages, this overlooks IRPA's text and judicial interpretations. The statute requires only that the identity be used "in connection with" the fundraising. Courts interpreting IRPA have found liability where identity was used as part of an overall marketing scheme—not necessarily as the face of the donation page itself (*Jordan v. Jewel Food Stores, Inc.,* 743 F.3d 509, 517 (7th Cir. 2014)).

Here, the posts in the Facebook group were the very instrument of monetization. D'Ambrosio's identity and the surrounding controversy were engineered into a spectacle that drove traffic, galvanized support, and served as the emotional and narrative hook for soliciting funds. This is quintessential "use in connection with fundraising."

### D. Lukis and Huston Support Plaintiff's Interpretation

In *Lukis v. Whitepages Inc.,* 454 F. Supp. 3d 746 (N.D. Ill. 2020)), the court denied a motion to dismiss where a consumer background-check company previewed individuals' partial data to induce users to purchase full reports. The court held that even the preliminary use of a person's identity to entice or direct consumer attention toward a monetized product constitutes a commercial purpose under IRPA.

Here, Plaintiff's likeness was used not only to entice users to engage, but also to cultivate a culture of virality around "exposing" men, which in turn translated into digital capital for the group's administrators. In *Huston*, the Seventh Circuit emphasized that "the identity must help sell something"—a standard plainly met where user engagement was the product being monetized.

The complaint specifically alleges that Meta monetized Plaintiff's image by pairing his photograph with targeted advertising in the AWDTSG group, resulting in increased engagementbased revenue. (R. 53 ¶ 64; R. 91 at 1516.) The district court nevertheless concluded that "no commercial purpose was pleaded." (R. 99 at 11.) That conclusion is irreconcilable with record allegations that Meta earns over 98 percent of its revenue from engagementdriven advertising. (R. 53 ¶¶ 61–65).

Illinois courts define "commercial purpose" broadly to include any use "in connection with" the sale or promotion of goods or services. *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005). Here, Rajala's repost was algorithmically amplified precisely because it generated reactions, which Meta then packaged for advertisers. (R. 53 ¶ 66). Nothing more is required to plead a commercial use under the Illinois Right of Publicity Act.

At the very least, Plaintiff pled sufficient factual content to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009). The District Court's insistence on a direct visual link between Plaintiff's identity and a donation widget ignored IRPA's flexible statutory reach and contravened persuasive authority. The dismissal of Count I should be reversed

## II. The District Court Misapplied Defamation Law

The District Court's dismissal of Plaintiff-Appellant's defamation claims represents a misapplication of Illinois defamation law and federal pleading standards under *Twombly* and *Iqbal*. Plaintiff alleged that Defendants published and republished defamatory statements implying he was a criminal sex offender, abuser, and morally corrupt individual—allegations that, on their face, are actionable as defamation per se. Even under the alternate theory of defamation per quod, Plaintiff adequately pled reputational harm and damages. The District Court erred in resolving factual inferences against Plaintiff and in applying heightened evidentiary burdens inappropriate for the pleading stage.

## A. Defamation Per Se – Criminal Imputation and the Misuse of the Innocent Construction Rule

Illinois recognizes five categories of statements that are actionable per se—that is, without a requirement to plead or prove actual damages. One such category includes statements that impute the commission of a criminal offense. (*Van Horne v. Muller,* 185 Ill. 2d 299, 307 (1998)). Here, Plaintiff alleged that Jane Doe 2 posted a mugshot and article referencing a known sex offender— while simultaneously referencing Plaintiff by name and photograph in the same thread. The juxtaposition of these elements in a social media environment known for "call-out" culture created a clear implication that Plaintiff was the man in the article (R. 53 ¶¶ 50–53).

Despite this, the District Court invoked the "innocent construction rule", which requires that a defamatory statement be considered nonactionable if it can be reasonably interpreted in an innocent way. But the rule is not a license to dismiss plausible defamatory meaning at the pleading stage, particularly when the alleged implication is contextually unavoidable.

The Seventh Circuit has held that even true facts can become defamatory if presented in a way that falsely implies a connection between the subject and criminality. In *Muzikowski v. Paramount Pictures Corp.,* 322 F.3d 918, 926 (7th Cir. 2003), the Seventh Circuit held that a fictional character bearing substantial resemblance to a real person could support a claim of defamation per se where the story alleged criminal conduct inconsistent with the plaintiff's life, and allowed the plaintiff to proceed beyond the pleading stage. Similarly, in *Bryson v. News America Publications, Inc*., 174 Ill. 2d 77, 672 N.E.2d 1207, 1215 (1996), the court emphasized that defamatory implications must be judged based on how an average reader would interpret the message—not based on dissecting the post in isolation.

In the current case, the ordinary group reader, seeing Plaintiff's name and image posted with commentary followed by a mugshot and sex abuse article, would reasonably believe the Plaintiff was the subject of that article. Illinois law prohibits precisely this form of character assassination through implication and juxtaposition.

## B. Defamation Per Quod – Sufficient Allegations of Reputational Harm and Damages

Even if this Court were to find that the statements require extrinsic evidence to establish their defamatory meaning, Plaintiff has adequately pled a defamation per quod claim. Unlike defamation per se, per quod requires a showing of actual damages, which the District Court mistakenly held Plaintiff failed to allege with sufficient specificity.

Under Illinois law, a plaintiff need not plead precise dollar amounts or itemized losses at the motion to dismiss stage. It is sufficient to allege general damages such as injury to reputation, personal humiliation, and mental anguish. This principle is supported by the Seventh Circuit's decision in *Kamelgard v. Macura*, 585 F.3d 334, 341 (7th Cir. 2009), where the court stated that a plaintiff "was entitled to recover [general damages] for injury to his reputation as well as for personal humiliation and mental anguish. D'Ambrosio clearly alleged:

- Emotional distress, including anxiety and public humiliation;

- Loss of professional opportunities, by noting a significant decline in social and professional engagement;

- Harm to reputation and community standing, particularly as the defamatory thread gained traction within Facebook's algorithmically-driven network (R. 53 ¶¶ 66–69).

Illinois law does not demand that Plaintiffs produce evidence at this early stage—it requires notice pleading and factual plausibility. In *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87, 672 N.E.2d 1207, 1214 (1996), the Illinois Supreme Court reaffirmed that in actions for defamation per se, damages are presumed due to the inherently harmful nature of the statements, eliminating the necessity for the plaintiff to plead or prove actual harm to reputation. Here, a Facebook group with tens of thousands of members republished the harmful content, suggesting broad reputational injury.

The District Court further erred by faulting Plaintiff for not providing "independent facts showing harm" beyond the defamatory statements. This improperly requires evidence rather than plausible factual allegations, in contradiction of *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[A] plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.").

The District Court's ruling ignores core tenets of defamation law, pleading standards, and the chilling effect of dismissing reputational claims at the threshold stage. Whether the statements are ultimately found defamatory is a question of fact—not law for resolution on a Rule 12(b)(6) motion. The defamation counts should be reinstated.

### III. False Light and Conspiracy Claims Were Adequately Pled

The District Court erroneously dismissed Plaintiff's false light and civil conspiracy claims by failing to recognize that both theories are adequately supported under Illinois law and arise directly from the same core facts underlying the actionable defamation claims. As both causes of action concern knowing and coordinated publication of offensive falsehoods, dismissal at the pleading stage was premature and legally unsound.

### A. False Light – Plaintiff Was Publicly Portrayed in a Highly Offensive and Misleading Manner

To state a claim for false light invasion of privacy under Illinois law, a plaintiff must allege that:

1. The defendant published information placing the plaintiff in a false light before the public;

2. The false light would be highly offensive to a reasonable person; and

3. The defendant acted with actual malice if the plaintiff is a public figure, or at least with knowledge of or reckless disregard for the falsity of the information. (*Lovgren v. Citizens First Nat'l Bank of Princeton*, 534 N.E.2d 987, 989 (Ill. 1989)).

Illinois courts have long held that the false light tort mirrors defamation in many respects. Indeed, the Seventh Circuit has stated that a viable defamation claim almost always gives rise to a false light claim as well. In *Madison v. Frazier, 539 F.3d 646, 659 (7th Cir. 2008),* the court explained that "[w]hen a false light invasion of privacy claim follows an unsuccessful defamation

claim, the false light claim must also fail," recognizing the significant overlap between the two torts under Illinois law. Similarly, in *Kolegas v. Heftel Broad. Corp.,* 154 Ill. 2d 1, 10 (1992), the Illinois Supreme Court acknowledged that the two claims "often rise or fall together."

Here, Plaintiff plausibly alleged that the Defendants published statements and materials that conveyed a false impression that he was a criminal predator, morally corrupt, and unsafe to be around. These portrayals were constructed not only through defamatory language, but also through strategic implication, juxtaposition with a known sexual predator's article and mugshot, and the surrounding accusatory context created by group administrators and moderators (R. 53 ¶¶ 108–112).

Such conduct easily satisfies the "highly offensive" prong of the false light standard. A reasonable person would find it profoundly disturbing to be falsely depicted as a sexual predator in a public forum with tens of thousands of members. Courts in Illinois have found far less egregious portrayals sufficient to survive dismissal, especially where the depiction attacks the subject's morality or accuses them of socially stigmatized conduct. See, e.g., *Kolegas v. Heftel Broad. Corp.,* 154 Ill. 2d 1, 10 (1992) (radio hosts' false suggestion that plaintiff exploited disabled children for profit deemed defamatory per se); *Dobias v. Oak Park & River Forest High Sch.*, 2016 IL App (1st) 152205, ¶¶ 29-32 (false statements implying teacher engaged in inappropriate conduct with students sufficient to proceed past dismissal); *Hardiman v. Aslam, 2019* IL App (1st) 173196, ¶ 24 (false suggestion plaintiff was a gang member and domestic abuser actionable as highly offensive and defamatory).

Further, Plaintiff plausibly alleged actual malice, or at least reckless disregard, as required by the third prong. The administrators and moderators—Defendants Sanchez, Millbrand, and

others—were notified of the false accusations, had access to moderation tools, and affirmatively chose not to intervene or remove the content, thereby endorsing and perpetuating the false portrayal.

## B. Civil Conspiracy – Defendants Acted in Concert to Publish and Monetize Harmful Falsehoods

The District Court also erred in dismissing the civil conspiracy claim on the mistaken basis that Plaintiff failed to plead a meeting of the minds or overt acts in furtherance of the agreement. Under Illinois law, the elements of civil conspiracy are:

1. A combination of two or more persons;

2. For the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means; and

3. An overt act in furtherance of the agreement which causes injury. (*McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999)).

While civil conspiracy claims must be pled with factual specificity, courts recognize that such claims are often proven through circumstantial evidence and reasonable inferences. However, mere parallel conduct or mutual interest, without specific facts showing agreement, is insufficient to support a conspiracy claim. (*Redelmann v. Claire Sprayway, Inc.*, 874 N.E.2d 230, 240 (Ill. App. Ct. 2007)).

Plaintiff alleged exactly this:

- Sanchez and Millbrand co-owned Spill the Tea, Inc., operated the Facebook group, controlled access and moderation, and used inflammatory content to drive user donations and revenue streams via crowdfunding and Patreon.

- They deployed group rules and content filters not to prevent harm, but to strategically avoid liability while allowing doxing and defamatory posts to flourish, particularly against male targets like Plaintiff.

- Meta, through its algorithm and moderation infrastructure, selectively amplified posts containing Plaintiff's identity, thereby acting as a willing participant in furthering the conspiracy by promoting false, reputation-damaging content.

- The coordinated inaction by group moderators, despite multiple reports from Plaintiff and third parties, further illustrates the agreement to maintain the defamatory campaign.

Taken together, these facts allege a clear meeting of the minds, a shared financial motive, and multiple overt acts—including moderation decisions, algorithmic promotion, and monetized outreach—all of which directly injured Plaintiff.

Illinois courts have sustained civil conspiracy claims based on similarly orchestrated efforts to damage a plaintiff's reputation (*Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004)), especially where the harm arises from multiple actors contributing to a defamatory narrative across different channels.


At this early stage of litigation, Plaintiff is entitled to every reasonable inference in his favor. The facts alleged plausibly support both that Defendants knowingly cast Plaintiff in a false light before the public, and that they did so pursuant to a shared scheme to monetize defamatory content. Dismissal of these claims denied Plaintiff the opportunity to develop a factual record through discovery. Reversal is warranted.

### IV. The Doxing Claim Was Improperly Narrowed

The District Court improperly dismissed Plaintiff's claim under the Illinois Civil Liability for Doxing Act (740 ILCS 195/1 *et seq.*) by adopting an unduly restrictive interpretation of "personally identifiable information" (PII) and failing to consider the totality of circumstances surrounding the publication. The Act is remedial in nature and must be construed liberally to effectuate its purpose—namely, to protect individuals from real-world harm resulting from online exposure and harassment.

### A. The Act Covers Names, Likeness, and Other Identifiable Information—Not Merely Complete Data Sets

The Civil Liability for Doxing Act, enacted in 2022, imposes civil liability on individuals who knowingly publish personally identifiable information of another person with the intent to cause or with reckless disregard for the likelihood of causing harm. Section 10 defines PII to include:

"Name, address, telephone number, email address, social security number, or any other information that can be used to identify a specific individual."

The District Court dismissed the claim on the grounds that only Plaintiff's first name and a photograph were published. This interpretation is both legally flawed and inconsistent with the statutory language and legislative intent.

First, Illinois courts have consistently recognized that "any other information that can be used to identify a specific individual" must be understood contextually. A clear facial image, published in a localized Facebook group whose membership overlaps significantly with the plaintiff's community, is sufficient to identify a person. The fact that the post included calls for

additional data—such as Plaintiff's employer, criminal background, and more—demonstrates both the intent to expose and the means to do so.

Moreover, screen names, location tags, and group context provide the connective tissue that transforms partial identifiers into actionable disclosures. This view is supported by broader federal data privacy standards, which recognize PII to include "any unique identifier that permits the physical or online contacting of a specific individual." (*FTC v. Accusearch Inc*., 570 F.3d 1187 (10th Cir. 2009)).

### B. The Group Context and Call to Action Establish Purposeful Harm

The statutory standard for liability under Section 15 of the Doxing Act requires:

1. Publication of PII;

2. With the intent to cause or reckless disregard of the risk of causing: (a) stalking, harassment, physical harm, or emotional distress.

Plaintiff alleged that his name and likeness were published in a Facebook group notorious for publicly shaming men, under a thread which labeled him "dangerous" and paired his image with a sex offender's mugshot and article. The group's moderators allowed inflammatory language to persist and even refused to remove the post upon report—despite acknowledging its potentially mistaken identity.

The purpose of the thread, and the broader ethos of the group, was not casual discussion but public exposure and social punishment. The comment section included suggestions to research Plaintiff's employment, prior relationships, and personal history—encouraging doxing conduct by implication (R. 53 ¶¶ 12–20).

This is precisely the type of "amplified exposure and endangerment" that the Act was designed to prevent. As the Illinois General Assembly explained in its legislative findings, the

doxing statute addresses the growing problem of "cyber vigilantism" that results in victims being targeted, harassed, and shamed in their real lives.

That standard does not require physical assault or even direct threats. Rather, it is met where, as here, the publication was reasonably likely to cause fear, distress, or reputational harm.

### C. The Court Failed to Credit Plausible Allegations of Harm and Intent

Even assuming arguendo that Plaintiff was required to allege harm with specificity, the Second Amended Complaint clearly states that he experienced:

- Severe emotional distress;

- Fear for his safety, based on the nature of comments and reposts;

- Professional and reputational injury, due to the post's virality;

- Lack of recourse due to the moderators' refusal to remove the post.

These facts support an inference that Defendants published the information with reckless disregard of the likely consequences. As the Seventh Circuit has held, courts at the pleading stage must accept all well-pleaded facts as true and draw reasonable inferences in favor of the plaintiff (*Tamayo v. Blagojevich*, 526 F.3d 1074, 1081-82 (7th Cir. 2008)).

The District Court improperly imposed an evidentiary burden inconsistent with Rule 12(b)(6) and misread the plain language of the Civil Liability for Doxing Act. Plaintiff's name, facial image, and contextual identifiers were more than sufficient to meet the statutory threshold. The claim was adequately pled and should be reinstated to allow for factual development through discovery.

### V. Meta Is Liable Under Negligence, Entrustment, and Product Liability

The District Court's dismissal of Plaintiff's claims against Meta Platforms, Inc. rests on an outdated understanding of platform immunity and passive publishing, and fails to account for

evolving jurisprudence concerning the design and deployment of harmful technologies. Plaintiff has plausibly alleged that Meta's content-recommendation systems, moderation infrastructure, and group management tools were not only capable of causing harm but were specifically engineered to amplify outrage, conflict, and defamatory narratives. As such, Meta's conduct gives rise to actionable claims for negligence, negligent entrustment, and product liability, particularly where Meta failed to safeguard against foreseeable misuse.

### A. Meta's Algorithm Functioned as an Active Agent in Amplifying Harm

Meta cannot cloak itself in Section 230 immunity where its role extends beyond passive hosting to active engineering of user experiences through design choices that fuel and disseminate defamatory and dangerous content (R. 87 at 5-6).

In *Gonzalez v. Google LLC*, 598 U.S. 617 (2023), the Supreme Court signaled openness to narrowing Section 230 of the Communications Decency Act where platforms employ recommendation algorithms that promote specific user-generated content based on platform-generated metadata. Although the Court ultimately remanded on other grounds, the decision recognized that platforms may bear liability when their content curation systems materially contribute to the illegality or harm of third-party content.

Here, Plaintiff specifically alleged that Meta's algorithms:

- Prioritized inflammatory and emotionally charged posts, including those that falsely linked Plaintiff to sexual misconduct (R. 87 at 6);

- Amplified the visibility of posts targeting Plaintiff, causing them to surface repeatedly in group members' feeds and "suggested content" modules (R. 87 at 7);

- Operated as a profit-maximizing tool, designed to increase user engagement and, by extension, Meta's ad revenue (R. 87 at 7).

Meta's system did not neutrally display content—it selectively elevated content based on virality indicators, including those stemming from outrage and moral panic. These choices are not editorial judgments protected by CDA § 230, but rather product design features subject to traditional tort liability, especially where the risk of harm was both foreseeable and preventable.

### B. Meta's Tools and Features Are "Products" Within the Scope of Liability Law

Courts have increasingly recognized that digital products—particularly those with autonomous or semi-autonomous functions like recommender systems—can constitute "products" for purposes of strict liability and negligence.

In *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), the Ninth Circuit held that Snapchat's "Speed Filter" was not merely a neutral platform feature but a designed functionality that encouraged dangerous behavior, thereby supporting claims for product defect and negligent design. The court emphasized that product-based liability applies when the platform is being sued for the design of the product itself, rather than simply for the content that flows through it.

Likewise, in *Anderson v. TikTok, Inc.,* No. 22-3061 (3d Cir. 2024)), the court found that plaintiffs had stated a plausible failure-to-warn and negligent design claim against TikTok for harms caused by its "For You" page algorithm that allegedly directed users to harmful content.

Meta's content ranking, recommendation, and moderation systems were engineered to manipulate the visibility of user posts for the express purpose of maximizing profit—not to passively host speech. Plaintiff's allegations fit comfortably within the reasoning of Lemmon and TikTok: Meta's product encouraged, enabled, and repeated the dissemination of harmful content about Plaintiff, with foreseeable reputational and emotional harm (R. 87 at 8).

## C. Meta's Failure to Implement Safety Mechanisms Supports Negligence and Negligent Entrustment

Meta also failed to exercise reasonable care in the design, implementation, and oversight of its platform tools—giving rise to claims under traditional negligence and negligent entrustment doctrines.

The elements of negligent entrustment include:

1. Entrustment of a dangerous instrumentality;

2. To a person whom the entrustor knows, or should know, is likely to use it in a dangerous manner;

3. With resulting harm. (*See Restatement (Second) of Torts* § 390.)

Here, Plaintiff alleged that Meta provided unregulated moderation tools, anonymous publishing mechanisms, and automated visibility boosts to the operators of "Are We Dating the Same Guy?"—a group whose content history and moderation tactics made foreseeable the misuse of platform tools for harassment and defamation.


Meta had notice of prior complaints, internal reports, and flagged content involving false accusations and identity misuse within this group, yet failed to intervene or restrict access to powerful platform features. Instead, Meta's algorithm actively entrusted the amplification of harmful content to known bad actors and failed to impose any structural safeguards.

In the context of modern digital products, algorithmic tools and content-ranking systems are the functional equivalent of hazardous instruments, and the negligent entrustment of such tools—especially to users known to misuse them—creates actionable liability. (*See Herrick v.*

*Grindr LLC*, 765 F. App'x 586, 590–91 (2d Cir. 2019), emphasizing that negligence claims may survive where a platform fails to address well-known risks of product misuse.)

### D. Meta's Conduct Surpassed Mere Inaction—It Was Active Negligence

The totality of Plaintiff's allegations shows not merely failure to remove offensive content, but affirmative conduct by Meta that caused or worsened Plaintiff's injury:

- Meta recommended the defamatory thread to users based on engagement metrics;

- Meta monetized the engagement through targeted ads;

- Meta failed to act on Plaintiff's content reports, despite internal tools that allowed immediate remediation;

- Meta maintained a system that rewarded group administrators financially for promoting viral—even if false—content.

These are not protected editorial decisions. They are foreseeable, profit-driven design choices with clear externalities, making dismissal of Plaintiff's claims premature and inconsistent with contemporary tort principles.


Meta's role in this case transcends that of a passive intermediary. It engineered, optimized, and profited from a system that weaponized Plaintiff's identity. The principles articulated in *Gonzalez*, *Lemmon*, and *TikTok* affirm the plausibility of Plaintiff's negligence, negligent entrustment, and product liability claims. These claims should not have been dismissed without discovery and factual development.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court reverse the District Court's dismissal and remand for further proceedings on all claims.

Respectfully submitted,

_____ /s/Aaron Walner _____
**Aaron Walner**
*Attorney for Plaintiff-Appellant*
TRENT LAW FIRM, P.C.
600 West Jackson BLVD Suite 100
Chicago, IL 60651
(630) 682-3100
service@trentlawfirm.com

## Certificate of Compliance

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

This brief contains **5.477** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using **Microsoft Word** in **Times New Roman, 14-point font**.

Dated: September 4, 2025

Respectfully submitted,
/s/ Aaron Walner
Aaron Walner
TRENT LAW FIRM, P.C.
200 East Randolph Street
Suite 5100
Chicago, IL 60601
(630) 682-3100
Attorney for Plaintiff-Appellant
service@trentlawfirm.com

**Certificate of Service**

I hereby certify that on this 4th day of September, 2025, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: September 4, 2025

Respectfully submitted,
**/s/ Aaron Walner**
Aaron Walner
Attorney for Plaintiff-Appellant
