# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

NIKKO D'AMBROSIO, )
                  Plaintiff-Appellant, )
    v. )
                             )    Appellate Case No: 25-2231
                             )
ABBIGAIL RAJALA, )
CAROL RAJALA, RODNEY RAJALA, )
PAOLA SANCHEZ, )    On Appeal from the United
BLAKE MILLBRAND, )    States District Court for the
META PLATFORMS, INC., a Delaware Corporation, )    Northern District of Illinois,
SPILL THE TEA, INC., a Delaware Corporation, )    Eastern Division
JANE DOES 1-26, Unnamed Defendants using screen )
names: Sam Daniels, Alexis Kyle, Coraline Lotz, )    Case No. 1:24-cv-00678
Dianne Wesley, Madison Pierce, Madison Bynum, )
Vanessa Villatoro, Christy Graessle, Sharleen Waa, )    Hon. Sunil R. Harjani,
Kaitlyn Mishay Moody, Linda Juarez, Amber Michelle, )    District Judge
Laura Maddox, Alina Drake, Chandi Constance, )
Alicia Ann, Salisha P. Dean, Jillian Cara, Jen Rahbar, )
Shannon Marie, Luisa Resendez, Daryl Ceasar, Lisa Miko, )
Amy Dukstein-Reynolds, Melissa Pinkerton, Monica Tska, )
                  Defendants-Appellees. )

## APPELLANT'S OPENING BRIEF AND REQUIRED SHORT APPENDIX FOR

## PLAINTIFF-APPELLANT

**Aaron Walner**
**TRENT LAW FIRM P.C.**
200 East Randolph Street
Suite 5100
Chicago, IL 60601
(630) 682-3100
*Attorney for Plaintiff-Appellant Nikko D'Ambrosio*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2231

Short Caption: Nikko D'Ambrosio v. Meta Platforms, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Nikko D'Ambrosio

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Trent Law Firm, P.C.

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Aaron Walner          Date: August 12, 2025

Attorney's Printed Name:  Aaron Walner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [✓]  No [ ]

Address:  AON Business Center 200 East Randolph Street Suite 5100 Chicago, IL 60601 (

Phone Number: (630) 682-3100          Fax Number:

E-Mail Address: service@trentlawfirm.com; awalner@trentlawfirm.com

rev. 12/19 AK

# TABLE OF CONTENTS

1. Table of Authorities………………………………………………………………iii-iv

2. Jurisdictional Statement ................................................................................1

3. Statement of the Issues...................................................................................1

4. Statement of the Case.....................................................................................2

5. Summary of the Argument..............................................................................3

6. Standard of Review.........................................................................................3

7. Argument .........................................................................................................3

    I.    The District Court Erred in Dismissing the IRPA Claim ....................3

    II.    The District Court Misapplied the Law on Defamation Per Se and Per Quod ...7

    III.    The False Light and Civil Conspiracy Claims Were Adequately Pled............10

    IV.    The Court Improperly Narrowed the Doxing Statute .......................14

    V.    D'Ambrosio Sufficiently Pled Negligent Entrustment and Product Liability Against Meta .......................................................................................................17

8. Conclusion ....................................................................................................21

9. Certificate of Compliance ............................................................................22

10. Certificate of Service ..................................................................................23

11. Statement Concerning the Appendix and Required Short Appendix……………..

**TABLE OF AUTHORITIES**

**Cases**

*Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014)………………………………3

*Anderson v. TikTok, Inc.,* No. 22-3061 (3d Cir. 2024)……………………………….........18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)……………………………………………………… 6

*Bryson v. News America Publications, Inc.,* 174 Ill. 2d 77, 672 N.E.2d 1207 (1996)… 9

*Dobias v. Oak Park & River Forest High Sch.,* 2016 IL App (1st) 152205………………11

*Fritz v. Johnston*, 807 N.E.2d 461 (Ill. 2004)…………………………………………..13

*FTC v. Accusearch Inc.,* 570 F.3d 1187 (10th Cir. 2009)    …………………………..…15

*Gonzalez v. Google LLC,* 598 U.S. 617 (2023)……………………………………………...17

*Hardiman v. Aslam,* 2019 IL App (1st) 173196    …………………………………………..11

*Herrick v. Grindr LLC*, 765 F. App'x 586 (2d Cir. 2019)    …………………………….19

*Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097 (7th Cir. 2022)    ……………….............4

*Jordan v. Jewel Food Stores, Inc.,* 743 F.3d 509 (7th Cir. 2014)    ……………….............5

*Kamelgard v. Macura*, 585 F.3d 334 (7th Cir. 2009)……………………………………..9

*Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1 (1992) ……………………………….…11

*Lemmon v. Snap, Inc.,* 995 F.3d 1085 (9th Cir. 2021)……………………………....…18

*Lovgren v. Citizens First Nat'l Bank of Princeton*, 534 N.E.2d 987 (Ill. 1989).................10

*Lukis v. Whitepages Inc.*, 454 F. Supp. 3d 746 (N.D. Ill. 2020)…………………..…..…..6

*Madison v. Frazier*, 539 F.3d 646 (7th Cir. 2008)……………………………………....10

*McClure v. Owens Corning Fiberglas Corp.,* 720 N.E.2d 242 (Ill. 1999)………………12

*Muzikowski v. Paramount Pictures Corp.,* 322 F.3d 918 (7th Cir. 2003)………………..8

*Redelmann v. Claire Sprayway, Inc.,* 874 N.E.2d 230 (Ill. App. Ct. 2007)……………...12

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chi.,* 786 F.3d 510 (7th Cir. 2015)…..3

*Swanson v. Citibank, N.A.,* 614 F.3d 400 (7th Cir. 2010)     ……………………….....9

*Tamayo v. Blagojevich,* 526 F.3d 1074 (7th Cir. 2008)…………………………….....16

*Toney v. L'Oreal USA, Inc.,* 406 F.3d 905 (7th Cir. 2005)………………………….6

*Van Horne v. Muller,* 185 Ill. 2d 299 (1998)……………………………………...........7

**Statutes**

28 U.S.C. § 1291…………………………………………………………….........1

28 U.S.C. § 1332…………………………………………………………...…..1

47 U.S.C. § 230 (Communications Decency Act § 230)……………………………..…17, 18

740 ILCS 195/1 *et seq.* (Illinois Civil Liability for Doxing Act)…………………………14

765 ILCS 1075/1 *et seq.* (Illinois Right of Publicity Act)…………………………………..3

765 ILCS 1075/5…………………………………….……………………………4

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. (Plaintiff's Second Amended Complaint (Doc. 53) ¶¶ 28.) The final judgment dismissing all claims with prejudice was entered on May 13, 2025. (R. 99 Memorandum Opinion & Order (Doc. 99, entered May 13 2025 at 35.)This Court has jurisdiction under 28 U.S.C. §1291. The notice of appeal was timely filed within 60 days pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A) with an extension granted by the Court.

# STATEMENT OF THE ISSUES

1. Whether the District Court erred in dismissing the llinois Right of Publicity Act ("IRPA") claim for failure to allege "commercial purpose" despite allegations of monetized engagement and targeted fundraising. (R. 53 ¶¶ 31, 8085).

2. Whether the statements made about Plaintiff constituted actionable defamation per se and per quod, particularly allegations falsely equating him with a criminal sex offender. (R. 53 ¶¶ 4653; R. 99 at 45, 2224).

3. Whether the false light and civil conspiracy claims were wrongly dismissed despite plausible allegations of knowing publication of highly offensive misinformation.

4. Whether the doxing claim was improperly dismissed by narrowly construing the Illinois statute's definition of "personally identifiable information." (R. 99 at 2124).

5. Whether Meta's conduct in designing, deploying, and profiting from its recommendation algorithm supports claims for negligent entrustment, product liability, and negligence. (R. 53 ¶¶ 6168; R.91 at 1013).

## STATEMENT OF THE CASE

In November 2023, Defendant Abbigail Rajala reposted Plaintiff's photograph and disparaging commentary in the private Facebook group: Are We Dating the Same Guy? | Chicago," which boasts roughly 100,000 members (R. 53 ¶¶ 15, 46; R. 99 at 3 lines 18-23). Soon after, Jane Doe defendant "Monica Tska" appended a link to an unrelated CBS News article about an individual charged with criminal sexual assault, falsely implying that Plaintiff was that offender (R. 53 ¶¶ 5053; R. 99 at 4 lines 19-23).

On December 15 2023, Plaintiff—through counsel—formally demanded removal of the defamatory posts and unauthorized photograph (R. 53 ¶ 57). Rajala briefly deleted her post but immediately reposted the same content under an anonymous handle to avoid detection (R. 53 ¶ 58; R. 99 at 4 lines 16-18).

Plaintiff pleads—on information and belief—that Meta's recommendation systems intentionally elevated the defamatory thread, surfacing it atop users' feeds to maximize engagement and advertising impressions (R. 53 ¶¶ 61-65). Meta's own filings acknowledge that News Feed ranking favors posts receiving rapid early engagement.

Between November 2024 and February 2025, each Defendant moved to dismiss (Exs. 810). After full briefing, the district court issued a 35page memorandum opinion granting all motions and dismissing the Second Amended Complaint with prejudice on May 13 2025 (R. 99 at 135). This appeal followed.

## SUMMARY OF THE ARGUMENT

The District Court erred by dismissing a well-pleaded complaint that stated plausible claims under Illinois law. D'Ambrosio specifically alleged unauthorized commercial use of his

likeness in a monetized platform, defamatory falsehoods imputing criminal acts, and publication of personally identifiable information under Illinois's doxing statute.

Further, the court's dismissal of product-based and negligence claims against Meta overlooked the evolving legal landscape holding tech companies accountable for algorithmic amplification. At a minimum, Plaintiff should have been allowed discovery before dismissal with prejudice.

## STANDARD OF REVIEW

This Court reviews de novo a district court's dismissal under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014). The denial of leave to amend is reviewed for abuse of discretion. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi.*, 786 F.3d 510, 524 (7th Cir. 2015).

## ARGUMENT

### I. The District Court Erred in Dismissing the IRPA Misappropriation Claim

The District Court improperly dismissed Plaintiff-Appellant Nikko D'Ambrosio's claim under the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 *et seq*., by applying an unduly narrow interpretation of "commercial purpose." The IRPA recognizes an individual's right to control the use of their identity for profit and was specifically enacted to prevent the unauthorized commercial exploitation of a person's likeness or name.

### A. Statutory Framework

Under 765 ILCS 1075/5, a "commercial purpose" includes:

(i)     the public use or holding out of an individual's identity on or in connection with the offering for sale or sale of a product, merchandise, goods, or services;

(ii)      for purposes of advertising or promoting products, merchandise, goods, or services; or

(iii)     for the purpose of fundraising.

To state a claim under IRPA, a plaintiff must plead:

1. The appropriation of their identity;

2. Without their consent;

3. For a commercial purpose. (*Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1099 (7th Cir. 2022)). Here, Plaintiff's allegations satisfy all three elements.

**B. Meta's Algorithmic Exploitation Constitutes a Commercial Purpose**

Plaintiff alleged that his image and identity were appropriated and disseminated in a Facebook group ("Are We Dating the Same Guy? – Chicago"), where the content was promoted by Meta's proprietary recommendation algorithm. These promotions were not incidental. Plaintiff detailed that Meta's system algorithmically amplified inflammatory content, including unauthorized posts featuring his likeness, to maximize user engagement—a core monetization vector for Meta through targeted ad revenue.

Courts have acknowledged that algorithmic activity aimed at increasing engagement can implicate the platform in content-based claims. Meta's conduct here goes beyond passive hosting; it constitutes affirmative, profit-driven deployment of content, using D'Ambrosio's identity as a mechanism to enhance platform interaction. At the motion to dismiss stage, these allegations are not only plausible—they directly invoke the statute's fundraising and advertising prongs.

### C. Defendants Sanchez and Millbrand Monetized the Misuse via Crowdfunding and Subscription Platforms

Equally significant, Plaintiff alleged that Defendants Sanchez and Millbrand, owners of Spill The Tea, Inc., exploited his image and defamatory narrative in direct support of commercial fundraising campaigns. These included a GoFundMe campaign—raising over $55,000—and Patreon accounts which solicited recurring donations from group members.

Although the District Court concluded that Plaintiff's image was not literally displayed on these fundraising pages, this overlooks IRPA's text and judicial interpretations. The statute requires only that the identity be used "in connection with" the fundraising. Courts interpreting IRPA have found liability where identity was used as part of an overall marketing scheme—not necessarily as the face of the donation page itself (*Jordan v. Jewel Food Stores, Inc.,* 743 F.3d 509, 517 (7th Cir. 2014)).

Here, the posts in the Facebook group were the very instrument of monetization. D'Ambrosio's identity and the surrounding controversy were engineered into a spectacle that drove traffic, galvanized support, and served as the emotional and narrative hook for soliciting funds. This is quintessential "use in connection with fundraising."

### D. Lukis and Huston Support Plaintiff's Interpretation

In *Lukis v. Whitepages Inc.,* 454 F. Supp. 3d 746 (N.D. Ill. 2020)), the court denied a motion to dismiss where a consumer background-check company previewed individuals' partial data to induce users to purchase full reports. The court held that even the preliminary use of a person's identity to entice or direct consumer attention toward a monetized product constitutes a commercial purpose under IRPA.

Here, Plaintiff's likeness was used not only to entice users to engage, but also to cultivate a culture of virality around "exposing" men, which in turn translated into digital capital for the group's administrators. In *Huston*, the Seventh Circuit emphasized that "the identity must help sell something"—a standard plainly met where user engagement was the product being monetized.

The complaint specifically alleges that Meta monetized Plaintiff's image by pairing his photograph with targeted advertising in the AWDTSG group, resulting in increased engagement-based revenue. (R. 53 ¶ 64; R. 91 at 1516.) The district court nevertheless concluded that "no commercial purpose was pleaded." (R. 99 at 11.) That conclusion is irreconcilable with record allegations that Meta earns over 98 percent of its revenue from engagement-driven advertising. (R. 53 ¶¶ 61–65).

Illinois courts define "commercial purpose" broadly to include any use "in connection with" the sale or promotion of goods or services. *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005). Here, Rajala's repost was algorithmically amplified precisely because it generated reactions, which Meta then packaged for advertisers. (R. 53 ¶ 66). Nothing more is required to plead a commercial use under the Illinois Right of Publicity Act.

At the very least, Plaintiff pled sufficient factual content to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The District Court's insistence on a direct visual link between Plaintiff's identity and a donation widget ignored IRPA's flexible statutory reach and contravened persuasive authority. The dismissal of Count I should be reversed

## II. The District Court Misapplied Defamation Law

The District Court's dismissal of Plaintiff-Appellant's defamation claims represents a misapplication of Illinois defamation law and federal pleading standards under *Twombly* and *Iqbal*.

Plaintiff alleged that Defendants published and republished defamatory statements implying he was a criminal sex offender, abuser, and morally corrupt individual—allegations that, on their face, are actionable as defamation per se. Even under the alternate theory of defamation per quod, Plaintiff adequately pled reputational harm and damages. The District Court erred in resolving factual inferences against Plaintiff and in applying heightened evidentiary burdens inappropriate for the pleading stage.

## A. Defamation Per Se – Criminal Imputation and the Misuse of the Innocent Construction Rule

Illinois recognizes five categories of statements that are actionable per se—that is, without a requirement to plead or prove actual damages. One such category includes statements that impute the commission of a criminal offense. (*Van Horne v. Muller,* 185 Ill. 2d 299, 307 (1998)). Here, Plaintiff alleged that Jane Doe 2 posted a mugshot and article referencing a known sex offender—while simultaneously referencing Plaintiff by name and photograph in the same thread. The juxtaposition of these elements in a social media environment known for "call-out" culture created a clear implication that Plaintiff was the man in the article (R. 53 ¶¶ 50–53).

Despite this, the District Court invoked the "innocent construction rule", which requires that a defamatory statement be considered nonactionable if it can be reasonably interpreted in an innocent way. But the rule is not a license to dismiss plausible defamatory meaning at the pleading stage, particularly when the alleged implication is contextually unavoidable.

The Seventh Circuit has held that even true facts can become defamatory if presented in a way that falsely implies a connection between the subject and criminality. In *Muzikowski v. Paramount Pictures Corp.,* 322 F.3d 918, 926 (7th Cir. 2003), the Seventh Circuit held that a fictional character bearing substantial resemblance to a real person could support a claim of

defamation per se where the story alleged criminal conduct inconsistent with the plaintiff's life, and allowed the plaintiff to proceed beyond the pleading stage. Similarly, in *Bryson v. News America Publications, Inc*., 174 Ill. 2d 77, 672 N.E.2d 1207, 1215 (1996), the court emphasized that defamatory implications must be judged based on how an average reader would interpret the message—not based on dissecting the post in isolation.

In the current case, the ordinary group reader, seeing Plaintiff's name and image posted with commentary followed by a mugshot and sex abuse article, would reasonably believe the Plaintiff was the subject of that article. Illinois law prohibits precisely this form of character assassination through implication and juxtaposition.

## B. Defamation Per Quod – Sufficient Allegations of Reputational Harm and Damages

Even if this Court were to find that the statements require extrinsic evidence to establish their defamatory meaning, Plaintiff has adequately pled a defamation per quod claim. Unlike defamation per se, per quod requires a showing of actual damages, which the District Court mistakenly held Plaintiff failed to allege with sufficient specificity.

Under Illinois law, a plaintiff need not plead precise dollar amounts or itemized losses at the motion to dismiss stage. It is sufficient to allege general damages such as injury to reputation, personal humiliation, and mental anguish. This principle is supported by the Seventh Circuit's decision in *Kamelgard v. Macura*, 585 F.3d 334, 341 (7th Cir. 2009), where the court stated that a plaintiff "was entitled to recover [general damages] for injury to his reputation as well as for personal humiliation and mental anguish. D'Ambrosio clearly alleged:

- Emotional distress, including anxiety and public humiliation;
- Loss of professional opportunities, by noting a significant decline in social and professional engagement;

- Harm to reputation and community standing, particularly as the defamatory thread gained traction within Facebook's algorithmically-driven network (R. 53 ¶¶ 66–69).

Illinois law does not demand that Plaintiffs produce evidence at this early stage—it requires notice pleading and factual plausibility. In *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87, 672 N.E.2d 1207, 1214 (1996), the Illinois Supreme Court reaffirmed that in actions for defamation per se, damages are presumed due to the inherently harmful nature of the statements, eliminating the necessity for the plaintiff to plead or prove actual harm to reputation. Here, a Facebook group with tens of thousands of members republished the harmful content, suggesting broad reputational injury.

The District Court further erred by faulting Plaintiff for not providing "independent facts showing harm" beyond the defamatory statements. This improperly requires evidence rather than plausible factual allegations, in contradiction of *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[A] plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.").

The District Court's ruling ignores core tenets of defamation law, pleading standards, and the chilling effect of dismissing reputational claims at the threshold stage. Whether the statements are ultimately found defamatory is a question of fact—not law for resolution on a Rule 12(b)(6) motion. The defamation counts should be reinstated.

### III. False Light and Conspiracy Claims Were Adequately Pled

The District Court erroneously dismissed Plaintiff's false light and civil conspiracy claims by failing to recognize that both theories are adequately supported under Illinois law and arise directly from the same core facts underlying the actionable defamation claims. As both causes of

action concern knowing and coordinated publication of offensive falsehoods, dismissal at the pleading stage was premature and legally unsound.

## A. False Light – Plaintiff Was Publicly Portrayed in a Highly Offensive and Misleading Manner

To state a claim for false light invasion of privacy under Illinois law, a plaintiff must allege that:

1. The defendant published information placing the plaintiff in a false light before the public;

2. The false light would be highly offensive to a reasonable person; and

3. The defendant acted with actual malice if the plaintiff is a public figure, or at least with knowledge of or reckless disregard for the falsity of the information. (*Lovgren v. Citizens First Nat'l Bank of Princeton*, 534 N.E.2d 987, 989 (Ill. 1989)).

Illinois courts have long held that the false light tort mirrors defamation in many respects. Indeed, the Seventh Circuit has stated that a viable defamation claim almost always gives rise to a false light claim as well. In *In Madison v. Frazier, 539 F.3d 646, 659 (7th Cir. 2008),* the court explained that "[w]hen a false light invasion of privacy claim follows an unsuccessful defamation claim, the false light claim must also fail," recognizing the significant overlap between the two torts under Illinois law. Similarly, in *Kolegas v. Heftel Broad. Corp.,* 154 Ill. 2d 1, 10 (1992), the Illinois Supreme Court acknowledged that the two claims "often rise or fall together."

Here, Plaintiff plausibly alleged that the Defendants published statements and materials that conveyed a false impression that he was a criminal predator, morally corrupt, and unsafe to be around. These portrayals were constructed not only through defamatory language, but also through strategic implication, juxtaposition with a known sexual predator's article and mugshot,

and the surrounding accusatory context created by group administrators and moderators (R. 53 ¶¶ 108–112).

Such conduct easily satisfies the "highly offensive" prong of the false light standard. A reasonable person would find it profoundly disturbing to be falsely depicted as a sexual predator in a public forum with tens of thousands of members. Courts in Illinois have found far less egregious portrayals sufficient to survive dismissal, especially where the depiction attacks the subject's morality or accuses them of socially stigmatized conduct. See, e.g., *Kolegas v. Heftel Broad. Corp.,* 154 Ill. 2d 1, 10 (1992) (radio hosts' false suggestion that plaintiff exploited disabled children for profit deemed defamatory per se); *Dobias v. Oak Park & River Forest High Sch.*, 2016 IL App (1st) 152205, ¶¶ 29-32 (false statements implying teacher engaged in inappropriate conduct with students sufficient to proceed past dismissal); *Hardiman v. Aslam, 2019* IL App (1st) 173196, ¶ 24 (false suggestion plaintiff was a gang member and domestic abuser actionable as highly offensive and defamatory).

Further, Plaintiff plausibly alleged actual malice, or at least reckless disregard, as required by the third prong. The administrators and moderators—Defendants Sanchez, Millbrand, and others—were notified of the false accusations, had access to moderation tools, and affirmatively chose not to intervene or remove the content, thereby endorsing and perpetuating the false portrayal.

**B. Civil Conspiracy – Defendants Acted in Concert to Publish and Monetize Harmful Falsehoods**

The District Court also erred in dismissing the civil conspiracy claim on the mistaken basis that Plaintiff failed to plead a meeting of the minds or overt acts in furtherance of the agreement. Under Illinois law, the elements of civil conspiracy are:

1. A combination of two or more persons;

2. For the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means; and

3. An overt act in furtherance of the agreement which causes injury. (*McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999)).

While civil conspiracy claims must be pled with factual specificity, courts recognize that such claims are often proven through circumstantial evidence and reasonable inferences. However, mere parallel conduct or mutual interest, without specific facts showing agreement, is insufficient to support a conspiracy claim. (*Redelmann v. Claire Sprayway, Inc.*, 874 N.E.2d 230, 240 (Ill. App. Ct. 2007)).

Plaintiff alleged exactly this:

- Sanchez and Millbrand co-owned Spill the Tea, Inc., operated the Facebook group, controlled access and moderation, and used inflammatory content to drive user donations and revenue streams via crowdfunding and Patreon.

- They deployed group rules and content filters not to prevent harm, but to strategically avoid liability while allowing doxing and defamatory posts to flourish, particularly against male targets like Plaintiff.

- Meta, through its algorithm and moderation infrastructure, selectively amplified posts containing Plaintiff's identity, thereby acting as a willing participant in furthering the conspiracy by promoting false, reputation-damaging content.

- The coordinated inaction by group moderators, despite multiple reports from Plaintiff and third parties, further illustrates the agreement to maintain the defamatory campaign.

Taken together, these facts allege a clear meeting of the minds, a shared financial motive, and multiple overt acts—including moderation decisions, algorithmic promotion, and monetized outreach—all of which directly injured Plaintiff.

Illinois courts have sustained civil conspiracy claims based on similarly orchestrated efforts to damage a plaintiff's reputation (*Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004)), especially where the harm arises from multiple actors contributing to a defamatory narrative across different channels.

At this early stage of litigation, Plaintiff is entitled to every reasonable inference in his favor. The facts alleged plausibly support both that Defendants knowingly cast Plaintiff in a false light before the public, and that they did so pursuant to a shared scheme to monetize defamatory content. Dismissal of these claims denied Plaintiff the opportunity to develop a factual record through discovery. Reversal is warranted.

### IV. The Doxing Claim Was Improperly Narrowed

The District Court improperly dismissed Plaintiff's claim under the Illinois Civil Liability for Doxing Act (740 ILCS 195/1 *et seq.)* by adopting an unduly restrictive interpretation of "personally identifiable information" (PII) and failing to consider the totality of circumstances surrounding the publication. The Act is remedial in nature and must be construed liberally to effectuate its purpose—namely, to protect individuals from real-world harm resulting from online exposure and harassment.

### A. The Act Covers Names, Likeness, and Other Identifiable Information—Not Merely Complete Data Sets

The Civil Liability for Doxing Act, enacted in 2022, imposes civil liability on individuals who knowingly publish personally identifiable information of another person with the intent to

cause or with reckless disregard for the likelihood of causing harm. Section 10 defines PII to include:

> "Name, address, telephone number, email address, social security number, or any other information that can be used to identify a specific individual."

The District Court dismissed the claim on the grounds that only Plaintiff's first name and a photograph were published. This interpretation is both legally flawed and inconsistent with the statutory language and legislative intent.

First, Illinois courts have consistently recognized that "any other information that can be used to identify a specific individual" must be understood contextually. A clear facial image, published in a localized Facebook group whose membership overlaps significantly with the plaintiff's community, is sufficient to identify a person. The fact that the post included calls for additional data—such as Plaintiff's employer, criminal background, and more—demonstrates both the intent to expose and the means to do so.

Moreover, screen names, location tags, and group context provide the connective tissue that transforms partial identifiers into actionable disclosures. This view is supported by broader federal data privacy standards, which recognize PII to include "any unique identifier that permits the physical or online contacting of a specific individual." (*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009)).

### B. The Group Context and Call to Action Establish Purposeful Harm

The statutory standard for liability under Section 15 of the Doxing Act requires:

1. Publication of PII;

2. With the intent to cause or reckless disregard of the risk of causing: (a) stalking, harassment, physical harm, or emotional distress.

Plaintiff alleged that his name and likeness were published in a Facebook group notorious for publicly shaming men, under a thread which labeled him "dangerous" and paired his image with a sex offender's mugshot and article. The group's moderators allowed inflammatory language to persist and even refused to remove the post upon report—despite acknowledging its potentially mistaken identity.

The purpose of the thread, and the broader ethos of the group, was not casual discussion but public exposure and social punishment. The comment section included suggestions to research Plaintiff's employment, prior relationships, and personal history—encouraging doxing conduct by implication (R. 53 ¶¶ 12–20).

This is precisely the type of "amplified exposure and endangerment" that the Act was designed to prevent. As the Illinois General Assembly explained in its legislative findings, the doxing statute addresses the growing problem of "cyber vigilantism" that results in victims being targeted, harassed, and shamed in their real lives.

That standard does not require physical assault or even direct threats. Rather, it is met where, as here, the publication was reasonably likely to cause fear, distress, or reputational harm.

### C. The Court Failed to Credit Plausible Allegations of Harm and Intent

Even assuming arguendo that Plaintiff was required to allege harm with specificity, the Second Amended Complaint clearly states that he experienced:

- Severe emotional distress;

- Fear for his safety, based on the nature of comments and reposts;

- Professional and reputational injury, due to the post's virality;

- Lack of recourse due to the moderators' refusal to remove the post.

These facts support an inference that Defendants published the information with reckless disregard of the likely consequences. As the Seventh Circuit has held, courts at the pleading stage must accept all well-pleaded facts as true and draw reasonable inferences in favor of the plaintiff (*Tamayo v. Blagojevich*, 526 F.3d 1074, 1081-82 (7th Cir. 2008)).

The District Court improperly imposed an evidentiary burden inconsistent with Rule 12(b)(6) and misread the plain language of the Civil Liability for Doxing Act. Plaintiff's name, facial image, and contextual identifiers were more than sufficient to meet the statutory threshold. The claim was adequately pled and should be reinstated to allow for factual development through discovery.

### V. Meta Is Liable Under Negligence, Entrustment, and Product Liability

The District Court's dismissal of Plaintiff's claims against Meta Platforms, Inc. rests on an outdated understanding of platform immunity and passive publishing, and fails to account for evolving jurisprudence concerning the design and deployment of harmful technologies. Plaintiff has plausibly alleged that Meta's content-recommendation systems, moderation infrastructure, and group management tools were not only capable of causing harm but were specifically engineered to amplify outrage, conflict, and defamatory narratives. As such, Meta's conduct gives rise to actionable claims for negligence, negligent entrustment, and product liability, particularly where Meta failed to safeguard against foreseeable misuse.

### A. Meta's Algorithm Functioned as an Active Agent in Amplifying Harm

Meta cannot cloak itself in Section 230 immunity where its role extends beyond passive hosting to active engineering of user experiences through design choices that fuel and disseminate defamatory and dangerous content (R. 87 at 5-6).

In *Gonzalez v. Google LLC*, 598 U.S. 617 (2023), the Supreme Court signaled openness to narrowing Section 230 of the Communications Decency Act where platforms employ recommendation algorithms that promote specific user-generated content based on platform-generated metadata. Although the Court ultimately remanded on other grounds, the decision recognized that platforms may bear liability when their content curation systems materially contribute to the illegality or harm of third-party content.

Here, Plaintiff specifically alleged that Meta's algorithms:

- Prioritized inflammatory and emotionally charged posts, including those that falsely linked Plaintiff to sexual misconduct (R. 87 at 6);

- Amplified the visibility of posts targeting Plaintiff, causing them to surface repeatedly in group members' feeds and "suggested content" modules (R. 87 at 7);

- Operated as a profit-maximizing tool, designed to increase user engagement and, by extension, Meta's ad revenue (R. 87 at 7).

Meta's system did not neutrally display content—it selectively elevated content based on virality indicators, including those stemming from outrage and moral panic. These choices are not editorial judgments protected by CDA § 230, but rather product design features subject to traditional tort liability, especially where the risk of harm was both foreseeable and preventable.

**B. Meta's Tools and Features Are "Products" Within the Scope of Liability Law**

Courts have increasingly recognized that digital products—particularly those with autonomous or semi-autonomous functions like recommender systems—can constitute "products" for purposes of strict liability and negligence.

In *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), the Ninth Circuit held that Snapchat's "Speed Filter" was not merely a neutral platform feature but a designed functionality

that encouraged dangerous behavior, thereby supporting claims for product defect and negligent design. The court emphasized that product-based liability applies when the platform is being sued for the design of the product itself, rather than simply for the content that flows through it.

Likewise, in *Anderson v. TikTok, Inc.,* No. 22-3061 (3d Cir. 2024)), the court found that plaintiffs had stated a plausible failure-to-warn and negligent design claim against TikTok for harms caused by its "For You" page algorithm that allegedly directed users to harmful content.

Meta's content ranking, recommendation, and moderation systems were engineered to manipulate the visibility of user posts for the express purpose of maximizing profit—not to passively host speech. Plaintiff's allegations fit comfortably within the reasoning of Lemmon and TikTok: Meta's product encouraged, enabled, and repeated the dissemination of harmful content about Plaintiff, with foreseeable reputational and emotional harm (R. 87 at 8).

### C. Meta's Failure to Implement Safety Mechanisms Supports Negligence and Negligent Entrustment

Meta also failed to exercise reasonable care in the design, implementation, and oversight of its platform tools—giving rise to claims under traditional negligence and negligent entrustment doctrines.

The elements of negligent entrustment include:

1. Entrustment of a dangerous instrumentality;

2. To a person whom the entrustor knows, or should know, is likely to use it in a dangerous manner;

3. With resulting harm. (*See Restatement (Second) of Torts* § 390.)

Here, Plaintiff alleged that Meta provided unregulated moderation tools, anonymous publishing mechanisms, and automated visibility boosts to the operators of "Are We Dating the

Same Guy?"—a group whose content history and moderation tactics made foreseeable the misuse of platform tools for harassment and defamation.

Meta had notice of prior complaints, internal reports, and flagged content involving false accusations and identity misuse within this group, yet failed to intervene or restrict access to powerful platform features. Instead, Meta's algorithm actively entrusted the amplification of harmful content to known bad actors and failed to impose any structural safeguards.

In the context of modern digital products, algorithmic tools and content-ranking systems are the functional equivalent of hazardous instruments, and the negligent entrustment of such tools—especially to users known to misuse them—creates actionable liability. (*See Herrick v. Grindr LLC*, 765 F. App'x 586, 590–91 (2d Cir. 2019), emphasizing that negligence claims may survive where a platform fails to address well-known risks of product misuse.)

### D. Meta's Conduct Surpassed Mere Inaction—It Was Active Negligence

The totality of Plaintiff's allegations shows not merely failure to remove offensive content, but affirmative conduct by Meta that caused or worsened Plaintiff's injury:

- Meta recommended the defamatory thread to users based on engagement metrics;

- Meta monetized the engagement through targeted ads;

- Meta failed to act on Plaintiff's content reports, despite internal tools that allowed immediate remediation;

- Meta maintained a system that rewarded group administrators financially for promoting viral—even if false—content.

These are not protected editorial decisions. They are foreseeable, profit-driven design choices with clear externalities, making dismissal of Plaintiff's claims premature and inconsistent with contemporary tort principles.

Meta's role in this case transcends that of a passive intermediary. It engineered, optimized, and profited from a system that weaponized Plaintiff's identity. The principles articulated in *Gonzalez*, *Lemmon*, and *TikTok* affirm the plausibility of Plaintiff's negligence, negligent entrustment, and product liability claims. These claims should not have been dismissed without discovery and factual development.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court reverse the District Court's dismissal and remand for further proceedings on all claims.

Respectfully submitted,

_____/s/Aaron Walner_____

**Aaron Walner**
*Attorney for Plaintiff-Appellant*
TRENT LAW FIRM, P.C.
1449 S Michigan Ave, Suite 13201
Chicago, IL 60605
(630) 682-3100
service@trentlawfirm.com

**Certificate of Compliance**

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

This brief contains **5.477** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using **Microsoft Word** in **Times New Roman, 12-point font**.

Dated: September 12, 2025

Respectfully submitted,

____/s/Aaron Walner_____

**Aaron Walner**
*Attorney for Plaintiff-Appellant*
TRENT LAW FIRM, P.C.
1449 S Michigan Ave, Suite 13201
Chicago, IL 60605
(630) 682-3100
service@trentlawfirm.com

**Certificate of Service**

I hereby certify that on this 12th day of September 2025, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: September 12, 2025

Respectfully submitted,

/s/Aaron Walner
**Aaron Walner**
*Attorney for Plaintiff-Appellant*
TRENT LAW FIRM, P.C.
1449 S Michigan Ave, Suite 13201
Chicago, IL 60605
(630) 682-3100
service@trentlawfirm.com

STATEMENT CONCERNING THE APPENDIX

**Circuit Rule 30(d) Statement**

Pursuant to Seventh Circuit Rule 30(d), undersigned counsel certifies that this Short Appendix contains all materials required by Circuit Rule 30(a), including the judgment or order under review and any accompanying opinion, memorandum of decision, findings of fact and conclusions of law, or oral statement of reasons. To the extent applicable, the materials identified in Circuit Rule 30(b) have also been included.

Respectfully submitted,

/s/Aaron Walner_____

**Aaron Walner**
*Attorney for Plaintiff-Appellant*
TRENT LAW FIRM, P.C.
1449 S Michigan Ave, Suite 13201
Chicago, IL 60605
(630) 682-3100
service@trentlawfirm.com

TABLE OF CONTENTS TO APPENDIX

AMENDED complaint by Nikko D' Ambrosio against All Defendants, ECF No. 53
(10/11/24)……………………………………………………………………………..SA-1

MEMORANDUM Opinion and Order Signed by the Honorable Sunil R. Harjani on 5/13/2025
ECF No. 99 (5/13/2025) …………………………………………………………...…SA-62

RESPONSE by Nikko D' Ambrosio in Opposition to MOTION TO DISMISS FOR FAILURE
TO STATE A CLAIM by Defendant Meta Platforms, Inc ECF No. 87
(01/30/2025)……………………………………………………………………….…SA-97

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NIKKO D'AMBROSIO, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:24-cv-00678 |
| | ) | |
| ABBIGAIL RAJALA, | ) | |
| CAROL RAJALA, | ) | **JURY TRIAL DEMAND** |
| RODNEY RAJALA, | ) | |
| PAOLA SANCHEZ, | ) | |
| BLAKE MILLBRAND, | ) | |
| META PLATFORMS, INC.,  a Delaware Corporation, | ) | |
| SPILL THE TEA, INC., a Delaware Corporation, | ) | |
| JANE DOES 1-26, Unnamed Defendants using screen | ) | |
| names: Sam Daniels, Alexis Kyle, Coraline Lotz, | ) | |
| Dianne Wesley, Madison Pierce, Madison Bynum, | ) | |
| Vanessa Villatoro, Christy Graessle, Sharleen Waa, | ) | |
| Kaitlyn Mishay Moody, Linda Juarez, Amber Michelle, | ) | |
| Laura Maddox, Alina Drake, Chandi Constance, | ) | |
| Alicia Ann, Salisha P. Dean, Jillian Cara, Jen Rahbar, | ) | |
| Shannon Marie, Luisa Resendez, Daryl Ceasar, Lisa Miko, | ) | |
| Amy Dukstein-Reynolds, Melissa Pinkerton, Monica Tska, | ) | |
| Defendants. | ) | |

### PLAINTIFF'S SECOND AMENDED COMPLAINT AT LAW

Now comes the Plaintiff, Nikko D'Ambrosio, by and through undersigned counsel, and

complaining of the Defendants, states as follows:

### NATURE OF THE ACTION

This is an action for declaratory and injunctive relief and for damages against Defendants

for the misappropriation of Plaintiff's intellectual property and likeness under the Illinois Right to

Publicity Act (765 ILCS 1075), in addition to the publication of false and defamatory statements

made and published by Defendants concerning Plaintiff under the Illinois Slander and Libel Act

(740 ILCS 145), to protect Plaintiff's rights to be free from the deliberate unauthorized

dissemination of Plaintiff's personal identifying information under the Illinois Civil Liability for

SA-1

Doxing Act (740 ILCS 195), as well as a strict product liability and negligence claim, and common law causes of action. This action also challenges the defective design of Meta's recommendation algorithm, which actively amplifies defamatory content, thereby exacerbating the harm to Plaintiff. The design and operation of Meta's algorithms go beyond merely hosting third-party content, instead actively promoting defamatory statements to a wider audience, thus directly contributing to the severe reputational and emotional harm suffered by Plaintiff.

## PARTIES

1.      The Plaintiff, Nikko D'Ambrosio, is an adult male who is a citizen of Illinois and resided in the territorial jurisdiction of the District Court.

2.      The Defendant, Abbigail Rajala, is an adult female who is a citizen of and is domiciled in the State of Michigan. Defendant Abbigail Rajala engaged in the distribution of Plaintiff's intellectual property on or about November 13, 2023 by republishing a photograph which he owns containing his personal likeness on the internet.

3.      The Defendant, Carol Rajala, is an adult female who is a citizen of and is domiciled in the State of Michigan.

4.      The Defendant, Rodney Rajala, is an adult male who is a citizen of and is domiciled in the State of Michigan.

5.      The Defendant, Paola Sanchez, is an adult female who is a citizen of and is domiciled in the State of California. Paola Snachez in the owner and manager of Spill the Tea, Inc., and operates as the lead administrator of the "Are We Dating the Same Guy?" online communities. Sanchez's responsibilities include the manual review and approval of defamatory statements and republication of others' intellectual property without consent by members of her community.

2

SA-2

Sanchez maintains a platform with the intent and purpose of enabling the unauthorized redistribution of others' intellectual property without consent. Sanchez has received substantial monetary proceeds in the form of crowdfunding and donations in order to support her illegal enterprise.

6.      The Defendant, Blake Millbrand, is a citizen of and domiciled in the State of California and is an owner of Spill The Tea, Inc. Millbrand is upon information and belief the primary software developer for the companies. Millbrand maintains a platform with the intent and purpose of enabling the unauthorized redistribution of others' intellectual property without consent. Upon information and belief, Millbrand has received substantial monetary proceeds in the form of crowdfunding and donations in order to support his illegal enterprise.

7.      The Defendant, Meta Platforms, Inc., is a corporation registered and authorized to do business in the State of Delaware and owns and operates the social media network known as Facebook.com. Meta Platforms has knowledge of and is aware of the "Are We Dating the Same Guy?" communities and the group's stated intent and rampant engagement in intellectual property violations, and has repeatedly refused to comply with demands from intellectual property holders to remove their intellectual property from the site.

8.      The Defendant, Spill The Tea, Inc. is a corporation registered and authorized to do business in the State of California and owns and operates the "Are We Dating the Same Guy?" communities. Spill The Tea, Inc. is an illegal enterprise with its stated intent and purpose to be enabling the unauthorized redistribution of others' intellectual property. Spill The Tea, Inc. maintains and operates the websites known as www.spilltheteainc.com, www.awdtsg.com, and www.arewedatingthesame.com. This Defendant receives compensation for enabling the unauthorized redistribution of intellectual property through subscription fees and crowdfunding.

SA-3

9.      Plaintiff is unaware of the true names and capacities of several prospective Defendants sued herein as Jane Doe, and therefore Plaintiff sues these Defendants by the above-referenced fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and therefore alleges that each fictitiously named Defendant is responsible in some manner for the occurrences alleged and Plaintiff's injuries as herein alleged were proximately caused by said Defendants.

## JURISDICTION

10.      Jurisdiction is proper pursuant to 28 U.S.C. § 1332 in that all Plaintiffs and Defendants are domiciled within different States and the amount in controversy exceeds $75,000.00.

## VENUE

11.      Venue is proper under 28 U.S.C. § 1391(b)(2) in that all or a substantial part of the events or omissions giving rise to the claim occurred within this district.

## FACTS

### Are We Dating the Same Guy?

12.      "Are We Dating the Same Guy?" is a collection of social groups maintained on various social media platforms throughout the Internet by Defendants. Said platforms purport to provide an anonymous platform for women to, without authorization, republish intellectual property, discuss, and disparage men in their local communities with which they have allegedly had unsatisfactory dating experiences. The collection of online communities claims to have over 4,000,000 registered users. *See Exhibit A.*

4

SA-4

13.     "Are We Dating the Same Guy?" self-describes its community as "Red Flag Awareness groups all across the country where women can empower each other and keep each other safe from toxic men." The group pontificates to the world that they are doing the "[L]ord's work" by maintaining a platform to enable and permit women to anonymously republish intellectual property of others without authorization, dox, defame, and attack the moral character of men they've met online. *See Exhibit A.*

14.     The "Are We Dating the Same Guy?" network of social platforms is divided into a large number of subgroups reflecting major metropolitan areas across the globe for the purposes of organization. Each and every platform carrying the "Are We Dating the Same Guy?" branding on any social media platform is operated by the same or substantially similar groups of individuals to the Defendants listed herein.

15.     Defendants Sanchez, Millbrand, Abbigal Rajala, Spill The Tea, Inc., and Jane Does have engaged in the creation, maintenance, publishing, and marketing, either as a user or administrative officer of a subgroup of "Are We Dating the Same Guy?" known as "Are We Dating the Same Guy? | Chicago" (The "Chicago Subgroup") maintained on the social network Facebook. Said group contains approximately 100,000 members.

16.     Defendants Sanchez, Millbrand, Spill The Tea, Meta Platforms, and Jane Does digitally monetize the "Are We Dating the Same Guy?" Platform through various avenues, including crowdfunding sources via Patreon, GoFundMe, and similar platforms, the collection of direct donations, and by displaying advertising and collecting consumer information related to users on the subject sites.

17.     That the Chicago Subgroup publishes dozens of instances of copyright infringement or otherwise stolen intellectual property alongside statements and narratives daily from women

SA-5

who wish to provide personally identifiable information about a man in the community with which they allege to have had a dating relationship. Thousands of men have been potentially defamed, doxed, or had their intellectual property stolen by Defendants via these online publications and remain entirely unaware of the attacks on their character and misappropriation of their likenesses as a result of the social media group's private status and heavily moderated members list.

18.     No independent fact-checking of the statements made by any woman published in the community occurs. No verification that authorization exists for the republication of a man's intellectual property occurs. Women are permitted to make statements, publish photographs, defame, threaten, harass, belittle, or otherwise attack men whom they allege to have engaged in a dating relationship with, void of any oversight and with total impunity.

19.     Each and every Defendant has actual knowledge of intellectual property violations occurring on their platform and has actively refused to take any action to prevent continued infringement. Defendants not only permit intellectual property violations to occur, but actively encourage said violations. Further, Defendants encourage the publication of men's personally identifiable information and potentially defamatory statements, inclusive of full names, photographs, employer information, addresses, and similar.

20.     Defendants Sanchez and Spill The Tea frequently provide legal and editorial advice pertaining to the substance of posts in an effort to assist users in avoiding liability for their unlawful conduct. Group administrators will assist in the editing of language in particular posts in an effort to avoid civil or criminal liability for the dissemination of any particular statement or the republication of any particular piece of intellectual property, including providing extensive guidelines on how to circumvent Facebook's policies on preventing such conduct.

SA-6

21.     Upon information and belief, certain agents and employees of Meta are active members, moderators, and administrators of the "Are We Dating the Same Guy?" communities and engage in the same or substantially similar conduct to that described in Paragraph 20 above. *See Exhibit G.*

22.     Several "Are We Dating the Same Guy?" Facebook groups, along with the accounts of several prominent administrators, including Defendant Sanchez, were previously banned by Meta for violations of Facebook's Community Guidelines in connection with the conduct described above.

23.     That subsequent to the removal of the aforementioned groups and accounts on the platform, Meta was contacted by Defendants Sanchez and Spill The Tea and reviewed the functions and purpose of the groups during the reinstatement process.

24.     Meta would have viewed the rampant intellectual property violations on the group pages, the group's rules encouraging users to violate others' intellectual property rights, and similar information during the reinstatement process.

25.     Any reasonable person, when reviewing the encouragement by Defendants Sanchez, Millbrand, Spill The Tea, and Jane Does to publish intellectual property without authorization, would have understood and become aware that unauthorized redistribution of intellectual property is apparent within the communities.

26.     Upon information and belief, Meta and its agents create, edit, modify, and develop particular pieces of content and software for the purpose of use by the Are We Dating the Same Guy communities, namely, without limitation, the enabling of "anonymous" posting and commenting within the groups and the enabling of software that permits group moderators and administrators to obtain information related to users who screenshot any particular post on the

group pages. This conduct assists in propagating and encouraging the republication of others'
intellectual property without authorization, while Meta has actual knowledge of the rampant
intellectual property violations apparent in the communities.

27.     Meta has received thousands of individual notifications from men around the world
that their intellectual property is being redistributed without authorization, and Meta has ignored
these demands for takedown and, in the alternative, has sought to make legal determinations with
respect to others' intellectual property rights in order to assist and enable the infringing conduct of
the communities.

28.     Meta continues to enrich itself by displaying advertising materials next to
intellectual property which has been redistributed without authorization and collects consumer
information and data from users which it chooses to display such content to.

29.     Defendants Sanchez, Millbrand, Spill The Tea, and Jane Does have engaged in
numerous crowdfunding events for the purpose of raising funds to develop a website, smartphone
application, and other infrastructure to enable their illegal enterprise.

30.     The purpose and intent of the "Are We Dating the Same Guy?" communities, its
owners, administrators, moderators, and users, is to:

        a.      Publish the personally identifying information of men through names,
photographs, and locations;

        b.      To publish private facts which are facially revealing and offensive pertaining
to the personal lives of men, despite said facts being of no legitimate public concern for the
purpose of commercial profit;

SA-8

c.    To republish the intellectual property of others without authorization for the purpose of commercial profit.

31.    On or about April, 2023, Defendants Sanchez, Millbrand, and Spill The Tea published a fundraiser on the "GoFundMe" platform seeking to raise funds in the amount of $50,000.00 for the development of a smartphone app to enable further unlawful conduct as described above. Said fundraiser has raised approximately $55,000.00 to date.

32.    Said fundraiser promises that all funds raised are "reinvested."

33.    Upon information and belief, Defendant Millbrand is a software developer by trade and has developed the relevant software for the smartphone application and websites maintained by Defendants Sanchez, Millbrand, and Spill the Tea.

34.    Upon information and belief, Defendants Millbrand and Sanchez are engaged in a dating relationship.

35.    Upon information and belief, no funds have been invested in the development of the smartphone application software, and Defendants Sanchez and Millbrand have retained said funds for their personal benefit.

36.    Upon information and belief, despite Defendant Sanchez, Millbrand, and Spill the Tea's statements to the contrary ("I really just used [the crowdfunding revenue to cover paying others…") dozens of moderators and administrators who were promised payment for their services remain unpaid, and Defendants Millbrand and Sanchez instead retained funds for their personal benefit.

37.    That on January 14, 2023, Defendant Sanchez published an announcement to her fundraiser page stating that a beta version of the application had been published. Sanchez wrote

that "The current beta version is testing screenshot blocking, screen record blocking, anonymous commenting, advanced tracking and logging to better help us catch bad actors."

38.     That the purpose of said features is to prevent victims from receiving notice that their intellectual property has been republished without authorization, that they are being defamed, harassed, doxed, and/or having private facts disclosed about them, in an effort to avoid liability.

39.     Upon information and belief, Defendants Sanchez and Millbrand use the revenue generated from their unlawful conduct to finance their personal lives at the expense of the victims and intellectual property holders.

40.     That on or about January 14, 2024, Defendant Sanchez published a fundraiser on the GoFundMe Platform seeking funds to finance their legal defense in the instant matter, which to date has raised nearly $40,000.00.

41.     That Defendant Sanchez maintains multiple accounts with "Venmo" an online payment processor and wallet service, known as @hownowpaopao and @awdtsgmoderators where she accepts funds for the express purpose of enriching themselves and allegedly distributing funds amongst the moderation team.

42.     Upon information and belief, Defendants Sanchez and Millbrand retain funds from the subject Venmo accounts for personal benefit.

43.     That on January 15, 2024, Defendant Sanchez published an announcement to the "Are We Dating the Same Guy?" community where she stated that users receive "hours and hours of benefits from this group…"

44.     Defendant Sanchez's choice of language is demonstrative of the true intent of the online community – to provide "hours and hours" of illegally reproduced intellectual property,

SA-10

defamatory statements, personally identifiable information, and private facts regarding the victims' personal lives to its users at the expense of the victims and intellectual property holders.

**Abbigail Rajala**

45.     In 2023, Plaintiff and Defendant Abbigail Rajala met organically at a cultural event in Chicago, Illinois and briefly communicated with one another. Plaintiff and Defendant Abbigail Rajala engaged in consensual sexual intercourse on the evening they first met. The parties spent brief periods of time together on dates on a handful of occasions which were unremarkable. The parties never engaged in an exclusive dating relationship.

46.     That in November, 2023, Defendant Abbigail Rajala republished the intellectual property of the Plaintiff, a photograph of his likeness owned and controlled by Plaintiff, alongside provably false and defamatory statements pertaining to Plaintiff and disseminated same amongst members of the "Are We Dating the Same Guy? | Chicago" Facebook group, knowing said statements to be false and defamatory. Abbigail Rajala made these statements and republished the Plaintiff's intellectual property to over 100,000 anonymous women with the intent of causing him reputational harm and putting him in reasonable fear of bodily harm to himself or his family at the hands of any of the 100,000 unidentified women involved in the unlawful conduct apparent in the "Are We Dating the Same Guy?" communities. *See Exhibits B and C.*

47.     Commenters on Rajala's post requested personally identifiable information related to Plaintiff's employer in an effort to make contact with and defame the character and reputation of Plaintiff for the purpose of causing harm to his employment status and/or attempting to cause his loss of gainful employment.

48.     Upon information and belief, Defendants Rodney Rajala and Carol Rajala maintain a home internet network accessed and utilized by Defendant Abbigail Rajala for the purpose of

posting such statements, intellectual property, and personally identifiable information relating to Plaintiff. Upon information and belief, Defendants Rodney Rajala and Carol Rajala were complicit in the unauthorized redistribution of Plaintiff's intellectual property by permitting the unauthorized redistribution to occur on an internet network owned, maintained, and controlled by them.

**Jane Doe - Monica Tska**

49.     Plaintiff has never met Defendant Jane Doe, sued herein under screen name Monica Tska, and the two have never interacted with one another.

50.     In November, 2023 in response to Abbigail Rajala's post containing the unauthorized republication of Plaintiff's intellectual property and his personally identifiable information, Monica Tska published a link to a CBS News Article detailing the arrest of one Anthony LaMonica, an Illinois resident who was charged with Criminal Sexual Assault. *See Exhibit C.*

51.     Defendant Tska used said article and the mugshot of LaMonica to claim that Plaintiff and Anthony LaMonica were the same person, and that Plaintiff had been accused of criminal sexual assault.

52.     Plaintiff is not Anthony LaMonica, has no relation to Anthony LaMonica, and has never committed, been charged with, nor convicted of criminal sexual assault.

53.     Monica Tska made false statements of fact about Plaintiff's criminal history with the intent of causing harm to his reputation and standing in the community, with actual knowledge of the falsity of the statements and/or with reckless disregard for the truth.

**Plaintiff's Attempts to Remove Unauthorized Redistribution of His Intellectual Property and Defamatory Statements**

SA-12

54.     Plaintiff has never created or maintained an account on Facebook or any other platform maintained by Meta, has never agreed to any of Meta's terms of service, community guidelines, or similar, and has never authorized any Defendant to take any action with respect to his intellectual property and/or likeness.

55.     That as part of the maintenance of the "Are We Dating the Same Guy?" Platform, Defendants Sanchez, Millbrand, Spill The Tea, Meta Platforms, and Jane Does engage in content moderation, which involves the review and approval of member applications, statements, and/or posts made on the platform.

56.     That as a part of Defendants' content moderation responsibilities, Defendants would have reviewed the false and defamatory statements made about Plaintiff in addition to the unauthorized redistribution of his intellectual property and approved same for publishing.

57.     On or about December 15, 2023 Defendants were contacted by Plaintiff and his attorneys demanding the removal of said intellectual property and false and defamatory statements.

58.     Immediately following Plaintiff's contact of Defendants, Defendant Abbigail Rajala removed her post on the platform containing the intellectual property of Plaintiff and false and defamatory statements pertaining to Plaintiff, and republished same under an "anonymous" handle on the "Are We Dating the Same Guy? | Chicago" Facebook group in an effort to avoid the detection of her identity while continuing to engage in her unlawful conduct. *See Exhibit C.*

59.     The Chicago subgroup, along with all other subgroups of the "Are We Dating the Same Guy?" community is maintained as an "invite-only" group on the Facebook platform intentionally and for the sole purpose of preventing victims of the Defendants' intellectual property violations and subjects of the Defendants' defamatory vitriol from becoming aware of the existence of same.

SA-13

60.     As of July 19, 2024, Defendant Abbigail Rajala's "anonymous" post remains in the Chicago subgroup and continues to republish and retransmit Plaintiff's intellectual property to users without authorization, despite all Defendants having due Notice of said unlawful conduct by way of the instant matter.

61.     Upon information and belief, Meta Platforms utilizes sophisticated artificial intelligence software to generate algorithms which recommends content to users.

62.     Upon information and belief, Meta's targeted recommendation algorithms chose to display the intellectual property of Plaintiff alongside defamatory statements pertaining to Plaintiff to users by elevating Plaintiff's post to the top of users' content feeds.

63.     Upon information and belief, Meta took particular action to misappropriate Plaintiff's likeness and promote defamatory statements about Plaintiff by way of its recommendation algorithms.

64.     Defendant Meta Platforms willfully and intentionally displayed and continue to display advertising materials for the purpose of commercial profit on pages redistributing without authorization the intellectual property of Plaintiff, misappropriating Plaintiff's likeness, and/or transmitting false and defamatory statements or personally identifiable information pertaining to the Plaintiff.

65.     Defendant Meta Platforms willfully and intentionally continues to collect consumer information from users for the purpose of commercial profit on pages redistributing without authorization the intellectual property of Plaintiff, misappropriating Plaintiff's likeness, and/or transmitting false and defamatory statements or personally identifiable information pertaining to the Plaintiff.

SA-14

66.     Plaintiff suffered emotional distress and anxiety caused by constant exposure to false information.

67.     The widespread reach and speed with which the defamatory content was disseminated through Defendant Meta Platforms' algorithms exacerbated this distress.

68.     Defendant Meta Platforms' algorithms played a crucial role in spreading defamatory statements to a larger audience, making the harm to Plaintiff much worse.

69.     This amplification turned what could have been a localized issue into a global one and increased the damage significantly.

70.     Defendant Meta Platforms' algorithm, which actively recommended content, resulted in first-party speech through curated recommendations.

71.     This goes beyond passive hosting by actively deciding what content to promote to users, making Defendant Meta Platforms' responsible for the harms caused by those recommendations.

72.     Defendant Meta Platforms' recommendation system was aware of the risks associated with the content it promoted yet failed to adjust its design to mitigate those risks.

73.     Defendant Meta Platforms' has knowledge of the risks posed by its algorithmic recommendations yet continues to use them without implementing sufficient safeguards.

74.     Defendant Meta Platforms' failure to address the defamatory content, despite being aware, allowed the harm to persist and exacerbate, leading to further financial and reputational losses.

75.     It is the responsibility of Defendant Meta Platforms' for designing an algorithm that prioritizes harmful or controversial content because it drives user engagement.

76.     Defendant Meta Platforms' was aware of the risks associated with its algorithms, including how they can promote or spread harmful, defamatory content.

SA-15

77.     Despite this awareness, Defendant Meta Platforms' did not adjust its algorithms or implement safeguards to prevent harm to Plaintiff.

## COUNT ONE – MISAPPROPRIATION (765 ILCS 1075)
### Against All Defendants

78.     Plaintiff reincorporates and realleges each preceding paragraph as if specifically set forth herein.

79.     The Defendants, as part of an ongoing campaign of harassment and abuse, and for the Defendants' own financial gain, intentionally republished the Plaintiff's intellectual property, consisting of a photograph owned and controlled by him and containing his personal identity and likeness, without authorization.

80.     Defendant Meta Platforms' algorithms did not simply allow defamatory content to exist on its platform; they chose to display Plaintiff's likeness in conjunction with defamatory content, thereby misappropriating Plaintiff's identity for purposes of generating user engagement and advertising revenue.

81.     The Defendants published Plaintiff's identity for a commercial purpose, including the crowdsourcing of funds and collection of monetary proceeds from supporters of the "Are We Dating the Same Guy?" community. *See Exhibits A and D.*

82.     The Defendants did not seek to obtain permission from the Plaintiff before publishing and profiting from his identity and likeness.

83.     The Defendants have never had authorization from Plaintiff to publish his intellectual property or likeness for any purpose, whether commercial or otherwise. To the contrary, Defendants have been explicitly and repeatedly notified that they do not have authorization to republish Plaintiff's intellectual property but continue to do so for financial gain.

SA-16

84.     Defendant Meta continues to retransmit and republish Plaintiff's intellectual property and likeness without authorization for the purpose of commercial profit despite constructive and actual notice that they are engaging in unlawful conduct.

85.     As a direct and proximate cause of Defendants' conduct, Plaintiff has suffered and will continue to suffer significant general, actual, consequential, and special damages including, without limitation, impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss. These harms are ongoing and, if Defendants are not prevented from continuing to republish Plaintiff's intellectual property and likeness without authorization, those harms will continue.

## COUNT TWO – UNJUST ENRICHMENT
### Against All Defendants

86.     Plaintiff reincorporates and realleges each preceding paragraph as if specifically set forth herein.

87.     Defendants unjustly received benefits in the form of payments from supporters, crowdfunding proceeds, advertising revenue, and the collection of consumer data at Plaintiff's expense through their wrongful conduct. Defendants continue to unjustly retain these benefits at Plaintiff's expense. It would be unjust for Defendants to retain any value they obtained as a result of their wrongful conduct.

88.     Plaintiff is entitled to full restitution of all amounts by which Defendants have been unjustly enriched at Plaintiff's expense.

## COUNT THREE -  DEFAMATION *PER SE*
### Against Meta Platforms, Abbigail Rajala, Paola Sanchez, Blake Millbrand, Spill the Tea, Inc., Jane Does

89.     Plaintiff reincorporates and realleges each preceding paragraph as if specifically set forth herein.

SA-17

90.     Defendants are "information content providers" within the meaning of 47 U.S.C. 230 and continue to publish, intend to continue to publish, and cause to be published a series of repetitive false and defamatory statements of fact about Plaintiff in a manner that led and will continue to lead to the reasonably foreseeable publication and republication of those and similar statements.

91.     The defamatory meanings of Defendants' false statements and implied statements of fact are apparent from the face of the publication, refer to Plaintiff by name, are accompanied by Plaintiff's intellectual property consisting of an image of his likeness, and/or are understood to be written by Plaintiff.

92.     The statements authored, published, and caused to be published by Defendants about Plaintiff are reasonably understood to state or imply that Plaintiff is dishonest, immoral and/or untrustworthy.

93.     The statements authored, published, and caused to be published by Defendants about Plaintiff are reasonably understood to state or imply that Plaintiff has engaged in criminal activity by way of falsely accusing him of criminal sexual assault.

94.     Each of the statements and the implications stemming therefrom are false and defamatory *per se* in that said statements have damaged Plaintiff in his trade, office, or profession and in that they falsely accuse Plaintiff of engaging in criminal activity.

95.     Each of the statements published by Defendants are publicly available and was or will be viewed by thousands of individuals.

SA-18

96.     Plaintiff is a private figure, but in any event each of these false statements were published with actual malice, *i.e.*, with knowledge of its falsity or with reckless disregard to the truth. At a minimum, Defendants acted negligently in assessing or investigating the truth of the statements prior to publication. Defendants had no applicable privilege or legal authorization to make these false and defamatory statements.

97.     Defendants acted with willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care which would raise the presumption of conscious indifference to consequences, and Defendants specifically intended to cause Plaintiff harm.

98.     Defendants' statements have damaged and continue to damage Plaintiff's reputation in the general public, in their professions, in their church communities, in their neighborhood, and with friends, relatives, and neighbors.

99.     Defendant Meta Platforms' is not shielded by Section 230 of the Communications Decency Act because it acted as more than a passive host of content. Defendant Meta Platforms' algorithmic choices directly facilitated the widespread dissemination of false and defamatory statements about Plaintiff, making it a key contributor to the harm suffered by Plaintiff.

100.     Defendant Meta Platforms' algorithms selected, promoted, and highlighted defamatory content about Plaintiff, creating a situation where the defamatory statements were seen by many more users than would have occurred through organic sharing alone, thus materially contributing to Plaintiff's damages.

101.     As a direct result of Defendant Meta Platforms' algorithmic promotion of false and defamatory content, Plaintiff suffered profound reputational harm, significant emotional distress, and emotional damages. The algorithm's decision to amplify the defamatory content exposed

SA-19

Plaintiff to an audience far beyond the original scope, directly leading to a loss of professional opportunities and substantial emotional suffering.

102.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer significant general, actual, consequential, and special damages including, without limitation, impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss. These harms are ongoing and, if Defendants are not prevented from continuing to repeat their defamatory statements about Plaintiff, those harms will continue.

**COUNT FOUR – CIVIL LIABILITY FOR DOXING (740 ILCS 195/15)**
**Against Abbigail Rajala, Paola Sanchez, Blake Millbrand, Spill The Tea, Inc., Jane Does**

103.     Plaintiff restates and realleges each preceding paragraph as if specifically set forth herein.

104.     The Defendants, as part of a campaign of harassment and abuse, published the personally identifiable information of Plaintiff without his consent, namely his name and likeness to an online group dedicated to the harassment and belittlement of men with over 100,000 registered members.

105.     That the Defendants published said information with knowledge and/or reckless disregard to the fact that the publishing of defamatory statements accusing someone of horrific crimes such as criminal sexual assault alongside personally identifiable information to an online platform of over 100,000 individuals would cause Plaintiff to be reasonably likely or otherwise have reasonable fear that he is likely to suffer significant injury, including risk of death, bodily injury, or stalking.

SA-20

106.    That as a direct and proximate cause of the Defendants actions, Plaintiff has suffered damages by way of significant emotional distress, disruption to his life, and fear of serious bodily injury at the hands of one of the group's thousands of unidentified members.

### COUNT FIVE – INVASION OF PRIVACY BY FALSE LIGHT; CIVIL CONSPIRACY
**Against Meta Platforms, Abbigail Rajala, Paola Sanchez, Blake Millbrand, Spill The Tea, Inc., Jane Does**

107.    Plaintiff restates and realleges each preceding paragraph as if specifically set forth herein.

108.    The Defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about Plaintiff that represented such major misrepresentations of Plaintiff's character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in Plaintiff's position.

109.    The false light in which the Defendant's statements placed the Plaintiff's would be highly offensive to a reasonable person.

110.    The Defendants had knowledge that their statements were lies, or acted with reckless disregard as to their falsity of their statements and the false light in which the Plaintiff's would be placed.

111.    These false publications have caused Plaintiff actual and substantial damages.

112.    In light of their prior experience with similar sorts of reckless and false statements, the Defendants knew that their publications could cause the Plaintiff to suffer harassment and potential violence.

113.    The Plaintiff is a private individual and is neither a public official nor public figure.

SA-21

114. The defendants broadcast their outrageous, cruel, and malicious lies about the Plaintiff with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

115. The Defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

116. The Defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the Plaintiff and in furtherance of that scheme.

117. As a result of the Defendants' wrongful conduct, Plaintiff has suffered damages.

## COUNT SIX – STRICT PRODUCTS LIABILITY
### Against Meta Platforms

118. Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs the same as though fully set forth herein.

119. Defendant Meta Platforms' app and the algorithm that determines the content that each user sees is a product that is downloaded and used prospectively billions, of people across the world.

120. Defendant Meta Platforms' app and its algorithm are designed, developed, programmed, manufactured, marketed, sold, supplied, distributed, operated, and/or managed by Defendant Meta Platforms.

121. Plaintiff is seeking to hold the Defendant Meta Platforms responsible for their own independent conduct as the designers, programmers, manufacturers, sellers, and/or distributors of their dangerously defective app and algorithm.

SA-22

122.    The Defendant Meta Platforms, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, are strictly liable under § 402A of the Restatement (Second) of Torts because:

  a. Defendants are engaged in the business of designing, developing, programming, manufacturing, selling, marketing, supplying, and/or distributing app products and algorithms, like the Defendant Meta Platforms' app and its associated algorithm;

  b. The Defendant Meta Platforms' app and algorithm which caused Plaintiff's harm was designed, created, programmed, developed, marketed, and placed in the general stream of commerce by Defendants;

  c. The Defendant Meta Platforms' app and algorithm was expected to and did reach users without substantial change in the condition in which it was designed, developed, programmed, manufactured, marketed, distributed and/or sold;

  d. The Defendant Meta Platforms' app and algorithm was designed, developed, programmed, manufactured, marketed, distributed and/or sold in the defective condition(s) for the reasons set forth herein.

123.    The Defendant Meta Platforms' app and its algorithm were in a defective condition as: (1) the danger contained therein is unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable person would conclude that the probability and seriousness of the harm caused by the subject product outweigh the burden or costs of taking precautions.

124.    The Defendant Meta Platform's, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, are strictly liable under § 402A of the Restatement (Second) of Torts, by:

  a. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) in a defective condition;

SA-23

b.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) without adequate warnings;

c.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) without adequate parental control features;

d.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous, harmful, and defamatory content;

e.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous, harmful, and defamatory content, knowing that a failure to equip, program, or develop the app and algorithm with such safeguards that would result in the circulation of dangerous, harmful, and defamatory content;

f.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users and manipulate them into participating in the circulation of dangerous, harmful, and defamatory content;

g.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users and manipulate them despite knowing that this would lead to the proliferation of dangerous, harmful, and defamatory content;

h.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users;

i.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that preyed upon the vulnerability of users;

j.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to manipulate and/or encourage maximum engagement and/or participation by users;

k.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended inappropriate, dangerous, harmful, and defamatory content and facilitated participation in Facebook groups involving the same;

l.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its

24

algorithm) which lacked all the necessary safety features to protect users;

m.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) for which the risks of use far outweighed the utility thereof;

n.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was unreasonably dangerous for its intended and foreseeable uses and/or misuses and to its intended and foreseeable users;

o.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms app and its algorithm) that promoted the circulation of dangerous, harmful, and defamatory content;

p.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was incapable of preventing the circulation of dangerous, harmful, and defamatory content;

q.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended dangerous, harmful, and defamatory content;

r.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended dangerous, harmful, and defamatory content despite knowing that this would lead to reputational, emotional, and financial harm;

s.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was not safe for its intended and represented purposes;

t.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that intentionally creates user addiction;

u.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that presents inappropriate, dangerous, harmful, and defamatory content;

v.    Despite having actual knowledge of dangerous, harmful, and defamatory content circulating through its app and platform and said content causing reputational, emotional, and financial harm, Defendant Meta Platforms' failed to assess the risks of the product and adopt available, reasonable, and feasible alternatives;

w.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that lacked all the necessary safety features to protect users;

x.    Designing, developing, programming, manufacturing, selling, supplying,

and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that malfunctioned by recommending dangerous, harmful, and defamatory content;

y. Failing to warn users of the risks associated with the product (the Defendant Meta Platforms' app and its algorithm);

z. Failing to warn users of the risks associated with dangerous, harmful, and defamatory content circulating through Defendant Meta Platforms' app and recommended to users;

aa. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) the risks and hazards of which far outweighed any utility or benefit of the product (i.e. in violation of the risk-utility test);

bb. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that lacked reasonable, available, and feasible alternative designs that would have made the product safer for users, and;

cc. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) the risks of which were unknown or unknowable to the consumer (i.e., in violation of the consumer expectations test).

125.    By conducting themselves as set forth above, the Defendant Meta Platforms' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm that caused Plaintiff's reputational, emotional, and financial harm.

126.    By reason of the breach of duties, pursuant to § 402A of the Restatement (Second) of Torts, by the Defendant Meta Platforms and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, Plaintiff was caused to sustain severe and permanent reputational, emotional, and financial harm as set forth above.

127.    The Defendant Meta Platforms' designed, developed, programmed, manufactured, sold, marketed, supplied, and/or distributed a product (the Defendant Meta Platforms' app and its algorithm)

the risks and hazards of which far outweighed its utility or benefit, thus violating the risk-utility test set forth in Restatement (Second) of Torts § 402A.

128.     The Defendant Meta Platforms' designed, developed, programmed, manufactured, sold, marketed, supplied, and/or distributed a product (the Defendant Meta Platforms' app and its algorithm) the risks of which were unknown or unknowable to the consumer and for which the consumer would not reasonably anticipate or appreciate the dangerous condition in violation of the consumer expectations test set forth in Restatement (Second) of Torts § 402A.

129.     The safety of the public and the users of the Defendant Meta Platforms' app, particularly children, must come first and be the paramount concern and consideration in the design, development, programming, supply, and distribution of Defendants' app and algorithm.

130.     Defendant Meta Platforms' knowingly exposed users to addiction, manipulation, and control causing them to promote, engage, and participate in dangerous, harmful, and defamatory content proliferation all in the name of greater corporate profits.

131.     The Defendant Meta Platforms' knew that dangerous, harmful, and defamatory content was circulating its app and being recommended to users by the Defendants' algorithm on users.

132.     The Defendant Meta Platforms' knew that users were promoting, engaging in, and participating in the proliferation of dangerous, harmful, and defamatory content based on recommendations by Defendants' algorithm.

133.     The Defendant Meta Platforms' Defendants outrageously prioritized revenues and profits over health and safety.

### COUNT SEVEN – NEGLIGENCE
**Against Meta Platforms**

134.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs the same as though fully set forth herein.

27

SA-27

135.     The Defendant Meta Platforms had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their app and algorithm such that it did not expose users to harm.

136.     The Defendant Meta Platforms had a duty to monitor the dangerous and harmful content shared, posted, and/or circulated on their app and platform to ensure that it was not posted, shared, circulated, recommended, and/or encouraged.

137.     The Defendant Meta Platforms had a duty to monitor and evaluate the performance of their algorithm and ensure that it was not recommending or posting dangerous and harmful content.

138.     The Defendant Meta Platforms had a duty to employ and train personnel to appropriately and reasonably respond to notice that dangerous and harmful content were being posted, shared, and/or circulated on Defendants' app.

139.     The Defendant Meta Platforms had a duty to protect vulnerable users of their product.

140.     The Defendant Meta Platforms had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their app and algorithm such that it did not manipulate users and/or otherwise encourage them to engage in proliferating dangerous, harmful and defamatory content.

141.     The Defendant Meta Platforms had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their app and algorithm so that it did not create addiction and dependence among its users.

142.     The Defendant Meta Platforms miserably failed these aforementioned duties and as a result Plaintiff was harmed emotionally and financially and his reputation was severely harmed.

143.     Plaintiff seeks to hold the Defendant Meta Platforms liable for their own independent conduct as the designers, programmers, manufacturers, sellers, and/or distributors of their dangerously defective social media products and for their own independent acts of negligence, gross

SA-28

negligence, carelessness, recklessness, and willful and wanton conduct as further described herein. Thus, Plaintiffs claims fall outside of any potential protections afforded by Section 230(c) of the Communications Decency Act.

144. The injuries, damages and losses suffered by Plaintiff, as more fully set forth herein, were caused by the negligence, gross negligence, carelessness, recklessness, willful and wanton conduct of the Defendant Meta Platforms, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, both generally and in the following particular respects:

a. Recommending and/or posting dangerous, harmful, and defamatory content;

b. Allowing dangerous, harmful, and defamatory content, to be posted, shared, and/or circulated to users on the Defendant Meta Platforms' app;

c. Creating an algorithm that recommended and/or posted dangerous, harmful, and defamatory content;

d. Failing to prevent dangerous, harmful, and defamatory content from being posted, shared, and/or circulated to users on the Defendant Meta Platforms' app despite being actually aware of said content and despite knowing that such a failure would expose users to and facilitate the proliferation of dangerous, harmful, and defamatory content;

e. Intentionally addicting users to the Defendant Meta Platforms' app;

f. Intentionally addicting users to the Defendant Meta Platforms' app for the goal of increasing corporate revenues and profits;

g. Manipulating and socially programming users into posting, engaging in, and participating in and proliferating dangerous, harmful, and defamatory content;

h. Creating a digital environment in which the risks of proliferation of dangerous, harmful, and defamatory content are hidden and/or downplayed and in which users are encouraged to participate in the proliferation of;

i. Failing to timely remove all dangerous, harmful, and defamatory content from its app;

j. Hiring and/or employing personnel who were unfit, untrained, and/or incapable of operating and/or managing the Defendant Meta Platforms' app and its algorithm to ensure that dangerous, harmful, and defamatory content

29

were not posted, shared, or circulated to users on the app;

k. Failing to adequately train, educate, and/or supervise its employees, contractors, agents, and/or servants such that they were capable of operating and/or managing the Defendant Meta Platforms' app and its algorithm to ensure that dangerous, harmful, and defamatory content were not posted, shared, or circulated to users on the app;

l. Failing to remove dangerous, harmful, and defamatory content from the Defendant Meta Platforms' app despite knowing that users were being encouraged to engage in the proliferation of dangerous, harmful, and defamatory content and despite knowledge thereof;

m. Manipulating and socially programming users to engage in certain desired activities and engagement on the Defendant Meta Platforms' app in order to maximize corporate revenues and profits;

n. Developing, enacting, promulgating, and enforcing policies and procedures which allowed dangerous, harmful, and defamatory content to be posted, shared, and circulated on the app;

o. Developing, enacting, promulgating, and enforcing policies and procedures which prevented the discovery of dangerous, harmful, and defamatory that were being posted, shared, and circulated to users on the app;

p. Developing, enacting, promulgating, and enforcing policies and procedures which prevented the timely takedown of dangerous, harmful, and defamatory content;

q. Developing, enacting, promulgating, and enforcing policies and procedures which resulted in the proliferation of dangerous, harmful, and defamatory content being recommended to users;

r. Failing to prevent dangerous, harmful and defamatory content from being posted, shared, circulated, and/or recommended to users despite knowing that multiple people had been reputationally, economically, and financially harmed by the recommendations of the algorithm on the Defendant Meta Platforms' app;

s. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) in a defective condition;

t. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) without adequate warnings;

u. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous, harmful, and defamatory content;

v. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its

algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous, harmful, and defamatory content and deadly despite knowing that a failure to equip, program, or develop the app and algorithm with such safeguards would result in severe reputational, emotional, and financial harm;

w. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users and manipulate them into participating in the proliferation of dangerous, harmful, and defamatory content;

x. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users and manipulate them into participating in the proliferation of dangerous, harmful, and defamatory content despite knowing that this would lead to severe reputational, emotional, and financial harm;

y. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users;

z. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that preyed upon the vulnerability of users;

aa. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to manipulate and/or encourage maximum engagement and/or participation by users;

bb. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended inappropriate, dangerous, harmful, and defamatory content to users;

cc. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) which lacked all the necessary safety features;

dd. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) for which the risks of use far outweighed the utility thereof;

ee. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was unreasonably dangerous for its intended and foreseeable uses and/or misuses and to its intended and foreseeable users;

ff. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that promoted the circulation of dangerous, harmful, and

defamatory content;

gg. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was incapable of preventing the circulation of dangerous, harmful, and defamatory content;

hh. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended dangerous, harmful, and defamatory content;

ii. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended dangerous, harmful, and defamatory content despite knowing that this would lead to severe reputational, emotional, and financial harm;

jj. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was not safe for its intended and represented purposes;

kk. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that intentionally creates user addiction;

ll. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that presents inappropriate, dangerous, harmful, and defamatory content;

mm. Despite having actual knowledge of dangerous, harmful, and defamatory content, circulating its app and platform and said videos and challenges causing serious reputational, emotional, and financial harm by failing to assess the risks of the product and adopt available, reasonable, and feasible alternatives;

nn. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that lacked all the necessary safety features;

oo. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that malfunctioned by recommending dangerous, harmful, and defamatory content;

pp. Failing to warn users of the risks associated with the product (the Defendant Meta Platforms' app and its algorithm);

qq. Failing to warn users of the risks associated with dangerous, harmful, and defamatory content circulating the Defendant Meta Platforms' app that was recommended to users;

145. By conducting themselves as set forth above, the Defendant Meta Platforms' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm that caused Plaintiff's reputational, emotional, and financial harm.

146. By reason of the Defendant Meta Platforms' carelessness, negligence, gross negligence, recklessness, and willful and wanton conduct, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, Plaintiff was caused to sustain severe reputational, emotional, and financial harm as set forth above.

147. The safety of the public and the users of the Defendant Meta Platforms' app must come first and be the paramount concern and consideration in the design, development, programming, supply, and distribution of Defendants' app and algorithm as well as in the operation, oversight, supervision, and management of the app and algorithm and the content available, posted, shared, and/or recommended to users on the app.

148. Outrageously, the Defendant Meta Platforms knowingly exposed the public to addiction, manipulation, and control causing them to promote, engage, and participate the proliferation of dangerous, harmful, and defamatory content all in the name of greater corporate profits.

149. The Defendant Meta Platforms knew that dangerous, harmful, and defamatory content were circulating its app and being recommended to users by the Defendants' algorithm but failed to take appropriate, reasonable, timely, and necessary remedial actions.

150. The Defendant Meta Platforms knew that reputational, emotional, financial harm were occurring due to the algorithm promoting users to participate in dangerous, harmful, and defamatory

SA-33

content that Defendants' algorithm was recommending to them but failed to take appropriate, reasonable, timely, and necessary remedial actions.

151. The Defendant Meta Platforms outrageously prioritized revenues and profits over the health and safety of its users.

## COUNT EIGHT – NEGLIGENT ENTRUSTMENT
### Against Meta Platforms

152. Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs the same as though fully set forth herein.

153. The injuries, harm, and damages incurred by Plaintiff were the direct result of the use of Defendant Meta Platforms' algorithmic recommendation system in a negligent and reckless manner, which Defendant knew, or had reason to know, involved an unreasonable risk of harm to users.

154. Defendant Meta Platforms had control over the design, implementation, and deployment of its recommendation algorithm, and had the right and power to alter or limit the algorithm's functions, including the amplification and distribution of harmful content.

155. Defendant Meta Platforms knew, or had reason to know, that its algorithm was likely to amplify harmful, dangerous, or defamatory content, because of the known design features that prioritize engagement and controversy, as well as prior incidents involving the algorithm's amplification of similar harmful content.

156. Defendant Meta Platforms continued to entrust its algorithm to users by allowing it to operate in a manner that prioritized engagement without sufficient safeguards to prevent the amplification of dangerous content, despite knowledge of the risks associated with such use.

157. Defendant Meta Platforms, as a direct and proximate result of their negligent entrustment of its algorithm, Plaintiff suffered injuries, damages, and harm, including but not

limited to reputational harm, emotional distress, and emotional losses, due to the

algorithm's amplification of defamatory and harmful content.

## COUNT NINE – DEFAMATION PER QUOD
**Against Meta Platforms, Inc., Abbigail Rajala, Paola Sanchez, Blake Millbrand, Spill The Tea, Inc., and Jane Does**

158.    Plaintiff restates and incorporates each preceding paragraph as if fully set forth

herein.

159.    Defendants published or caused to be published statements about Plaintiff that are

defamatory when considered in light of extrinsic facts known to the audience or that could be

reasonably inferred.

160.    These statements, when understood in their proper context, implied false and

defamatory meanings about Plaintiff, including accusations of criminal conduct, immoral behavior,

or dishonesty.

161.    The defamatory nature of these statements are exceeding apparent when considering

additional facts, such as Plaintiff's identity and background or prior relationships with other

individuals named in the defamatory content.

162.    The statements have caused special damages to Plaintiff, including but not limited to

emotional distress, emotional loss, loss of professional opportunities, and damage to his reputation

and relationships.

163.    The statements were published negligently, recklessly, or with actual malice, in that

Defendants either knew the defamatory implications of the statements or failed to take reasonable

care to ascertain their truth before publication.

164.    Meta Platforms' recommendation algorithms materially contributed to the harm by

amplifying the reach of the defamatory content, making it accessible to a larger audience and

exacerbating the damage to Plaintiff's reputation.

SA-35

165.    As a direct and proximate result of the publication of these statements, Plaintiff has suffered significant harm, including loss of income, business opportunities, and other pecuniary damages.

166.    Plaintiff seeks relief in the form of compensatory damages, punitive damages, and an injunction against further defamatory publications.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court award Plaintiff:

a.  Injunctive relief enjoining Defendants from making or publishing, or causing to be made or published, any further statements repeating any and all false claims that Plaintiff engaged in any sort of immoral or illegal conduct of any kind;

b.  Injunctive relief requiring Defendant Meta Platforms to adjust its recommendation algorithms to prevent the amplification of defamatory content and to provide greater transparency regarding the mechanisms by which content is prioritized on its platforms;

c.  Compensatory damages, where appropriate;

d.  Punitive damages, where appropriate;

e.  Restitution, where appropriate;

f.  The costs of this action, including attorney's fees; and

g.  Any such other and further relief this Court deems equitable and just.

## **PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

*Marc Trent*

Marc P. Trent (ARDC # 6324928)
Attorney for Plaintiff

36

**TRENT LAW FIRM, P.C.**
2 TransAm Plaza Drive, Suite 300
Oakbrook Terrace, IL 60181
(630) 682-3100
*service@trentlawfirm.com*

SA-37





# Create A Safe Platform For AWDTSG

$44,543 raised of $50,000 goal • 1.7K donations

Share

Donate now

 Anonymous
$20 • 8 d

 Anonymous
$20 • 9 d

 Ishita Gupta
$25 • 25 d

 Mackenzie Miles
$10 • 26 d

 Tiffany Ranney
$20 • 26 d

See all                                    See top

A   Paola Sanchez is organizing this fundraiser.

I'm Paola Sanchez and I created and operate "AWDTSG" Red Flag Awareness groups all around the world where women can empower each other and keep each other safe from dangerous and/or toxic men.

I first started these groups to help solve some of the problems and dangers that me and my friends were experiencing with dating. We hit on a winning formula, and have grown by over 3.4 million members in just a year and a half, with over 600 moderators helping to run the groups. So we've stumbled onto something a lot of women are struggling with and are definitely onto something here... but this hasn't come without some struggles.

You may have noticed weird things going on with the groups these last few days. What happened was that 5 of our admin's accounts were abruptly deactivated all at once, including my 15 year old personal account. We've also had 4 of our groups suddenly shut down this week.. and none of those groups ever had community guideline violations.

With over 3,444,900 women in 212 groups we operate across the world, the sudden deactivation of all our admins has greatly disrupted our ability to keep them all safe. The worst part is the anxiety that comes with never knowing when or why our volunteers will suddenly be deactivated or a group will suddenly disappear.

These latest fiascos made me realize we need something better, and finally pushed me to start prioritizing my time towards building a new ideal platform for the lord's work we are doing here.. one with additional safety features such as screenshot logging, anonymous commenting, and much more.

I believe that the best way to keep women even safer is to create a platform where we can do everything we're doing in the groups, but with more specialized safety features and control over sharing.

But I realize that we need more resources to bring it into existence while continuing to operate and grow the current groups. I've started this GoFundMe to help raise as much of the development and operational costs as we can

I humbly ask you to please consider donating to support us in our efforts to help keep even more women safe

I guarantee that 100% of all money raised from this will go towards the design and development of an app or any necessary help in running the groups. I absolutely promise that 0% will go in my own pocket 

I sincerely appreciate all of the support you've continued to give us! You ladies seriously mean the world to me! With your help we have a real opportunity to help dating get better for women everywhere

- Paola 

P.S. To receive updates on development, please follow me on Instagram @hownowpaopao (https://www.instagram.com/hownowpaopao/) or enter your email on this simple web form I set up (https://www.awdtsg.com/). My instagram will be the main account to check for updates on the off chance more groups get deleted, so follow it for a place to regroup if you want to stay connected

P.P.S. If anyone has any friends or family at Facebook that they could put me in touch with to better understand things, please reach out to Dianne and let her know

P.P.P.S. We have looked into other existing platforms such as Discord and Reddit. It would be significantly more time consuming to determine that every member joining the group was for sure a real woman, and don't have the robust feature set we would want. It also still doesn't let us fine tune features to fit our specific safety concerns



P.P.P.P.S. I'm sorry that this isn't as detailed as I would have liked it to be, the deactivations all came so suddenly and I wasn't really planning on doing anything like this anytime soon.

P.P.P.P.P.S. Since first writing this, we have lost 6 groups totaling 251,800 members due to some overly restrictive FB moderation. I'm still fighting to try to get them back! But on a good note, within the last month alone their replacements have already reached 62,500 members but this further reinforces the fact that we need another platform.

EDIT! Here's some more information I was able to write out to address common questions:

I was hoping to announce this when it was further along and when I had written out something more informative that gave away more without giving too much, but this has pushed up the timeline in having to post it, as the group could potentially disappear at any moment without warning. I've been developing an app based off what I've learned in growing these groups. We've actually been able to find some great technical partners. It's not often that a concept gets validated and refined by a preexisting user base of millions of members, so that was very attractive in securing help.

If you're interested in giving a larger scale donation and having more details would be necessary for you to do so, please DM Dianne with the details around what you're thinking in terms of your investment, and in return I can happily provide you with more on the concept, as well as timetables, budgets, etc. It doesn't seem like a great idea to publicly release all of that information, as there's already competition in the market, and competing startups who may be able to use that information in their own plans. But I'm happy to share more in the right circumstances

I know this will take more than 50,000$. Any dollar previously given was reinvested. Even if I said it was for a coffee, I really just used it to cover paying others, design and development costs, legal expenses and filings, etc. I also invested my own savings into this, and had a small family and friends round.

I have had offers from institutional investors, and will leverage them if need be. But I wanted to attempt this GoFundMe campaign as a way to not have to rely on investment capital so early, and be able to keep more of the company in the hands of women ♥

♡ Add a Reaction to this GoFundMe

## Updates (1)

**April 28th, 2023** by Paola Sanchez, Organizer

Hey everyone! Some of you may have noticed already, but early last week I got my account back  It only took a letter to the CA Attorney General, tickets submitted by Meta employees who were in some of our groups, and over 2 weeks of stress to get it back

That being said, I'm still going to start putting more of my time towards developing our own app just in case shutdowns continue to happen!

Our current plan is to build it where it could function in a similar way to these groups should they ever get taken down, but also serve as an extension for these groups for as long as Facebook allows these groups to stay up essentially meaning that if you crosspost and link between the two, it provides a way to comment anonymously, prevent screenshots, and allow us better tracking on which users view content that later leaks. At least that's the current plan

Donate                              Share



## Organizer


**Paola Sanchez**
Organizer
Brooklyn, NY

Contact

## Words of support (33)

Please donate to share words of support.


**Kathy Rose**
$100 • 7 mos

Thank you for all the meaningful work that you do to help keep women safe! 


**Shamaly Valdez**
$10 • 9 mos

Thank you for having the safe space to share and look out for one another


**Sara Ghattas**
$50 • 9 mos

Thank you for all that you do. It is a thankless job. As a woman who organizes
events as part of her side hustle, I wish I had folks understand how important you
are to our safety. Protect women!


**Erin Cheever**
$50 • 9 mos

The truth about the sickness in online dating culture must come out.


**Angela Teasenfitz**
$20 • 9 mos

You're doing God's work. Thank you!!!


**Stella Guan**
$20 • 10 mos

Thank you so much for your effort, Paola. Please reach out if you need any design
help with the new platform.


**Nicole Eckert**
$20 • 10 mos

Although lost access when the big crash happened. You guys brought light to a situation and were a man wasted 5 years of my time. The women that commented shared and had also dealt with him were so supportive and we are all bonded. Doing the Lords... Read more



**MANDY VERNIER**
$25 • 10 mos

Women supporting women to protect women. Thank you for developing a safe space for all of us trying to navigate the dating world. I'm sure your efforts have saved alot of women from pain and heartbreak.



**Sarah Horrigan**
$25 • 10 mos

As a moderator... a separate platform would be life changing! Thank you for all you do Paola



**Kellie May**
$20 • 10 mos



Show more

Created March 15th, 2023 • 🏷 Community

🏳 Report fundraiser

## Your easy, powerful, and trusted home for help



**Easy**
Donate quickly and easily.



**Powerful**
Send help right to the people and causes you care about.



**Trusted**
Your donation is protected by the GoFundMe Giving Guarantee.

More ways to make a difference. Find fundraisers inspired by what you care about.

SA-42

Nearby ⌄



6 of 6

EXHIBIT

B



EXHIBIT

C

1 TO 7



C

1 of 7







Like   Reply   8w

**Anonymous member**
We met organically in Chicago two and a half months ago. Very clingy very fast. Flaunted money very awkwardly and kept talking about how I don't want to see his bad side, especially when he was on business calls. He came to see me yesterday, and I explained how I didn't really want to stay the night I just wanted to spend the day together. And this was his response.

Like   Reply   8w   Edited

**Anonymous member**
Anonymous member After I blocked his number, he texted me on another one. Which is the other text screenshot

Like   Reply   8w

**Monica Tska**
https://www.cbsnews.com/.../antho ny-lamonica-sexual.../

CBSNEWS.COM
Man Charged With Sexually ...

Like   Reply   7w





**Anonymous member**
December 27, 2023 at 11:48 AM · 🌐

Any 🔺 or 👎?
Nikko, 32

👍 Like      ◯ Comment      ▷ Send

**Top comments**

**Nicole Morisco**
I matched with him a month or so ago but convo never went anywhere

Like    Reply    5d

**Marnie Knouse**
🔺🔺 He's been posted here before. The poster said he sent her a slew of texts calling her names because she didn't want to spend the night with him. I just searched and this was on November 2nd so take a look!

Like    Reply    5d



Q Find a creator

Create on Patreon

Log in

Skip navigation

# Paola Sanchez

Creating safe & empowering communities for women to thrive in.

54 members · 158 posts · $146.8/month

Join for free

Home    About

EXHIBIT

1-2



# Sip of SafeTea
## $5 / month

Skip navigation

This tier level is perfect for those who want to show a little more support and want to stay updated on the development and growth of safe spaces for women.

- General Support



# Cup of SafeTea
## $10 / month

This is the tier level for those who want to show their support while also getting a behind the scenes look at the day to day operations of the current Red Flag Awareness groups as well as the development of our safetea dating app This tier includes: - beta app participation after one donation ever (once available) - interesting insights in running the groups as well as our development process - lists of worldwide group growth over time, mockups of apps and features, etc.

- Early access
- Behind-the-scenes content
- Work-in-progress updates (digital)

# Pot of SafeTea
## $25 / month

This is the tier level for those who strongly believe in the cause and might be interested in having a direct influence on the decision making process and have input in the development of our safetea dating app as well as the direction of the current groups 🍵 p.s. omg I love you 😊 This tier includes: - beta app participation after one donation ever (once available) - interesting insights in running the groups as well as our development process - lists of worldwide group growth over time, mockups of apps and features, etc. - exclusive polls when making tough decisions on names, direction, etc. - a private community where we can further

SA-53

EXHIBIT

1-5

## Search Results

in Are We Dating The Same Guy? | Chicago

Nikko D'Ambrosio

### Filters

Posts You've Seen

Most Recent

Posted by

Tagged Location

Date Posted

**Anonymous member**
December 28, 2023 at 11:31 AM

Hii any tea on Nick? Seems sweet and thinking of meeting up. Just want to check for any red flags or anything before meeting in person since its my first time meeting someone from online. Thanks ladies

3 comments

Like     Comment     Send

**Anonymous member**
December 27, 2023 at 11:48 AM

Any ▼ or – ?
Nikko, 32

SA-54 of 5

/8/24, 11:34 AM

(4) Are We Dating The Same Guy? | Chicago | Facebook

ps1//www.facebook.com/groups/315938570542151/search?q=Nikko D%27Ambrosio



# Search Results

in Are We Dating The Same Guy? | Chicago

## Filters

Posts You've Seen

Most Recent

Date Posted










**Anonymous member**
December 3, 2023

Nick ▼▼▼ details/pics in comments once approved.

👍 7



3 comments

Like  Comment  Send

3 comments







tps://www.facebook.com/groups/315938570542151/search/?q=Nikko D%27Ambrosio

/8/24, 11:34 AM

(4) Are We Dating The Same Guy? | Chicago | Facebook

## Search Results

in Are We Dating The Same Guy? | Chicago

### Filters

Posts You've Seen

Most Recent

Date Posted

**Anonymous member**
November 6, 2023

Any – or ▼ on Nick / Nicolas / Nicholas?

2

Like      Comment      Send

1 comment

**Anonymous member**
November 2, 2023

Any – on Nikko 32?

Like      Comment      Send

SA-56

8/24, 11:34 AM



# Search Results

in Are We Dating The Same Guy? | Chicago

(4) Are We Dating The Same Guy? | Chicago | Facebook

## Filters

Posts You've Seen

Most Recent

Date Posted

 

2:40

 













 





ps://www.facebook.com/groups/315938570542151/search?q=Nikko D%27Ambrosio

4
SA-57

tps://www.facebook.com/groups/315938570542151/search/?q=Nikko D%27Ambrosio

1/8/24, 11:34 AM

(4) Are We Dating The Same Guy? | Chicago | Facebook

**Search Results**

in Are We Dating The Same Guy? | Chicago

**Filters**

Posts You've Seen

Most Recent

Date Posted

Like

Comment

Send

3 comments

SA-58

Case: 1:24-cv-00678 Document #: 53 Filed: 10/11/24 Page 59 of 61 PageID #:404
Case: 1:24-cv-00200 Document #: 1 Filed: 01/08/24 Page 45 of 45 PageID #:45
Are We Dating The Same Guy? | Chicago




**EXHIBIT**

F



**Paola Sanchez** ✓
Moderator · October 2, 2022 · ⏷

We've been getting more reports of screenshots leaving the group and things getting back to some of the guys that were posted, so I'm dedicating a week of pinned posts to go over the harm this can cause, how to protect yourself, and what to do if it happens.

I can not emphasize enough how important it is for you to not screenshot or share anything you see in here.

You may be friends with a guy and think that the words posted about him can't possibly be true, but I'm telling you right now to please trust me when I say that some men act differently with women in the dating scene and that can include violent encounters and behavior that they don't exhibit in front of friends and colleagues. Letting your friend know he was shared here compromises the safety of every girl that spoke up.

You may have just found your boyfriend on here and feel the need to confront him about it. Don't let your emotions cloud your judgement. Take the time to think of another place where you heard the information and don't ever let him know that he was posted in any sort of group. That slip up could lead him back here to harass girls in an effort to destroy the evidence.

You may think you're just innocently sharing something funny, but then that person sends it to someone who knows someone and soon after the guy is coming after the girl who thought she could post safely here. Just put yourself in her shoes for one second and think about how scared she must feel.

We have a rigorous vetting process and have been working extremely hard to keep out any fake profiles and Trojan horses. And honestly I think we've gotten it down really good! Just to give you one example of the things we're dealing with: One man who was posted about in the group created two fake profiles (having stolen his profile pics from a girl on Instagram) in an attempt to get in. We caught and blocked both of them, at which point he messaged every moderator of the page threatening legal action in an attempt to get the post taken down.

We're working our absolute hardest to keep this group as safe as humanly possible, but it's all for nothing if girls are leaking info out of the group anyways.

So please, strongly consider the harm you might cause and don't screenshot or share anything outside of the group. We want to keep this as safe of a space as we possibly can.

And, as always, thank you from the bottom of my heart to the vast majority of you who are doing nothing wrong except existing in here and supporting each other 🙂 🙏 😊







From:
To:
Date:



6:35  🎤  .ıl LTE 41

1/14/24, 12:53 AM

### Paola Sanchez ✔
Admin · April 6 · 🌐

Hey everyone! Some of you may have noticed already, but early last week I got my account back 😍❤️ It only took a letter to the CA Attorney General, tickets submitted by Meta employees who were in some of our groups, and over 2 weeks of stress to get it back 😣😫

That being said, I'm still going to start putting more of my time towards developing our own app just in case shutdowns continue to happen! If you'd like to sign up to receive progress updates on the app, I set up a simple sign up page at https://www.awdtsg.com ❤️ the signup has optional fields for your name and city. If this page ever goes down, we'll use that email list to help regroup members 😊 if you want updates but don't check your email, I'll also be posting updates on my Instagram @hownowpaopao 💕

Our current plan is to build it where it could function in a similar way to these groups should they ever get taken down, but also serve as an extension for these groups for as long as Facebook allows these groups to stay up 😊 essentially meaning that if you crosspost and link between the two, it provides a way to comment anonymously, prevent screenshots, and allow us better tracking on which users view content that later leaks. At least that's the current plan 😊

The other thing I wanted to mention today is that, with it having been months since we last did the pinned posts here, starting on Monday we're going to repost all of them over the next month or two! In the spirit of me focusing more of my time on the app, some of the moderators who stepped up to keep things running while I was deactivated will be the ones running the series in most cities 😊

We wrote out a bunch of informational posts that will hopefully answer some of the most common questions and criticisms 😊 Some of the topics we'll be covering include:

Anonymous Posting Issues

Screenshots - Don't Do It
Screenshots - Risk
Screenshots - Be Prepared
Screenshots - Confrontation
Screenshots - What To Do



Sent from my iPhone

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NIKKO D'AMBROSIO,

               Plaintiff,

      v.

ABBIGAIL RAJALA, CAROL RAJALA,
RODNEY RAJALA, PAOLA SANCHEZ,
BLAKE MILLBRAND, META
PLATFORMS, INC., a Delaware
Corporation, SPILL THE TEA, INC., a
Delaware Corporation, JANE DOES 1-26,
Unnamed Defendants using screen names:
Sam Daniels, Alexis Kyle, Coraline Lotz,
Dianne Wesley, Madison Pierce, Madison
Bynum, Vanessa Villatoro, Christy Graessle,
Sharleen Waa, Kaitlyn Mishay Moody, Linda
Juarez, Amber Michelle, Laura Maddox,
Alina Drake, Chandi Constance, Alicia Ann,
Salisha P. Dean, Jillian Cara, Jen Rahbar,
Shannon Marie, Luisa Resendez, Daryl
Ceasar, Lisa Miko, Amy Dukstein-Reynolds,
Melissa Pinkerton, Monica Tska,

               Defendants.

Case No. 24 cv 00678

Honorable Sunil R. Harjani

## <u>MEMORANDUM OPINION AND ORDER</u>

The realities of modern dating are complicated. Seemingly gone are the days of being introduced to a friend-of-a-friend or dating someone in your personal or professional network. Instead, with the advent of online dating and dating apps, it has become increasingly common to go on a date with a stranger after only messaging them online. As a result of this alteration in the dating landscape, those involved have changed how they gather information and intelligence about potential suitors. In the absence of knowing a potential date personally, or having a friend or acquaintance vouch for them, some women have turned to online women-only groups like "Are

SA-62

We Dating the Same Guy?" where they ask other women for information about men they are considering dating. While many posts in these groups are benign, occasionally women respond with decidedly negative "red flags" about the man in question. But rarely do such statements and unsuccessful dating forays end up in federal court.

In his Second Amended Complaint, Plaintiff Nikko D'Ambrosio brings claims of privacy violations, defamation *per se* and *per quod*, invasion of privacy by false light, doxing, strict products liability, negligence, negligent entrustment, and unjust enrichment because of statements made about him in a private Facebook group. Doc. [53]. In effect, Plaintiff has sued anyone remotely associated with those posts for all possible, imaginable claims, including the woman who dated him and her parents, women commenting on posts, the operators of the Facebook group, and Facebook itself. Defendants Abbigal Rajala, Carol Rajala, Rodney Rajala, Paola Sanchez, Blake Millbrand, Spill The Tea, Inc., and Meta Platforms, Inc. move to dismiss the Second Amended Complaint with prejudice for failing to state a plausible claim for relief on all counts. Docs. [65] [71] [75] [76]. For the reasons stated below, the Court finds that Plaintiff has failed to allege plausible claims for relief and Defendants' motions are granted in their entirety.

## Background

This dispute stems from statements made about D'Ambrosio in the "Are We Dating the Same Guy?" group on Facebook. Defendants are all alleged to be associated with the operations or management of the group, or to have made (*i.e.* posted) statements about D'Ambrosio. The Court takes the facts, as it must on a motion to dismiss, from the allegations of the Second Amended Complaint and assumes the truth of those allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Before discussing the specific posts at issue in this litigation, it is helpful to recount the operation of the Facebook group where the statements were made.

As will be no surprise to any reader of this opinion, Meta Platforms, Inc. owns and operates the social media network known as Facebook where the group "Are We Dating the Same Guy?" operates. Doc. [53] ¶ 7. The "Are We Dating the Same Guy?" group is owned and operated by Spill The Tea, Inc., which is in turn owned by Defendants Blake Millbrand and Paola Sanchez (collectively the "Spill The Tea Defendants"). *Id.* ¶¶ 5, 6, 8. "Are We Dating the Same Guy?" is a collection of social groups maintained on various social media platforms that include Facebook. *Id.* ¶ 12. The stated purpose of this group is to be a "Red Flag Awareness group[] all across the country where women can empower each other and keep each other safe from toxic men." *Id.* ¶ 13. The group is divided up by geographic location, with subgroups for major metropolitan areas across the globe. *Id.* ¶ 14. D'Ambrosio alleges that "Defendants Sanchez, Millbrand, Abbigal Rajala, Spill The Tea, Inc., and Jane Does have engaged in the creation, maintenance, publishing, and marketing, either as a user or administrative officer of" the Chicago subgroup on Facebook, which contains approximately 100,000 members.[1] *Id.* ¶ 15. The Chicago subgroup is maintained as an "invite-only" Facebook group. *Id.* ¶ 59.

According to D'Ambrosio, his dispute with this group began in November 2023. *Id.* ¶ 46. D'Ambrosio alleges that he went on a few dates with Abbigail Rajala "which were unremarkable." *Id.* ¶ 45. This case derives from Defendant Abbigail Rajala's post in "Are We Dating the Same Guy?" about D'Ambrosio that included her description of his actions while they were dating, a text message he sent her, and his photo. Doc. [53] ¶ 46; Doc. [53] Exs. B & C. Abbigail Rajala wrote the following about D'Ambrosio:

---

[1] D'Ambrosio names 26 Jane Does in his complaint by their screen names. Doc. [53] ¶ 9. However, with the exception of one screen name "Monica Tska," none of the other screen names are specifically alleged to have done or posted anything about D'Ambrosio. Instead, D'Ambrosio summarily lumps them as a group of Jane Does into allegations about the "Are We Dating the Same Guy? | Chicago" Facebook group with the other Defendants. Doc. [53] ¶¶ 15, 16, 25, 29, 55.

> We met organically in Chicago two and a half months ago. Very clingy and very fast. Flaunted money very awkwardly and kept talking about how I don't want to see his bad side, especially when he was on business calls. He came to see me yesterday and I explained how I didn't really want to stay the night. I just wanted to spend the day together, and this was his response.[2]

> After I blocked his number, he texted me on another one. Which is the other text screenshot.[3]

Abbigail Rajala then posted a screenshot of the text message D'Ambrosio sent her, which stated:

> Speak for yourself you ugly vial fake whore. Your ego matches that fake fucking face where you can't even smile in pictures because your teeth are so fucked. The truth hurts bitch and my message will stay with you forever cunt.[4]

D'Ambrosio alleges that he contacted Defendants—he does not specify which Defendant or Defendants he contacted—demanding they remove the posts about him. *Id.* ¶ 57. Abbigail Rajala removed her post and republished it under an "anonymous" handle in the group. *Id.* ¶ 58.

D'Ambrosio next alleges that a Jane Doe by the screen name "Monica Tska," who he has never met, "published a link to a CBS News Article detailing the arrest of one Anthony LaMonica, an Illinois Resident who was charged with Criminal Sexual Assault." *Id.* ¶ 50 & Ex. C. According to D'Ambrosio, Tska used the article to claim that he was LaMonica and that he had been accused of sexual assault. *Id.* ¶ 51. D'Ambrosio asserts that he is not LaMonica and that he has never been charged with or convicted of sexual assault. *Id.* ¶ 52.

## Legal Standard

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). To survive a Rule

---

[2] The exhibits attached to the Second Amended Complaint only include an image of Abbigail Rajala's post of a single text message from D'Ambrosio. *See* Doc. [53] Ex. C. While the above posts imply a second text message from D'Ambrosio, D'Ambrosio does not provide any further information one way or another.

[3] Doc. [53] Ex. C; Doc. [75] at 6.

[4] Doc. [53] Ex. C; Doc. [75] at 6. D'Ambrosio does not dispute that he sent this message to Abbigail Rajala.

12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). "Making the plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at. 679). When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Heredia v. Capital Management Services, L.P.*, 942 F.3d 811, 814 (7th Cir. 2019). However, a complaint must consist of more than "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### Discussion

In this case, D'Ambrosio brings claims for misappropriation under IRPA (Count One), unjust enrichment (Count Two), defamation *per se* (Count Three), doxing (Count Four), invasion of privacy by false light and conspiracy (Count Five), strict products liability (Count Six), negligence (Count Seven), negligent entrustment (Count Eight), and defamation *per quod* (Count Nine). Defendants argue that, despite his multiple attempts at drafting a complaint, D'Ambrosio failed to state a claim for each count and that he cannot allege the required elements of each count, so his Second Amended Complaint should be dismissed. Meta and the Spill The Tea Defendants

also alleged that the claims against them are barred by Section 230 of the Communications Decency Act of 1996.

## I. IRPA Misappropriation – Count One

D'Ambrosio alleges that all Defendants violated IRPA by misappropriating his identity and likeness for commercial purposes. Doc. [53] ¶¶ 78–81. More to the point, D'Ambrosio alleges that by displaying his image, Meta was generating user engagement and advertising revenue and the other Defendants were using it for crowdsourcing funds and collecting money from supporters of the "Are We Dating the Same Guy?" community. *Id.* ¶¶ 80–81. Defendants respond that D'Ambrosio's identity was not used for commercial purposes because neither Meta's advertising nor the Spill The Tea Defendants' fundraiser are connected to the use of D'Ambrosio's identity.

The IRPA codified the common law tort of the right to publicity, providing that "[t]he right to control and to choose whether and how to use an individual's identity for commercial purposes is recognized as each individual's right of publicity." 765 ILCS 1075/10. "To state a claim for a violation of IRPA, the plaintiff must allege: (1) an appropriation of the plaintiff's identity, (2) without the plaintiff's written consent, and (3) for defendant's commercial purpose." *Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1099 (7th Cir. 2022). The statute defines commercial purpose as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." 765 ILCS 1075/5. However, the IRPA does not apply to the "use of an individual's identity in an attempt to portray, describe, or impersonate that individual in a live performance, a single and original work of fine art, play, book, article, musical work, film, radio, television, or other audio, visual, or audio-visual work, provided that the performance, work, play, book, article,

SA-67

or film does not constitute in and of itself a commercial advertisement for a product, merchandise, goods, or services[.]" 765 ILCS 1075/35.

First, Defendants argue that D'Ambrosio does not allege that his identity was used by Defendants for a commercial purpose because the photo posted in the Facebook group, was not used on or in connection with the sale of a product, for the purpose of advertising or promoting a product, or for the purpose of fundraising. *See* 765 ILCS 1075/5. In the Second Amended Complaint, D'Ambrosio does not allege that his identity was used on or in connection with the sale of a product or service, and instead he relies on the Defendants' alleged advertising and fundraising purposes. Specifically, D'Ambrosio alleges that Meta displayed his likeness for the purpose of generating user engagement and advertising revenue. Doc. [53] ¶ 80. However, the fact that his name and photo appear in a Facebook group is not enough to allege an IRPA claim. His "identity must help sell something—whether it is that product or a separate product or service." *Huston*, 53 F.4th at 1102. For example, courts have found that when a website is trying to sell background reports on individuals and it uses free previews with some information about the individual to entice customers to purchase the full background report, that was a commercial use under the IRPA. *See Id.* at 1100; *Dobrowolski v. Intelius*, 2018 WL 11185289, at *3 (N.D. Ill. May 21, 2018); *Lukis v. Whitepages Inc.*, 542 F. Supp. 3d 831, 837−38 (N.D. Ill. 2020). But simply selling someone's information as part of the product being sold, but not using it to advertise the product, is not a commercial use of their identity. *Huston*, 53 F.4th at 1100. It is also insufficient that there are advertisements for other products on the page containing a plaintiff's identity. *See Hart v. Amazon.com, Inc.*, 2015 WL 8489973, at *7 (N.D. Ill. Dec. 8, 2015) (dismissing an IRPA claim against Amazon for running ads next to the sale of plaintiff's book with him listed as the author).

Here, D'Ambrosio does not allege that Meta was using his identity to sell or advertise a product. Instead, D'Ambrosio's theory is that a third-party post about him necessarily drove user engagement and therefore Meta's advertising revenue. Doc. [53] ¶ 80. But that does not equate to Meta using D'Ambrosio's identity as an advertisement. Accepting that argument would expand the bounds of the IRPA to include any time a website includes an individual's identity and happens to contain separate advertisements. This is not what the IRPA protects against. *Huston*, 53 F.4th at 1101 ("On its face, the statute prohibits the use or holding out of a person's identifying information *to offer to sell or sell* a product, piece of merchandise, good, or service.") (emphasis in original). As alleged, D'Ambrosio's name and photo were not used to entice Facebook users to purchase a product. Therefore, D'Ambrosio fails to plead that Meta had a commercial purpose for using his identity.

D'Ambrosio likewise fails to allege that other Defendants had a commercial purpose in using his identity. Beyond Meta's alleged advertising revenue, the other commercial purpose asserted by D'Ambrosio is that Defendants published his identity as part of their crowdsourcing and fundraising from supporters of the group. Doc. [53] ¶¶ 16, 81. D'Ambrosio alleges that in or about April 2023, the Spill The Tea Defendants published a fundraiser on GoFundMe seeking to raise funds in the amount of $50,000 to develop a smartphone app to further the "Are We Dating the Same Guy?" community. *Id.* ¶ 31. Despite his assertions in his response brief, D'Ambrosio does not allege that his name or likeness was ever published or used on the GoFundMe fundraiser page. Doc. [87] at 16 (citing Doc. [53] ¶¶ 31, 81). Nor does his name or likeness appear in the exhibits attached to the Second Amended Complaint which show the GoFundMe page and

Sanchez's Patreon.[5] Doc. [53] Exs. A & D. The only place D'Ambrosio alleges his name or likeness appeared was in the Chicago subgroup of "Are We Dating the Same Guy?" in November 2023. *Id.* ¶¶ 2, 46–47, 50–53. But the use of his identity must be in connection or precede the commercial use. The Seventh Circuit has made clear that the "statute contemplates a use or holding out of an individual's identity with the aim of effectuating a sale. Necessarily, then, any use or holding out must either accompany an offer to sell or precede the sale[.]" *Huston*, 53 F.4th at 1101. So, the fact that on a separate website, seven months prior to the posting of his likeness on Facebook, three Defendants established a fundraiser that never referenced him, does not establish that those three Defendants used his identity for a commercial purpose.

This is even more evident for Abbigail Rajala and the other Jane Doe Defendants,[6] where there is no allegation that they were trying to sell, advertise, or promote anything through their use of the Facebook group. Instead, D'Ambrosio argues that Abbigail Rajala posted about him in a forum where the administrators were soliciting donations, and the platform was trying to drive user engagement. Doc. [87] at 17. However, since the Spill The Tea Defendants and Meta did not have a commercial purpose with this particular group, D'Ambrosio's attempt to link Abbigail Rajala and the other Jane Doe Defendants to that purpose likewise fails.[7] And as the only allegation against Carol and Rodeny Rajala is, on information and belief, that they maintained the home internet network accessed and utilized by their daughter Abbigail Rajala, which makes them

---

[5] Patreon is a platform that provides tools for content creators to run a subscription service and sell digital products. It allows fans and consumers to buy a monthly or annual subscription to support a content creator in exchange for various rewards or access to content.

[6] To the extent D'Ambrosio lumps the Jane Does in with the Spill The Tea Defendants for having fundraising motives, such an argument would fail for the reasons provided above.

[7] As D'Ambrosio failed to allege a commercial purpose, the Court need not address his arguments related to IRPA exemptions and Abbigail Rajala's intent.

"complicit" in her unauthorized redistribution of D'Ambrosio's likeness, as none of the other Defendants had a commercial purpose, and they clearly had no independent commercial purpose in any of the conduct identified by D'Ambrosio. Doc. [53] ¶ 48. Thus, D'Ambrosio fails to allege that any Defendants had a commercial purpose and his IRPA claim is dismissed.

## II.     Defamation *Per Se* and *Per Quod* – Counts Three and Nine

D'Ambrosio brings claims for both *per se* and *per quod* defamation against Meta, Abbigail Rajala, Paola Sanchez, Blake Millbrand, Spill The Tea, and the Jane Does for the statements about him in the "Are We Dating the Same Guy?" Chicago Facebook group.  "An Illinois defamation action may state a claim either for defamation *per se* (statements so harmful to reputation that damages are presumed) or defamation *per quod* (statements requiring extrinsic facts to show their defamatory meaning)." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003) ("*Muzikowski I*").  The elements for *per se* and *per quod* defamation claims are the same under Illinois law; the differences are in the requirements for pleading and proving damages. *See Love v. Simmons*, 2024 WL 809107, at *4 (N.D. Ill. Feb. 27, 2024).

Defendants Meta, Abbigail Rajala, Paola Sanchez, Blake Millbrand, and Spill The Tea moved to dismiss because the statements have a non-defamatory interpretation, attacks on personal integrity and character are not actionable, the statements are nonactionable opinions, and D'Ambrosio failed to identify any false statements.  Defendants also argue that the statements do not fall within the five categories of *per se* defamation and that D'Ambrosio failed to allege special damages as required for *per quod* defamation.

Turning first to the question of whether any of the statements could be actionable *per se* defamation, under Illinois law, the limited categories of actionable statements to recover for *per se* defamation are those that impute "to a person: (1) commission of a crime, (2) a 'loathsome

communicable disease,' (3) a person's inability to perform or lack of integrity in performing employment duties, (4) adultery or fornication, and last, (5) that the person lacks ability in his profession or the words otherwise prejudice the person in his profession." *L. Offs. of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1129 (7th Cir. 2022) (citing *Solaia Technology, LLC v. Specialty Publishing Co.*, 852 N.E.2d 825, 839 (Ill. 2006)). However, simply because a statement falls into one of these categories does not automatically make it *per se* defamation. "Even if a statement falls into a recognized category, it will not be actionable *per se* if the statement 'may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff.'" *Muzikowski I*, 322 F.3d at 924 (7th Cir. 2003) (quoting *Chapski v. Copley Press*, 442 N.E.2d 195, 199 (Ill. 1982)). In Illinois courts, whether the statement may be reasonably innocently interpreted or interpreted as referring to someone other than the plaintiff, is a determination "made by the judge and it is regarded as a question of law." *Id.* "[I]f a statement is capable of two reasonable constructions, one defamatory and one innocent, the innocent one will prevail." *Id.*

D'Ambrosio argues that his statements fall into two of the *per se* defamation categories: commission of a crime and harm to his professional reputation. Doc. [87] at 15, 18. As the statement related to the commission of a crime is more clearly articulated in the Second Amended Complaint and defended in D'Ambrosio's response, the Court starts there. In the Second Amended Complaint, D'Ambrosio alleges that a Jane Doe using the screen name "Monica Tska published a link to a CBS News Article detailing the arrest of one Anthony LaMonica, an Illinois resident who was charged with Criminal Sexual Assault." Doc. [53] ¶ 50 & Ex. C. According to D'Ambrosio, "Defendant Tska used said article and the mugshot of LaMonica to claim that Plaintiff and Anthony LaMonica were the same person, and that Plaintiff had been accused of criminal sexual assault."

*Id.* ¶ 51. D'Ambrosio asserts that this statement is false because he is not Anthony LaMonica and he has never been charged with or convicted of criminal sexual assault. *Id.* ¶ 52.

While D'Ambrosio is correct that imputing the commission of a crime on him, which he did not commit, is a form of *per se* defamation, he fails to address that this news article clearly is not talking about him. D'Ambrosio alleges that he is not Anthony LaMonica. *Id.* ¶ 52. According to the images of the Facebook posts attached to the Second Amended Complaint, Monica Tska posted a link to a CBS news article, which showed the title of the article and the mugshot of Anthony LaMonica. *Id.* Ex. C at 48. Although D'Ambrosio asserts that Tska claimed he and LaMonica were the same person, the exhibit belies that conclusion as it shows her merely posting a link to the news article without commentary. *Id.* As alleged, there is no statement from Tska that D'Ambrosio is Anthony LaMonica or that D'Ambrosio was ever accused, charged, or convicted of sexual assault. The posting of a CBS news article that is clearly discussing a different person, both because the names are different, but also because there are photos of the two men and they do not look alike. Thus, the CBS news article is not actionable because it can reasonably be interpreted as discussing another individual, which D'Ambrosio himself alleges and recognizes to be true in the Second Amended Complaint.

The facts here are unlike the more traditional case of mistaken identity where a plaintiff alleges that a supposedly fictional individual in a piece of media is based on them, and the negative portrayal of that character is defamation *per se*. For example, in *Muzikowski*, the plaintiff plead similarities between himself and the 'fictional' movie character, including experiencing "almost exactly the same things" that the plaintiff had, except the fictional character "never breaks his drinking habit" and "commits such crimes as battery, theft, criminal destruction of property, disorderly conduct, and drinking on the public way." *Muzikowski I*, 322 F.3d at 922. The Seventh

12

SA-73

Circuit held that there was a reasonable interpretation that the character was depicting the plaintiff, even if there were some aspects that differed from the plaintiff. *Id.* at 926. Therefore, the fictional character lying about being a licensed securities broker fit within the *per se* defamation category because it implied that the plaintiff was not a member of his profession, and the plaintiff had sufficiently pled that Paramount imputed to him the commission of crimes that he did not commit. *Id.*

Here, D'Ambrosio pleads himself out of court because, unlike the fictional character who had detailed similarities to the plaintiff in *Muzikowski*, D'Ambrosio is clearly not Anthony LaMonica. The only alleged statement about a criminal offense, which was not posted by any of the named defendants but a Jane Doe, was a link to a news article about Anthony LaMonica being charged with sexual assault. This link includes both the name of the person, who is not D'Ambrosio, and a photo of someone, who is not D'Ambrosio. No reasonable person could think this article was about D'Ambrosio or that it was accusing him of sexual assault. *See Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008) (holding that no reasonable person could interpret the fantasy sequence purported to represent the author's frustrations as actual events). "Illinois has chosen a difficult standard to meet, as 'if a statement is capable of two reasonable constructions, one defamatory and one innocent, the innocent one will prevail.'" *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 904 (7th Cir. 2007) ("*Muzikowski II*"). Here the innocent, and most plausible, reading of the news article is that LaMonica, and not D'Ambrosio, was charged with sexual assault. While D'Ambrosio may have interpreted the post as implying that he was LaMonica, the Court need not "take the plaintiff's *interpretation* of the allegedly defamatory words at face value." *Ludlow v. Nw. Univ.*, 79 F. Supp. 3d 824, 838 (N.D. Ill. 2015) (quoting *Lott v. Levitt*, 556 F.3d 564, 569 (7th Cir. 2009)). There is a reasonable construction that the news article

13

discusses the criminal actions of someone other than D'Ambrosio. Thus, this is not *per se* defamation.

Next, D'Ambrosio argues that the statements harmed his professional reputation. D'Ambrosio does not identify any specific statements made by any Defendant about his ability to perform his profession, instead he argues that the statements imply his cruelty and dishonesty and characterize him as dishonest and immoral. To support this argument, D'Ambrosio vaguely states that Abbigail Rajala republished provably false and defamatory statements but does not allege what those statements were. Doc. [87] at 18 (citing Doc. [53] ¶ 46). He also relies on his conclusory allegation that "statements authored, published, and caused to be published by Defendants about Plaintiff are reasonably understood to state or imply that Plaintiff is dishonest, immoral and/or untrustworthy[,]" but that also fails to identify any statement by any Defendant. *Id.* (citing Doc. [53] ¶ 92). The other paragraphs identified by D'Ambrosio to support his argument that Defendants made statements harmful to his profession do not discuss statements made by Defendants about D'Ambrosio and therefore cannot be the basis of a defamation claim. *Id.* at 15 (citing Doc. [53] ¶¶ 13, 19). D'Ambrosio also argues that by falsely accusing him of sexual assault, Defendants harmed his professional reputation. *Id.* at 15, 18 (citing Doc. [53] ¶¶ 91–93).

The fundamental flaw in D'Ambrosio's argument is that he does not allege any statements by Defendants that impute an inability to perform his profession.[8] For a statement to be *per se* defamation under either the "imputing an inability to perform or want of integrity in the discharge of duties of office or employment" or "imputing a lack of ability, or that prejudice a party in his trade, profession, or business" categories, the statement must have been related to job performance

---

[8] D'Ambrosio also does not identify his job or profession. The Court is aware that D'Ambrosio is serving a year and a day in prison for a conviction on two counts of filing a false tax return. *United States. v. D'Ambrosio*, 1:23-cr-00323-1, Doc. [84] (N.D. Ill. May 29, 2024).

and "the plaintiff must have been accused of lacking *ability in his trade* or doing something bad *in the course of carrying out his job*." *Cody v. Harris*, 409 F.3d 853, 857 (7th Cir. 2005) (emphasis in original). Here, D'Ambrosio does not identify any statement made that relates to his job or profession. Instead, all the statements relate to his actions while dating women in Chicago.

These comments are unlike the defendants' statements on a law firm's Facebook, Yelp, and Google pages disparaging the plaintiff-lawyer's professionalism and ability to practice law and leaving one-star reviews in *Law Offices of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1127 (7th Cir. 2022). In *Freydin*, after the plaintiff posted an "odd and offensive comment" about Ukrainians, people angered by his comments left reviews expressing that the plaintiff was an "embarrassment and a disgrace to the US judicial system," a "hypocrite," "chauvinist," and "racist" who "has no right to practice law[,]" and that plaintiff "is not professional" and a "biased and unprofessional attorney." *Id.* Others left one-star reviews and complained of a "terrible experience," "awful customer service," "disrespect[ ]," and "unprofessional[ism]." *Id.* None of these defendants had used the plaintiff's legal services. The Seventh Circuit found that these statements fall into the fifth category—prejudice to a person in his profession—and were defamatory *per se*, but ultimately held that they were statements of opinion and not actionable. *Id.* at 1129. Unlike these comments, the women in the "Are We Dating the Same Guy?" Facebook group were commenting on D'Ambrosio's dating etiquette, not his professional ability, so these statements are not defamatory *per se*.

Although not identified by D'Ambrosio, Defendants cited one statement potentially related to D'Ambrosio's ability to perform his profession when Abbigail Rajala wrote that D'Ambrosio "kept talking about how [Rajala didn't] want to see his bad side, especially when he was on business calls." Doc. [53] Ex. C. However, this does not impugn D'Ambrosio's ability to perform

15

SA-76

in his profession, but appears to be an off-hand and innocuous comment. Unlike the defendants in *Freydin*, Abbigail Rajala did not accuse D'Ambrosio of job-related poor performance or an inability to function at his job, just his commentary on how he might *appear to her*. Therefore, D'Ambrosio has not alleged any statements from Defendants that fall into the categories that form the basis of *per se* defamation.

Instead of addressing how the statements related to his inability to perform his profession, D'Ambrosio argues that the statements imply his cruelty and dishonesty and characterize him as dishonest and immoral. However, mere "attacks related to personal integrity and character have not been deemed defamatory *per se*." *See Cody v. Harris*, 409 F.3d 853, 858 (7th Cir. 2005) (*Heying v. Simonaitis*, 466 N.E.2d 1137, 1143 (Ill. 1984)). As D'Ambrosio does not allege Defendants' statements relate to his inability to perform his job or profession, and were instead about his actions while dating, they are not *per se* defamation. Statements with implications to personal, rather than professional, traits such as implying a plaintiff "has a bad temper, is unable to control his anger, and lacks the integrity and judgment to resist getting revenge in an immature and vicious manner" do not establish *per se* defamation. *Id.*

Even if these statements were to fall under a defamation *per se* category, they are not actionable because they are statements of opinion. "[T]he First Amendment affords protection from liability to a speaker expressing an opinion that does not misstate actual facts." *Madison v. Frazier*, 539 F.3d 646, 653 (7th Cir. 2008). "Whether a statement is an opinion or assertion of fact is a question of law." *Freydin*, 24 F.4th at 1129. "To aid in this legal determination, courts ask: (1) whether the statement 'has a precise and readily understood meaning;' (2) whether the statement is factually verifiable; and (3) whether the 'literary or social context signals that [the statement] has factual content.'" *Id.* (quoting *Solaia Technology*, 852 N.E.2d at 840). While a statement that

can be reasonably interpreted as stating actual facts is not constitutionally protected, "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Id.* at 1129–30 (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).

D'Ambrosio argues that the statements—none of which are actually identified in the complaint or his response brief—characterize him as cruel, dishonest, immoral and lacking integrity, because they "imply verifiable false facts[.]" Doc. [87] at 18. But that is not the standard of whether something is an opinion. If the Facebook posts do "not contain statements that can be objectively verified as true or false" and instead merely imply "undisclosed and unassumed facts that support" the poster's opinion, that is insufficient to turn an opinion into an actionable defamatory statement. *Trahanas v. Nw. Univ.*, 64 F.4th 842, 859 (7th Cir. 2023). In *Trahanas*, the Seventh Circuit found that the plaintiff's supervisor's letter withdrawing his support for a medical school candidate was too vague, and while it implied undisclosed facts, it did not provide facts that the medical schools could verify and thus was not defamation. *Id.* Specifically, the letter stated: "I am writing to formally withdraw my prior letter of reference for [plaintiff]. I can no longer support her candidacy for admission to medical school." *Id.* at 858. The court noted that the general rule is that the "vaguer and more generalized the 'opinion[,] the more likely the opinion is non-actionable as a matter of law.'" *Id*. at 859 (quoting *Hopewell v. Vitullo*, 701 N.E.2d 99, 105 (1998)).

Abbigail Rajala's statement about D'Ambrosio's "bad side" or that he "flaunted money very awkwardly" and was "very clingy very fast" are her subjective opinions about him, not verifiable facts. Much like the statements in *Freydin*, discussed above, that the plaintiff was a

17

"hypocrite," "chauvinist," and "racist" were the defendants' opinions of the plaintiff, and similarly here Abbigail Rajala gave her opinion of what D'Ambrosio was like to date.[9] *Freydin*, 24 F.4th at 1131. Likewise, while the Facebook posts might imply "undisclosed and unassumed facts that support" Abbigail Rajala's opinion about D'Ambrosio, as they did in *Trahanas*, that does not convert her opinions into actionable defamatory statements. 64 F.4th at 859. Such opinions are subjective and not verifiable facts.

Another flaw in D'Ambrosio's Second Amended Complaint is that he does not allege that any of the statements, except that he was implied to have committed sexual assault, are false. Doc. [53] ¶¶ 53, 93. Excluding that one allegation, D'Ambrosio only summarily and conclusively alleges that Defendants made or transmitted false and defamatory statements without identifying what about the statements was false. *Id.* ¶¶ 46, 56, 91, 94. And despite Defendants raising this in their motions to dismiss, D'Ambrosio failed to address this issue or identify any specific statements that he alleges are false in his response. Doc. [71] at 19; Doc. [75] at 9–10. Besides Abbigail Rajala's opinions about D'Ambrosio's actions while they were dating, the only potentially verifiable fact that she stated was that they "met organically in Chicago two and a half months ago" which D'Ambrosio alleges was true in his Second Amended Complaint. Doc. [53] ¶ 45 & Ex. C.

The importance of identifying specific statements that are allegedly false is underscored by the fact that truth is an absolute defense to defamation. *Love*, 2024 WL 809107, at *5 (quoting *Hnilica v. Rizza Chevrolet, Inc.*, 893 N.E.2d 928, 931 (Ill. App. Ct. 2008)). Under Illinois law, "a

---

[9] Although the images from "Are We Dating the Same Guy?" attached as Exhibit C to the Second Amended Complaint include other statements about D'Ambrosio from other women, those women are not named as defendants in this lawsuit and D'Ambrosio does not reference their statements as potentially defamatory in either his Second Amended Complaint or response brief. Therefore, the Court does not need to address them. However, as articulated by Defendants in their motions, these statements are also subjective opinions and would not be actionable.

statement need not be accurate in every detail as long as the 'gist' or 'sting' of the statement is true." *Black v. Wrigley*, 2019 WL 2433740, at *4 (N.D. Ill. 2019). "The burden of proving falsity rests on the plaintiff." *Love*, 2024 WL 809107, at *5 (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993)). Requiring a plaintiff to allege the "defamatory statements with particularity is not holding him to a higher, fact pleading standard, but rather to require he plead the substantive elements of these torts under Illinois law." *Ludlow v. Nw. Univ.*, 79 F. Supp. 3d 824, 836–37 (N.D. Ill. 2015). The Court is not required to "'invent legal arguments for litigants,' even at the motion to dismiss stage, and [is] 'not obliged to accept as true legal conclusions or unsupported conclusions of fact.'" *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 825 (7th Cir. 2018) (quoting *County of McHenry v. Insurance Co. of the West*, 438 F.3d 813, 818 (7th Cir. 2006)). Thus, the Court will not accept D'Ambrosio's blanket argument of defamatory statements when he has not identified what statements are false.

Lastly, in addition to the reasons stated above, D'Ambrosio's defamation *per quod* claim (Count Nine) also fails because he does not allege his itemized losses or plead specific damages of actual financial injury. "In Illinois courts and federal courts sitting in diversity, special damages must be specifically stated in a *pro quod* claim." *Lott v. Levitt*, 556 F.3d 564, 570 (7th Cir. 2009) (citing FED.R.CIV.P. 9(g)). In *Lott*, the Seventh Circuit affirmed the district court's dismissal of a complaint, and refusal to allow an amended complaint, when the plaintiff only alleged "substantial reputational and monetary damages," (without a specific accounting of those damages or an explanation of harm) and that he would interact with individuals in professional settings who would understand "the passage to be a swipe at his professional reputation[.]" *Id.* The Seventh Circuit held that "[s]uch general allegations, which make no effort to explain how any reputational damage translated into actual harm, are not enough." *Id.* Similarly, here, D'Ambrosio failed to

allege a specific accounting of his alleged damages. His general allegation of lost professional opportunities and reputational harm are insufficient. Thus, this is an alternative basis on which Count Nine is dismissed.

### III.    Invasion of Privacy by False Light and Civil Conspiracy – Count Five

Closely associated with the defamation claims is D'Ambrosio's claim for invasion of privacy by false light. To prevail on a false light claim, a plaintiff must "show that the publicity at issue is 'of and concerning' him, that it placed him before the public in a false light, and that there was actual malice." *Muzikowski I*, 322 F.3d at 927 (internal citation omitted). Also, for claims based on statements that are "not defamatory *per se*, special damages too must be pleaded." *Id.*

Since D'Ambrosio failed to allege *per se* defamation, he likewise fails to allege false light invasion of privacy because "the 'of and concerning' requirement of the tort of false light invasion of privacy is 'basically the same as the innocent construction rule[.]'" *Muzikowski II*, 477 F.3d at 907 (quoting *Muzikowski I*, 322 F.3d at 927). Further, because D'Ambrosio failed to plead special damages, any remaining false light claims based on defamation *per quod* also fail. Moreover, "when a false light invasion of privacy claim follows an unsuccessful defamation claim, the false light claim must also fail[.]" *Gracia v. SigmaTron Int'l, Inc.*, 986 F.3d 1058, 1062 (7th Cir. 2021) (citing *Madison v. Frazier*, 539 F.3d 646, 659 (7th Cir. 2008)).

As the false light invasion of privacy claim fails, so too must the associated conspiracy claim. Under Illinois law, "[c]ivil conspiracy 'is not an independent tort.'" *Freydin*, 24 F.4th at 1133 (quoting *Indeck North American Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662 (2000)). Thus, when "a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails." *Id.* Since D'Ambrosio failed to allege

a claim for invasion of privacy by false light, the civil conspiracy claim also failed.  Therefore, the Court dismisses Count Five.

### IV.    Doxing – Count Four

Next, D'Ambrosio brings a claim for doxing against Abbigail Rajala, Paola Sanchez, Blake Millbrand, Spill The Tea, and the Jane Does.  Defendants argue that he has failed to state a claim for several reasons including that he does not allege the use of personally identifiable information, he is not likely to suffer death, bodily injury, or stalking, and he does nothing more than summarily allege harm as a direct and proximate result of the conduct.

To state a claim for doxing under Illinois law, a plaintiff must allege that the defendant intentionally published the plaintiff's "personally identifiable information without the consent of the person whose information is published[.]" *See* 740 ILCS 195/10(a).  Personally identifiable information does not mean all information used to identify an individual, instead it is limited to certain types of information.  The Act defines personally identifiable information as:

> any information that can be used to distinguish or trace a person's identity, such as name, prior legal name, alias, mother's maiden name, and date or place of birth in combination with any other information that is linked or linkable to a person such as:
> (1) social security number, home address, phone number, email address, social media accounts, or biometric data;
> (2) medical, financial, education, consumer, or employment information, data, or records;
> (3) any other sensitive or private information that is linked or linkable to a specific identifiable person, such as gender identity, sexual orientation, or any sexually intimate visual depiction; or
> (4) any information that provides access to a person's teleconferencing, video-teleconferencing, or other digital meeting room.[10]

Defendants contend that D'Ambrosio failed to allege that any of the information posted about him in the Facebook group amounts to personally identifiable information.  D'Ambrosio

---

[10] 740 ILCS 195/5.

alleges that Abbigail Rajala published a photo of him. Doc. [53] ¶ 46. D'Ambrosio then alleges that Defendants (without specifying who) posted his name and likeness. *Id.* ¶ 104. Lastly, he alleges that unnamed commenters on Rajala's post requested information related to his employer. *Id.* ¶ 47. But D'Ambrosio does not allege that any such information was ever provided. On its face, this information is insufficient to allege that his personally identifiable information was disclosed.

First, D'Ambrosio never alleges that Defendants published his full name in the Facebook group. In the Second Amended Complaint, D'Ambrosio alleges that his "name" was published in the group, but does not specify if this was his first name or full legal name. Doc. [53] ¶ 104. Based on the exhibits attached to the Second Amended Complaint, the extent of D'Ambrosio's name in "Are We Dating the Same Guy?" was that an anonymous member of the group posted "Nikko, 32" on December 27, 2023 and "Nikko 32" on November 2, 2023. Doc. [53] Exs. C & E.[11] "It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998); *Thompson v. Illinois Dep't of Pro. Regul.*, 300 F.3d 750, 754 (7th Cir. 2002) ("The fact remains that where a plaintiff attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim."). Since D'Ambrosio never alleged that his full name was posted in the group and instead attached copies of the posts that do not include his full name, the Court concludes that only his first name was posted in the group. As such, the Second Amended Complaint only alleges that D'Ambrosio's first name and age (but not date of birth) were posted.

---

[11] Exhibit E appears to be the result of searching D'Ambrosio's name in the group which hit on other posts that include the names "Nick," "Nicolas," and "Nicholas" but those are not names D'Ambrosio alleges that he uses, and as such are not discussed in this Opinion. Doc. [53] Ex. E. Further, even if those were references to D'Ambrosio, they also do not include a last name and would not change the analysis.

SA-83

As the first prong of determining whether something is personally identifiable information is whether it "can be used to distinguish or trace a person's identity, such as name, prior legal name, alias, mother's maiden name, and date or place of birth[.]" 740 ILCS 195/5. Defendants contend that publishing only D'Ambrosio's first name and age is insufficient to establish this prong. However, by using the phrase "such as" prior to the list, the statute does not require that each of these items be present, rather that some of these items "in combination with any other information that is linked or linkable to a person" be used to trace a person's identity. *Id.*

The statute goes on to list what types of information could be linked to a person, including social security number, home address, phone number, email address, or employment information. *Id.* But D'Ambrosio does not allege that any such information was ever posted in the group. D'Ambrosio argues in his response brief that his "employment details" were published in the group, but this argument is unavailable because it conflicts with the actual allegations of the Second Amended Complaint. Doc. [87] at 15. D'Ambrosio only alleged that commenters on Rajala's post requested information related to his employer, but does not allege that his employment information was ever posted in the "Are We Dating the Same Guy?" group. Doc. [53] ¶ 47. Nor does D'Ambrosio's employer or employment information appear in any of the Facebook posts or comments that he attached as exhibits to the Second Amended Complaint. *Id.* Ex. C.

D'Ambrosio centers his claim on the publishing of his photograph, but does not explain how this qualifies as linkable information under the statute. D'Ambrosio attached to the Second Amended Complaint the four photographs of him that were posted in the group, all of which were taken in public places with him smiling for the camera. Doc. [53] Exs. C & E. Defendants argue that because the statute does not specifically list photographs as a type of information, a photo of an individual should be excluded. D'Ambrosio responds that the photos fall under the statute. The

23

parties provided no case law precedent that dictates how Illinois courts interpret this statute and when a photograph could be considered linkable information, and the Court also found no such precedent. However, the Court need not delve into whether the statute excludes all photographs because it is evident from a cursory look at D'Ambrosio's photographs that they would not be covered by the statute. The statute explicitly covers items such as an individual's social security number, home address, medical or financial data, or items linkable to a person's gender identity or sexual orientation indicating that the concern was with private information not readily accessible to anyone looking at an individual. For example, the statute provides that "any sexually intimate visual depiction" qualifies as linkable personal information. *Id.* Public and innocuous photos, like the ones of D'Ambrosio, are clearly distinguishable. Under the plain text of the statute, D'Ambrosio's photos of himself clearly taken in a public place in which he was posing for the camera does not qualify. Doc. [87] at 15, 19; Doc. [53] Ex. C. Thus, D'Ambrosio has not alleged that his personally identifiable information was posted in the "Are We Dating the Same Guy?" group.

However, even if D'Ambrosio had alleged that his personally identifiable information was published, his claim would still fail. To allege a claim for doxing under Illinois law D'Ambrosio also needs to sufficiently plead:

> (1) the information is published with the intent that it be used to harm or harass the person whose information is published and with knowledge or reckless disregard that the person whose information is published would be reasonably likely to suffer death, bodily injury, or stalking; and
> (2) the publishing of the information:
>     (i) causes the person whose information is published to suffer significant economic injury or emotional distress or to fear serious bodily injury or death of the person or a family or household member of the person; or
>     (ii) causes the person whose information is published to suffer a substantial life disruption; and

(3) the person whose information is published is identifiable from the published personally identifiable information itself.[12]

D'Ambrosio does nothing more than restate these elements in his Second Amended Complaint. Doc. [53] ¶ 105. D'Ambrosio does not allege facts establishing any of the Defendants' knowledge or reckless disregard that the person whose information is published would be reasonably likely to suffer death, bodily injury, or stalking. As alleged by D'Ambrosio, the purpose of "Are We Dating the Same Guy?" was so "women can empower each other and keep each other safe from toxic men." *Id.* ¶ 13. D'Ambrosio does not allege that he was contacted by anyone in the group, let alone stalked or threatened with death or bodily injury, as a result of the posts. Nor do the posts themselves allow such an inference. Without any factual allegations, D'Ambrosio is left with conclusory allegations that Defendants acted with this intent.

Similarly, D'Ambrosio does not allege facts to show that he suffered "significant economic injury or emotional distress or to fear serious bodily injury or death" or that this caused him to suffer a substantial life disruption. D'Ambrosio, again, only restates the elements of the claim. A plaintiff may not "merely parrot the statutory language of the claims that they are pleading (something that anyone could do, regardless of what may be prompting the lawsuit), rather than providing some specific facts to ground those legal claims, that they must do more." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). As this is all D'Ambrosio has done, he fails to state a plausible claim and it must be dismissed.

## V.     Strict Products Liability – Count Six

In Count Six, D'Ambrosio alleges that Meta is liable for strict products liability for its app and algorithm. Meta moved to dismiss this claim for failure to state a claim because it provides a service not a product and D'Ambrosio did not allege physical harm. D'Ambrosio failed to respond

---

[12] 740 ILCS 195/10(a).

or oppose this argument. *See* Doc. [87]. D'Ambrosio's failure to respond to this argument or defend his claim, results in a waiver of such an argument. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as the [plaintiffs] have done here—results in waiver.").

Regardless of D'Ambrosio's waiver, he has failed to state a claim for products liability. A defendant is liable under a theory of strict products liability for selling "any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property[.]" Restatement (Second) of Torts § 402A (1965). "The general rule is that strict product liability does not extend to services." *Milford v. Com. Carriers, Inc.*, 210 F. Supp. 2d 987, 990 (N.D. Ill. 2002). "A product is tangible personal property distributed commercially for use or consumption." Restatement (Third) of Torts: Prod. Liab. § 19 (1998). Courts have held that the content of a website is not a product for the purpose of strict liability. *See James v. Meow Media, Inc.*, 300 F.3d 683, 701 (6th Cir. 2002) (distinguishing between the content of communications from their "tangible containers" for the purpose of strict products liability); *Jackson v. Airbnb, Inc.*, 639 F. Supp. 3d 994, 1011 (C.D. Cal. 2022) (finding Airbnb is a platform that connects users, making it a service not a product); *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 399 (S.D.N.Y. 2018) (finding Amazon was a provider of services through its market place and not a distributor of products, therefore not subject to New York's strict product liability claims). D'Ambrosio alleges problems with Meta's app and algorithm, but his allegations do not establish that these are products and not service platforms. Therefore, D'Ambrosio has failed to state a claim for strict products liability.

Further, physical harm is an essential element of any action for products liability, whether for negligence or strict liability. *Sondag v. Pneumo Abex Corp.*, 2016 IL App (4th) 140918, ¶ 23. D'Ambrosio does not allege that he suffered any *physical* harm from Meta's app and algorithm. Doc. [53] ¶ 126. Therefore, his claim also fails on this ground.

## VI. Negligence – Count Seven

Next, D'Ambrosio brings a claim of negligence against Meta. D'Ambrosio alleges Meta was negligent in numerous ways when designing, developing, and monitoring its app, algorithm, and social media platform. Doc. [53] ¶ 144. Meta argues that this count should be dismissed because D'Ambrosio failed to allege that Meta owed a duty or that simply making content available establishes proximate cause. Doc. [65] at 15. Meta contends that courts have held that online service providers do not owe a duty of care to their users or the public for harmful third-party content. Among other cases, Meta relies on *Klayman v. Zuckerberg*, where the D.C. Circuit found that Facebook's Statement of Rights and Responsibilities does not establish a special relationship between Facebook and its users. 753 F.3d 1354, 1359–60 (D.C. Cir. 2014). D'Ambrosio does not address Meta's duty argument in his response, instead arguing that Meta failed to exercise reasonable care and, claims (without any citation) that: "Courts have increasingly recognized that platforms may be held liable for negligence when they engage in conduct beyond mere passive hosting." Doc. [87] at 12. The failure to respond and develop this argument renders any opposition waived and Count Seven is dismissed. *See Bonte*, 624 F.3d at 466.

Had D'Ambrosio not waived the argument, the Second Amended Complaint still fails to state a claim. "To state a cause of action for negligence, a complaint must allege facts that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Simpkins v. CSX Transp., Inc.*, 2012 IL 110662, ¶ 14

SA-88

(internal citations omitted).  The existence of a duty is a matter for the court to decide. *Vesely v. Armslist LLC*, 762 F.3d 661, 665 (7th Cir. 2014).  When determining if there was a duty, courts ask, "whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Id.* (quoting *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1057 (Ill. 2006)).  The common law in Illinois has long held that absent a special relationship, "a private person has no duty to act affirmatively to protect another from criminal attack by a third person[.]" *Id.* (quoting *Iseberg v. Gross*, 879 N.E.2d 278, 284 (Ill. 2007)).

D'Ambrosio's theory is that Meta owed a duty to its users. Doc. [53] ¶¶ 135, 139–141.  Whether such a duty exists is an open question.[13]  But even if that were true, D'Ambrosio pleads himself out of court by alleging that he "has never created or maintained an account on Facebook or any other platform maintained by Meta" and thus is not a "user" of Meta's services. Doc. [53] ¶ 54.  Therefore, under his own allegations, Meta does not owe D'Ambrosio a duty and cannot be liable to him for negligence.  Thus, Count Seven is also dismissed on this basis.

## VII. Negligent Entrustment – Count Eight

D'Ambrosio also alleges that Meta is liable for negligent entrustment because it entrusted "its algorithm to users by allowing it to operate in a manner that prioritized engagement without sufficient safeguards to prevent the amplification of dangerous content[.]" Doc. [53] ¶ 156.  Meta

---

[13] Whether such a relationship exists and creates a duty for Meta is not evident based on the case law. *See, e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1101 (9th Cir. 2019) ("No website could function if a duty of care was created when a website facilitates communication, in a content-neutral fashion, of its users' content."); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359–60 (D.C. Cir. 2014) (finding no special relationship existed between Facebook and its users as a result of Facebook's Statement of Rights and Responsibilities); *but see Anderson v. TikTok, Inc.*, 116 F.4th 180, 184 (3d Cir. 2024) (reversing and remanding a grant of immunity under Section 230 when TikTok used an algorithm to promote certain content but not ruling on how this impacted the negligence claim).  However, as this question is not dispositive to the case, the Court will proceed as if there was a duty.

argues that D'Ambrosio's claim is unclear and that there is no allegation that it entrusted its algorithm with the knowledge that users would use it in a way that created an unreasonable risk of harm. Doc. [65] at 15–16.

Like many of the other claims, D'Ambrosio does not respond to any of Meta's arguments or defend his negligent entrustment claim in his response brief. The burden of responding to the motion to dismiss falls on the plaintiff, and not on this Court. "If a Rule 12 motion to dismiss is filed, plaintiffs must 'specifically characterize or identify the legal basis' of their claims or face dismissal[.]" *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 825 (7th Cir. 2018) (citing *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.")). Therefore, the motion to dismiss is granted because of D'Ambrosio's failure to respond.

Further, even if the Court were to consider this claim on its merits, it most surely fails. "The common law rarely requires people to protect strangers, or for that matter acquaintances or employees." *Doe v. GTE Corp.*, 347 F.3d 655, 661 (7th Cir. 2003). Typically, a negligent entrustment claim, is brought against the owner of a car or airplane when it was operated by a third party in a manner that results in the injury or death of the plaintiff. *See, e.g.*, *Garland v. Sybaris Club Int'l, Inc.*, 2014 IL App (1st) 112615 (airplane crash) ("*Garland I*"); *Am. Access Cas. Co. v. Novit*, 2018 IL App (1st) 171048 (car accident); *Evans v. Shannon*, 776 N.E.2d 1184, 1185 (Ill. 2002) (car accident). The basic idea behind a negligent entrustment claim "is that if A entrusts his car to B, knowing that B is not competent to drive, then A (if present) must exercise reasonable care to protect pedestrians and other drivers." *GTE Corp.*, 347 F.3d at 661. "To prove negligent

29

entrustment, a plaintiff must establish that 'the defendant gave another express or implied permission to use or possess a dangerous article or instrumentality that the defendant knew, or should have known, would likely be used in a manner involving an unreasonable risk of harm.'" *Garland v. Sybaris Clubs Int'l, Inc.*, 2019 IL App (1st) 180682, ¶ 31 (quoting *Garland I*, 2014 IL App (1st) 112615, ¶ 53).

The Seventh Circuit previously rejected the theory that the use of a defendant's "servers, routers, and optical-fiber lines" are chattels that can be negligently entrusted to a plaintiff. *GTE Corp.*, 347 F.3d at 661. Instead, it found that defendants provided internet access and web hosting services, which meant it "did not entrust its computers, network, or any other hardware to [plaintiff]; it furnished a service, not a chattel." *Id.* Similarly, as alleged here, Meta did not entrust chattels to its users, it provided a service, in this case a social media network. Therefore, D'Ambrosio failed to state a claim for negligent entrustment.

## VIII.  Unjust Enrichment – Count Two

Lastly, D'Ambrosio brings a claim for unjust enrichment against all Defendants. However, this claim cannot stand on its own. "Under Illinois law, unjust enrichment is not a separate cause of action." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739 (7th Cir. 2019) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011)). Accordingly, as all D'Ambrosio's underlying claims failed, necessarily his unjust enrichment claim suffers the same fate and is dismissed.

## IX.  Section 230 Immunity

As a final note, both Meta and the Spill The Tea Defendants assert that in addition to D'Ambrosio failing to state a claim for each count, they are also immunized by Section 230 of the Communications Decency Act of 1996. Docs. [65] & [71]. However, as D'Ambrosio failed to

state a plausible claim for relief for any of his counts, the Court need not address the application of Section 230 in this case. *Gonzalez v. Google LLC*, 598 U.S. 617, 622 (2023) (Declining "to address the application of § 230 to a complaint that appears to state little, if any, plausible claim for relief."); *Webber v. Armslist LLC*, 70 F.4th 945, 957 (7th Cir. 2023) (Courts "need to decide whether § 230(c)(1) precludes the plaintiffs' claims only if they have stated a cause of action against [defendant].").

### X.  Dismissal With Prejudice

Defendants asked that the Second Amended Complaint be dismissed with prejudice.  "Rule 15(a) says that a party may amend its complaint once as a matter of course. After that, leave to amend depends on persuading the judge that an amendment would solve outstanding problems without causing undue prejudice to the adversaries." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 819 (7th Cir. 2013).  Although leave to amend should be freely given when justice so requires, district courts, "have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015) (quoting *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008)).

D'Ambrosio has already been given two opportunities to amend his complaint. *See* Docs. [28], [29], [40], [48], [52] & [53].  When comparing D'Ambrosio's First and Second Amended Complaints, the only substantive changes are additional allegations about Meta's algorithm and adding counts Six through Nine. Docs. [29] & [53].  This includes attaching the same exhibits to both versions of the complaint.

Both Meta and the Spill The Tea Defendants identified the same issues that doom D'Ambrosio's Second Amended Complaint in their motions to dismiss the First Amended

31

Complaint, including that D'Ambrosio failed to allege that his photo was used for a commercial purpose as required for his IRPA claim and that the fundraiser was not connected to his photo and took place eight months before the post. Doc. [38] at 8–12; Doc. [47] at 17–18. The Spill The Tea Defendants also argued that the First Amended Complaint failed to allege any false statements, that none of the statements would fit in a *per se* defamation category, and that the article about LaMonica was insufficient. Doc. [47] at 18–22. Further, the Spill The Tea Defendants provided a detailed explanation on why even if these statements were defamatory, they are not actionable as opinions. *Id.* at 22–23. Also, even though there was no *per quod* defamation claim in the First Amended Complaint, the Spill The Tea Defendants argued why the statements in the exhibits would not be actionable under that standard. *Id.* at 23. Lastly, the Spill The Tea Defendants made the same arguments about false light and doxing, which they made again in their second motion to dismiss. *Id.* at 23–27. Despite being made aware of these problems with his First Amended Complaint, and having the opportunity to amend, D'Ambrosio failed to address any of these issues, or revise his complaint in any substantive way.

Further, D'Ambrosio's response in opposition to the motion to dismiss does not make any showing that Plaintiff could or would improve his complaint if granted leave to amend. D'Ambrosio fails to identify any false statement made by any Defendant, beyond stating that he is not LaMonica, and instead broadly asserting that Defendants had defamed him by their statements. It is also worth considering that in addition to failing to identify any specific false statements in his Second Amended Complaint, D'Ambrosio also failed to identify those statements in his opposition brief, despite Defendants identifying this issue and proposing what they thought D'Ambrosio might argue the false statements were. This shows that even if D'Ambrosio were granted leave to amend, he has not shown that he is able to address the deficiencies. *See Knight*,

32

SA-93

725 F.3d at 819 (affirming a dismissal with prejudice when plaintiff already had three chances and the briefing failed to address the issues and continued to be "maddeningly vague"); *Gonzalez-Koeneke*, 791 F.3d at 808 ("A district court acts within its discretion in denying leave to amend, either by dismissing a complaint with prejudice or by denying a post-judgment motion, when the plaintiff fails to demonstrate how the proposed amendment would cure the deficiencies in the prior complaint.").

Although D'Ambrosio requested leave to amend "if this Court finds any deficiencies in the pleadings" he provides no indication that he intends to, or could, amend his complaint to address these deficiencies. Doc. [87] at 23. Moreover, D'Ambrosio failed to respond to many of the Defendants' arguments in his opposition brief, including making no argument in support of his strict liability or negligent entrustment claims—resulting in waiver of his arguments. *See* Doc. [87]. Indeed, the current version of the amendment is D'Ambrosio's third attempt at drafting a complaint and "in court, as in baseball, three strikes and you're out." *Knight*, 725 F.3d at 819 (dismissal with prejudice was appropriate when the plaintiff was on his third complaint and had made no improvements to pleading a claim). While D'Ambrosio requests some discovery into how Meta's algorithm operates and Meta's internal operations, that information would not resolve any of the issues fatal to his complaint. Doc. [87] at 9–11, 13.

Further, any amendment to the complaint would be futile. D'Ambrosio's complaint centers around statements made about his actions while dating in Chicago. These statements, although not clearly outlined in his Second Amended Complaint, were attached as exhibits, so the parties and the Court have had an opportunity to review them—and the Court has found they failed to provide a basis for D'Ambrosio's claims. As discussed above, the statements are subjective opinions or clearly refer to another person (and not D'Ambrosio), thus they are not actionable. As

33

SA-94

such, any amendment would be futile as the statements at issue are not actionable. *See Braun v. Day*, 2025 WL 662081, at *6–7 (N.D. Ill. Feb. 28, 2025) (dismissing a defamation claim with prejudice when it was based on nonactionable opinions and theories); *Creation Supply, Inc. v. Hahn*, 608 F. Supp. 3d 668, 698 (N.D. Ill. 2022), *aff'd sub nom. Creation Supply, Inc. v. Cherrie*, 61 F.4th 511 (7th Cir. 2023) (dismissing the amended complaint with prejudice when amendment would be futile when plaintiff had an opportunity to cure the deficiencies identified in the original complaint); *Maag v. Illinois Coal. for Jobs, Growth & Prosperity*, 368 Ill. App. 3d 844, 852–53 (2006) (affirming dismissal with prejudice when the statements were not actionable *per se* defamation because they were substantially true and the plaintiff failed to plead special damages for defamation *per quod*).

Furthermore, D'Ambrosio attached as exhibits screenshots of the statements about him in the Are We Dating the Same Guy?" Chicago group, so there are no additional statements for him to identify. Doc. [53] Ex. C. If D'Ambrosio were given an opportunity to amend, he could only add to how he interpreted the statements. The Court is "required to accept as true the facts alleged in the complaint, including the words used in the allegedly defamatory statement, and make all reasonable inferences in favor of the plaintiff." *Lott*, 556 F.3d at 569. "But that does not mean that the court must take the plaintiff's *interpretation* of the allegedly defamatory words at face value." *Id.* (emphasis in original). Instead, deciphering the "meaning of a statement and whether it is reasonably susceptible to an innocent construction is a question of law for the courts to resolve." *Id.* Thus, the Court is not bound by D'Ambrosio's interpretations of the statements and may "decide the natural and obvious meaning of an allegedly defamatory passage at the pleading stage." *Id.* As the Court determined that the statements about D'Ambrosio were not defamatory, there is nothing left to decide. Further, despite having ample opportunity, D'Ambrosio has yet to identify

any false statements, the central element of a defamation claim. While evident from his complaint that D'Ambrosio objects to the idea that women in Chicago, and nationally, have a private invite-only forum in which they are able to discuss and potentially warn other women against men's dating habits and that he personally detested being discussed in that group, the statements made about him do not amount to defamation, false light invasion of privacy, or doxing. The comments about D'Ambrosio in "Are We Dating the Same Guy?" were subjective opinions, which even if D'Ambrosio dislikes, cannot amount to defamation. As a result of these deficient claims and D'Ambrosio's failure to articulate how Meta could be liable under the other counts, any amendment would be futile. Therefore, the Court dismisses D'Ambrosio's Second Amended Complaint with prejudice.

## Conclusion

For the reasons stated above, Defendants' motions to dismiss [65] [71] [75] [76] are granted. As D'Ambrosio has already had multiple opportunities to amend his claims and any further amendments would be futile, the Court dismisses D'Ambrosio's Second Amended Complaint with prejudice.

**SO ORDERED.**

Dated:  May 13, 2025

_____
Sunil R. Harjani
United States District Judge

35

SA-96

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NIKKO D'AMBROSIO, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 24-cv-678 |
| | ) | |
| META PLATFORMS, INC., *et al.*, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Plaintiff, Nikko D'Ambrosio, respectfully submits this response in opposition to

Defendant Meta Platforms, Inc.'s ("Meta") Defendants Spill the Tea, Inc., Paola Sanchez, and

Blake Millbrand's, Defendants Carol Rajala and Rodney Rajala, and Defendant Abbigail Rajala's

Motions to Dismiss Plaintiff's Second Amended Complaint, respectfully and collectively.

## I.     INTRODUCTION

This case involves a coordinated and malicious effort by all Defendants—Spill the Tea,

Inc., its principals Paola Sanchez and Blake Milbrand, Meta Platforms, Inc., and individual

contributors, including Abbigail Rajala, Carol and Rodney Rajala, and other unnamed Jane

Does—to defame the Plaintiff, Nikko D'Ambrosio, misappropriate his intellectual property, and

expose his private information through the online platform "Are We Dating the Same Guy?" (the

"AWDTSG").

This case underscores Meta Platforms, Inc.'s ("Meta") active role in curating, amplifying,

and profiting from harmful content via its proprietary algorithms and generative AI tools. By

transforming user-submitted content into derivative works and prioritizing high-engagement

posts, Meta has forfeited its claim to immunity under Section 230 of the Communications

Decency Act ("CDA"). Meta's deliberate algorithmic decisions, driven by financial incentives,

SA-97

expose its liability for the amplified defamation, reputational harm, and financial losses suffered by Plaintiff Nikko D'Ambrosio.

Meta Platforms, Inc., the operator of Facebook, is accused of amplifying and facilitating the dissemination of defamatory and harmful content targeting Plaintiff Nikko D'Ambrosio through its algorithms and infrastructure, specifically in the Facebook group "Are We Dating the Same Guy? | Chicago." The Plaintiff alleges that Meta's recommendation systems actively promoted defamatory posts and unauthorized uses of his likeness, enabling the widespread circulation of false statements and private information to a large audience. Despite being notified of the harmful content, Meta allegedly failed to take action, contributing to the reputational damage, emotional distress, and financial harm suffered by the Plaintiff. By prioritizing user engagement and ad revenue over content moderation, Meta is accused of acting with reckless disregard for the foreseeable harm caused by its platform, demanding accountability under Illinois law and principles of corporate responsibility.

Frances Haugen, a former Facebook employee who disclosed extensive internal data, testified before Congress that Meta's algorithms amplify harmful and divisive content for profit. Haugen confirmed that these algorithms systematically prioritize engagement-driven posts, regardless of their harmful effects, aligning with Plaintiff's allegation that Meta actively curates and promotes defamatory material targeting him. Haugen emphasized that Meta's financial model prioritizes profits over user safety, underscoring the platform's role in amplifying the harmful content at issue in this case (**Exhibit A**, *Statement of Frances Haugen to the United States Senate Committee on Commerce, Science and Transportation*).

In response to these allegations, Meta files their Motion to Dismiss which is predicated on the argument that it is immune from liability under Section 230 of the CDA and protected by the

SA-98

First Amendment. However, Plaintiff has adequately alleged that Meta is not entitled to Section 230 immunity because it went beyond passive hosting by actively amplifying defamatory and tortious content through its algorithms, failing to properly moderate harmful materials, and benefiting financially from increased engagement. Furthermore, the First Amendment does not shield Meta from liability for harmful content generated or amplified by its algorithms when such amplification constitutes active participation.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure should be granted only in the rare instance where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." See *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard, which ensures access to the courts for claims that are factually supported, does not demand the plaintiff prove their case at the pleading stage. Rather, it requires the plaintiff to articulate sufficient factual matter to allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

The Supreme Court has made clear that this standard does not impose a heightened pleading requirement. A complaint need not contain detailed factual allegations, nor is the plaintiff required to provide evidence or prove their claims at this stage. Instead, the court must focus on the allegations as pleaded and accept them as true, giving the plaintiff the benefit of every reasonable inference that can be drawn in their favor. See *Twombly*, 550 U.S. at 555. This deferential approach ensures that potentially meritorious claims are not prematurely dismissed before the parties have had the opportunity to develop the facts through discovery

SA-99

Dismissal under Rule 12(b)(6) is particularly inappropriate when the allegations present a plausible basis for relief, even if ultimate success on the merits remains uncertain. The court's role at this stage is not to evaluate the strength of the evidence or resolve factual disputes but simply to determine whether the facts alleged, if proven, would entitle the plaintiff to relief under the law. Where the complaint alleges conduct that, if true, would constitute a violation of the law, the motion to dismiss must be denied.

Plaintiff has pleaded detailed factual allegations that, when taken as true, provide a clear and plausible foundation for relief. The Court must accept these allegations as true and draw all reasonable inferences in Plaintiff's favor. Defendants' attempt to argue otherwise misapplies the Rule 12(b)(6) standard and seeks to litigate factual disputes that are inappropriate for resolution at this preliminary stage. Accordingly, their motion to dismiss must be denied, and Plaintiff's claims allowed to proceed.

### III.    ARGUMENT

### META IS NOT IMMUNE UNDER SECTION 230 OF THE COMMUNICATIONS DECENCY ACT

Meta's reliance on Section 230 fails because it actively contributed to the development, dissemination, and amplification of harmful content. Courts have consistently held that platforms lose Section 230 immunity when they move beyond passive hosting and materially contribute to harmful activity.

### A.    Meta's Algorithms Actively Curate and Amplify Harmful Content

Meta's proprietary algorithms, including Relevancy Scores (**Exhibit B**, *Relevance Score for Facebook Ads – Meta for Business*), and "Story Bumping," (**Exhibit C**, *Showing More Timely Stories from Friends and Pages – Meta Newsroom*), go beyond passive hosting by

4

SA-100

actively prioritizing and amplifying high-engagement content, including harmful posts. These features assign engagement-based scores to content, amplifying posts that generate likes, comments, and shares. These features use "Story Bumping" to resurface older content and increase its visibility, ensuring sustained engagement. And finally, these features amplify content likely to provoke user responses, even if defamatory or harmful.

Meta's story bumping isn't just a feature—it's a strategic algorithmic content amplification tool that directly ties their content creation and development efforts to sustained user engagement. Through news feed ranking and engagement prioritization, Meta's algorithms manufacture virality by selectively resurfacing posts based on real-time interactions, ensuring that content remains active beyond its natural lifespan.

This isn't passive content sorting—it's an engineered feedback loop where Meta's own algorithms dictate what gets seen, when, and by whom—in effect, making them co-creators of engagement-driven content. By dynamically bumping older posts back into circulation, they shape narratives, influence discourse, and extend the shelf life of user-generated material, turning fleeting interactions into long-term content cycles.

This algorithmic intervention transforms Meta from a mere platform into an active participant in content propagation—an entity that doesn't just host content but curates, amplifies, and monetizes it through artificial engagement signals.

Meta's editorial judgments, encoded into its algorithms, demonstrate active involvement in disseminating harmful content, removing it from Section 230 protection. In *Lemmon v. Snap Inc.,* 995 F.3d 1085 (9th Cir. 2021), the court held that Snapchat's speed filter, which incentivized dangerous behavior, was a design feature outside Section 230 immunity. Similarly,

SA-101

Meta's algorithms incentivize the visibility of harmful content, directly contributing to Plaintiff's harm.

Meta's algorithms systematically prioritize and amplify content based on engagement metrics, such as likes, shares, and comments. These algorithms assign relevance scores and elevate high-engagement content—regardless of its harmful or defamatory nature—to increase user activity and advertising revenue. By curating and amplifying content, Meta exercises editorial judgment, removing its conduct from the protections afforded under Section 230(c)(1).

Meta's algorithmic amplification of harmful content is not an isolated claim. Frances Haugen's testimony before Congress highlighted that Facebook's leadership deliberately designed its algorithms to maximize engagement, even when it resulted in harm. She testified, "The result has been a system that amplifies division, extremism, and polarization," a direct consequence of Meta's profit-driven algorithms. Haugen further stated that Facebook's internal research confirms its algorithms cause harm, mirroring Plaintiff's allegation that Meta actively contributed to the dissemination of defamatory material about him.

## B.    Meta's Financial Incentives Align with Content Amplification

Meta's financial model is directly tied to the amplification of high-engagement posts, including harmful and defamatory content. Plaintiff alleges that Meta's algorithms deliberately prioritize posts with higher engagement potential, even when those posts are harmful or defamatory. This prioritization strategy drives user activity and generates greater advertising revenue, demonstrating that Meta's content moderation decisions are not neutral but instead profit-driven.

SA-102

Meta employs algorithms such as Story Bumping and Relevancy Scores, which assign engagement-based scores to content, surfacing posts likely to attract more likes, shares, and comments. Features like "Story Bumping" ensure that older, highly engaging posts—including defamatory ones—are resurfaced to sustain visibility and user interaction. This algorithmic design incentivizes the promotion of controversial content, increasing the likelihood that harmful posts will be amplified and monetized. Such practices undermine the claim that Meta is a passive intermediary under Section 230.

Courts have consistently recognized that platforms lose Section 230 immunity when their financial incentives align with harmful content amplification. For instance, in *Anderson v. TikTok, Inc.*, 116 F.4th 180 (3d Cir. 2024), the court held that a platform's financial model tied to maximizing engagement through harmful content weakened its immunity claim. Similarly, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009), supports the principle that platforms lose immunity when they contribute to the development of harmful content. Meta's intentional prioritization of high-engagement posts—including defamatory content—establishes an active role in the development and dissemination of harmful speech, removing it from Section 230 protections.

Haugen testified that Meta's business model "pays for its profits with our safety," prioritizing high-engagement posts for ad revenue. This testimony substantiates Plaintiff's claims that Meta's amplification of harmful content is profit-driven. Haugen described how Meta's systems intentionally promote controversial content to increase user interaction, aligning with Plaintiff's allegations that Meta's algorithms amplified defamatory content to maximize engagement and revenue.

SA-103

The Plaintiff further contends that Meta's profit-driven amplification demonstrates editorial judgment, as the platform makes calculated decisions about which posts to prioritize based on revenue potential. These actions are far from neutral hosting; they constitute active participation in content dissemination for financial gain. Meta's reliance on Section 230 immunity is therefore unavailing when its content amplification practices are directly tied to its profit motives.

## C. Meta's Algorithms Create Derivative Works

Meta's use of generative AI tools and algorithmic features goes beyond passive hosting by actively transforming user-submitted content into derivative works. These tools, including automated animations, "Story Bumping," and 3D enhancements, modify user-generated posts to make them more engaging, visually appealing, and shareable. By altering the original content, Meta actively participates in the development and creation of new, derivative content.

Features like "Story Bumping" resurface older posts that generate high engagement, increasing their visibility and ensuring prolonged user interaction. This algorithmic manipulation effectively repackages content for a new audience, altering its presentation and reach. Generative AI features, such as "Make It 3D" animations, create entirely new formats from static user submissions. These transformations align with the statutory definition of an "information content provider" under Section 230(c)(1).

Platforms lose Section 230 immunity when they co-create or develop user content. For example, in *Barnes,* 570 F.3d at 1101, the court held that platforms are no longer passive intermediaries when they contribute to the creation or enhancement of content. Similarly, in *Lemmon v. Snap Inc.*, 995 F.3d 1085 (9th Cir. 2021), the court found that design features

SA-104

encouraging specific user behaviors constituted active participation, disqualifying the platform from immunity.

Meta's generative AI tools exemplify this principle. By using features that transform and reformat content, Meta creates derivative works that are distinct from the original submissions. These tools enhance the visibility, engagement, and profitability of harmful posts, underscoring Meta's active involvement in content development. These actions remove Meta's protections under Section 230 and establish its role as an "information content provider."

Haugen testified that Meta's closed design shields its operations from meaningful oversight, including its own Oversight Board. She compared this lack of transparency to regulating cars without crash tests, underscoring that regulators and courts cannot evaluate the harm caused by Meta's algorithms without direct access to its internal data. Plaintiff's allegations of Meta's closed systems align with this testimony, further supporting the necessity for transparency and judicial scrutiny.

## D.    IRPA Claims Are Not Preempted by Section 230

Section 230(e)(2) explicitly excludes intellectual property claims from its scope. IRPA, as a statute protecting the commercial use of a person's identity, qualifies as intellectual property law. *See Lukis v. Whitepages Inc.,* 549 F. Supp. 3d 798, 805 (N.D. Ill. 2021). Plaintiff's IRPA claim alleges that Meta monetized Plaintiff's identity without authorization, removing it from Section 230 immunity.

## E.    Discovery Is Necessary to Resolve Factual Issues

Meta's arguments hinge on factual issues that necessitate discovery to resolve. Plaintiff seeks discovery to uncover critical evidence demonstrating Meta's active role in amplifying

SA-105

harmful content and its financial incentives to do so. This evidence is essential to establishing that Meta went beyond passive hosting, actively contributing to the creation and dissemination of harmful content, disqualifying it from Section 230 immunity.

Meta's algorithms, including Relevancy Scores and Story Bumping, actively curate and amplify high-engagement posts, regardless of their harmful nature. Plaintiff seeks internal engineering specifications detailing how these algorithms assign relevance scores, prioritize certain posts, and resurface older content for continued visibility. Additional evidence, such as testing data and internal studies on how these algorithmic adjustments impact user engagement and the visibility of harmful content, is also necessary. These records will demonstrate the deliberate algorithmic decisions to maximize engagement, even when the content poses reputational harm to individuals like the Plaintiff.

Plaintiff also seeks discovery into Meta's monetization strategies, which are directly tied to its content prioritization practices. Internal communications and financial models are critical to showing how amplified content, such as high-engagement defamatory posts, translates to increased advertising revenue. Analyses and reports quantifying the profitability of controversial posts, and data revealing how Meta prioritized posts with higher potential for ad revenue, will further establish the platform's financial incentives for amplifying harmful content.

Frances Haugen's disclosures reveal the significant gaps in public understanding of Meta's internal operations. Haugen testified that "almost no one outside of Facebook knows what happens inside Facebook," underscoring the necessity of discovery to assess Meta's active role in content amplification and the financial incentives underpinning its algorithms. Her testimony demonstrates that Meta's internal research confirms the harm caused by its platform, making discovery essential to uncover this information for Plaintiff's claims.

SA-106

Meta's use of generative AI tools, such as "Make It 3D" and automated animations, represents another area requiring discovery. These tools transform user-submitted content into derivative works, creating distinct and enhanced iterations of the original posts. Discovery is necessary to obtain documentation of AI-driven content modifications, communications regarding the development and deployment of generative AI tools, and records demonstrating how AI-enhanced content differs from original user submissions. This evidence will show how Meta's generative AI tools disqualify it from Section 230 immunity by making the platform an "information content provider."

Finally, Plaintiff seeks discovery into Meta's knowledge of the harm caused by its platform and its inaction in addressing these issues. Plaintiff requests reports, complaints, and notifications submitted to Meta regarding harmful posts in the "Are We Dating the Same Guy?" Facebook group, as well as internal communications discussing the risks of prioritizing high-engagement content. Meta's responses—or lack thereof—to such notifications are critical to establishing its knowledge of the harm caused to individuals, including the Plaintiff.

Discovery is critical to Plaintiff's case because it will reveal the extent of Meta's active participation in content amplification, its financial incentives to amplify harmful posts, and its knowledge of the harm caused by its platform. Courts have recognized the importance of discovery in cases where platforms' internal processes are central to determining their immunity under Section 230. See *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (discovery required to assess the role of algorithms in content creation). This requested discovery will allow Plaintiff to demonstrate that Meta's conduct disqualifies it from Section 230 immunity and establishes its liability for the harm suffered by Plaintiff.

11

SA-107

## PLAINTIFF'S CLAIMS ARE VIABLE UNDER STATE LAW

### A.  Illinois Right of Publicity Act

Meta improperly used Plaintiff's identity, including his photograph and personal information, to drive user engagement and generate advertising revenue. Such unauthorized commercial use violates IRPA. Courts have recognized that monetized uses of identity satisfy IRPA's commercial purpose requirement. *See Lukis* 549 F. Supp. 3d at 805.

### B.  Defamation

Meta's amplification of posts imputing criminal behavior alleging rape by the Plaintiff and harming his professional reputation satisfies the threshold for defamation per se under Illinois law. Additionally, Plaintiff adequately pleads defamation per quod by detailing specific damages, including lost professional opportunities and reputational harm, in compliance with the heightened pleading standard of Rule 9(g).

### C.  False Light Invasion of Privacy

Meta amplified content that cast Plaintiff in a false light, portraying him as dangerous and untrustworthy. These actions caused reputational and emotional harm, and Meta's editorial decisions demonstrate actual malice.

### D.  Negligence and Negligent Entrustment

Plaintiff has also sufficiently pleaded negligence, alleging that Meta failed to exercise reasonable care in both moderating harmful content and designing algorithms that amplified defamatory materials. Courts have increasingly recognized that platforms may be held liable for negligence when they engage in conduct beyond mere passive hosting. Plaintiff alleges that Meta's

SA-108

algorithms prioritized harmful content targeting him, and that Meta failed to take reasonable measures to mitigate or prevent this harm. These allegations of active involvement and failure to exercise reasonable care are more than sufficient to state a claim for negligence.

**E.     Unjust Enrichment**

Meta profited unjustly by monetizing harmful posts at Plaintiff's expense. Illinois law permits recovery where a defendant gains financial benefits through wrongful conduct. *See Vanzant v. Hill's Pet Nutrition, Inc*., 934 F.3d 730, 739 (7th Cir. 2019).

## META'S FIRST AMENDMENT DEFENSE IS UNFOUNDED

Meta's amplification of harmful content is not protected under the First Amendment. Defamatory speech, particularly when amplified for profit, falls outside the scope of First Amendment protections. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974). Furthermore, Meta's algorithmic curation and promotion of harmful content constitute active participation rather than neutral moderation, disqualifying it from constitutional safeguards for editorial discretion.

## DISCOVERY IS NECESSARY TO RESOLVE FACTUAL ISSUES

Meta's arguments hinge on factual issues that necessitate discovery to resolve. Plaintiff seeks internal documents detailing how Meta's algorithms prioritized AWDTSG content, data demonstrating Meta's knowledge of harmful activity within the group, and communications related to monetization strategies tied to high-engagement posts. This evidence is critical to understanding the extent of Meta's role in amplifying and profiting from harmful content.

**A.     Section 230 of the Communications Decency Act Does Not Bar Plaintiff's Claims**

SA-109

Under Section 230(f)(3), a party loses immunity when it is responsible "in whole or in part" for the "creation or development" of content. *See Fair Housing Council of San Fernando Valley, LLC,* 521 F.3d at 1168. Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand did more than passively host content. The SAC alleges that Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand edited, curated, and moderated content to ensure it complied with their group's defamatory objectives, assisting users in circumventing liability (SAC, ¶ 20). Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand manually reviewed and approved posts, including those defaming Plaintiff, demonstrating active participation (SAC, ¶¶ 5, 55-56). Additionally, Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand explicitly encouraged the posting of defamatory and infringing material by providing "guidelines" on how to avoid detection while maintaining inflammatory content. These facts demonstrate that Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand acted as information content providers and are therefore ineligible for immunity under Section 230.

Section 230(e)(2) explicitly excludes intellectual property claims from immunity. Plaintiff's claim under the Illinois Right of Publicity Act (IRPA) is rooted in the unauthorized commercial use of his likeness for fundraising and user engagement. Courts recognize that IRPA claims fall under the intellectual property exception. See *Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1103 (7th Cir. 2022). Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand's use of Plaintiff's photograph alongside defamatory posts to monetize the group directly implicates this exception (SAC, ¶¶ 31, 81).

## B.      Plaintiff States a Plausible Claim for Defamation

SA-110

Plaintiff identifies specific false statements, including allegations falsely associating Plaintiff with criminal conduct (sexual assault charges against "Anthony LaMonica") (SAC, ¶¶ 46, 50-52, 93) and statements implying Plaintiff's cruelty and dishonesty (SAC, ¶¶ 13, 19, 53). These statements are defamatory *per se* as they impute criminal activity and harm Plaintiff's professional reputation. Unlike generalized opinions, these statements assert or imply verifiable facts.

Statements of opinion lose protection when they imply underlying false facts. See *Madison v. Frazier*, 539 F.3d 646, 655 (7th Cir. 2008). By linking Plaintiff to criminal allegations and falsely portraying him as abusive, Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand crossed this line. The defamatory nature of these statements is further underscored by their publication alongside Plaintiff's photograph, amplifying the false factual implications.

Plaintiff has also alleged economic losses, including harm to his professional reputation and lost business opportunities, satisfying the heightened pleading standard for defamation per quod (SAC, ¶ 162).

## C.    Plaintiff States a Valid Claim Under the Doxing Act

Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand published Plaintiff's photograph, full name, and employment details to an online group with over 100,000 members. These details fall squarely within the definition of Personally Identifiable Information (PII) under 740 ILCS 195/15 (SAC, ¶¶ 46, 104-105).

The SAC plausibly alleges that Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand's actions exposed Plaintiff to a realistic threat of harassment, stalking, or violence. For

SA-111

instance, commenters requested details about Plaintiff's employer, amplifying the risk of harm (SAC, ¶ 47). Additionally, Plaintiff describes significant emotional and psychological harm caused by Defendants' conduct (SAC, ¶¶ 66-67, 105-106). These allegations are specific and sufficient to state a claim.

### D.    The Illinois Right of Publicity Act Claim is Properly Pled

Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand's use of Plaintiff's photograph to attract users and monetize their platform constitutes "commercial use" under IRPA. See 765 ILCS 1075/5. Plaintiff alleges that Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand raised $55,000 via a GoFundMe campaign prominently featuring Plaintiff's likeness without authorization (SAC, ¶¶ 31, 81). These facts satisfy the statutory elements.

### E.    Plaintiff States a Viable Claim for False Light

Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand placed Plaintiff in a false light by portraying him as a criminal and morally reprehensible individual. These misrepresentations are "highly offensive to a reasonable person" and were published with reckless disregard for their falsity (SAC, ¶¶ 108-110). The false light claim is independent of the defamation claim and requires no additional factual support. See *Osundairo v. Geragos*, 447 F. Supp. 3d 727, 738 (N.D. Ill. 2020).

### F.    Plaintiff Sufficiently Pleads Unjust Enrichment

Plaintiff alleges that Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand profited through crowdfunding and advertising revenue generated by exploiting Plaintiff's likeness and defamatory content (SAC, ¶¶ 81, 87). Retaining these benefits would unjustly

SA-112

enrich Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand at Plaintiff's expense.
*See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E.2d 672, 678-79 (Ill. 1989).

## G. Plaintiff Has Properly Pleaded a Claim Under the Illinois Right of Publicity Act (IRPA)

### 1. Commercial Use of Plaintiff's Likeness

Defendant Abbigail Rajala's claim that her actions do not constitute "commercial use" ignores the allegations in ¶¶ 46, 79–81 of the Second Amended Complaint, which detail how Plaintiff's photograph and likeness were republished in a monetized forum for the benefit of its administrators. Specifically, Defendant Abbigail Rajala's republication was on a platform where administrators solicited donations, subscriptions, and crowdfunding (¶¶ 16, 28, 31). The platform used Plaintiff's likeness to drive user engagement, which was directly tied to advertising revenue (¶¶ 28, 81).

### 2. IRPA Exemptions Do Not Apply

Defendant Abbigail Rajala's reliance on the statutory exemption under 765 ILCS 1075/35(b)(1) is misplaced. The exemption applies only to non-commercial uses, whereas Plaintiff's allegations show Defendant Abbigail Rajala's actions were inextricably linked to the group's profit motives (¶¶ 16, 28, 81). These facts, when taken as true, render the exemption inapplicable.

### 3. Defendant's Intent to Exploit Plaintiff's Likeness

The Complaint alleges Defendant Abbigail Rajala republished Plaintiff's photograph and defamatory statements with the intent to harm Plaintiff's reputation and incite further

SA-113

engagement within the group, which directly benefited its monetization efforts (¶¶ 46, 81). This intent is sufficient under the IRPA.

Illinois law defines "commercial use" broadly to encompass any use intended to generate economic benefit (*Blair v. Nev. Landing P'ship,* 369 Ill. App. 3d 318, 321 (2006)). Defendant's conduct falls squarely within this definition.

## H.  Plaintiff Has Sufficiently Pleaded Defamation Per Se and Per Quod

### 1.  Defamatory Statements Are Actionable

Defendant Abbigail Rajala argues the statements are mere opinions. However, the Complaint identifies specific false and defamatory statements, including:

i.  Implying Plaintiff was accused of criminal sexual assault by equating him with a different individual (¶ 51); and

ii.  Statements characterizing Plaintiff as dishonest and immoral (¶¶ 46, 91–92).

These statements are actionable because they imply verifiable false facts and directly impute criminal activity and lack of integrity, which are defamatory per se (*Bryson v. News Am. Publs., Inc.*, 174 Ill. 2d 77, 88 (1996)).

### 2.  Sufficient Allegations of Damages

For defamation per quod, the Complaint pleads specific damages, including reputational harm, emotional distress, and loss of professional opportunities (¶¶ 85, 102, 162). These allegations meet the requirement to plead special damages, as they detail the specific harm Plaintiff suffered.

18

SA-114

## I.     Plaintiff Has Properly Pleaded False Light and Civil Conspiracy Claims

### 1.     False Light

Defendant Abbigail Rajala's publication of Plaintiff's photograph and statements created a false impression of criminality and immorality (¶¶ 108–110). The Complaint alleges Defendant acted with actual malice, knowing the statements were false or with reckless disregard for their truth (*Lovgren v. Citizens First Nat'l Bank of Princeton*, 126 Ill. 2d 411, 418 (1989)).

### 2.     Civil Conspiracy

Defendant Abbigail Rajala's participation in the group's coordinated campaign of harassment is detailed in ¶¶ 115–117. The Complaint alleges overt acts by Defendant, including republishing defamatory content (¶ 46) and contributing to a scheme designed to harm Plaintiff's reputation for the group's financial gain. These allegations satisfy the elements of conspiracy under Illinois law (*McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999)).

## J.     Plaintiff Has Pleaded a Viable Claim Under the Illinois Doxing Act

The Complaint sufficiently alleges all elements of a claim under 740 ILCS 195/15:

i.     Defendant Abbigail Rajala published Plaintiff's photograph and identifying information in a forum designed to harass and belittle men (¶¶ 46, 104).

ii.     Defendant Abbigail Rajala acted with intent to harm Plaintiff, as evidenced by her targeting him within a group known for inciting harassment (¶ 105).

iii.   Plaintiff suffered substantial emotional distress and life disruption as a direct result (¶¶ 105–106).

These allegations are plausible under the statutory framework.

### K.   Plaintiff's Unjust Enrichment Claim Is Properly Pleaded

Defendant Abbigail Rajala's argument that unjust enrichment is not an independent cause of action ignores its derivative nature in this case. Illinois law permits unjust enrichment claims when tied to underlying tortious conduct (*Cleary v. Philip Morris Inc*., 656 F.3d 511, 517 (7th Cir. 2011)). Defendant's wrongful use of Plaintiff's likeness and defamatory actions unjustly enriched her and the group's administrators at Plaintiff's expense (¶¶ 87–88).

### L.   Meta's Algorithmic Amplification Claim

The Complaint alleges Meta's algorithms actively amplified harmful content, turning it into first-party speech (¶¶ 61–74). While § 230 of the Communications Decency Act generally shields platforms from liability, Plaintiff plausibly alleges that Meta went beyond passive hosting by curating and promoting the defamatory content. Courts have recognized exceptions to § 230 where platforms contribute materially to harmful content (*Fair Hous. Council of San Fernando Valley*, 521 F.3d at 1162. Meta's actions fall within this exception.

### M.   The Complaint Plausibly Alleges Defendants Carol and Rodney Rajalas' Violation of the Illinois Right to Publicity Act.

Contrary to Defendants Carol and Rodney Rajalas' assertion, Plaintiff has alleged facts sufficient to establish the elements of a claim under the IRPA. To state a claim, a plaintiff must allege: (1) an appropriation of their identity, (2) without written consent, and (3) for a

SA-116

commercial purpose. *Huston v. Hearst Commc'ns Inc.*, 53 F.4th 1097, 1099 (7th Cir. 2022). Plaintiff's Complaint satisfies each of these elements.

Defendants Carol and Rodney Rajalas' network facilitated the unauthorized use of Plaintiff's identity. Plaintiff alleges that Defendants knowingly permitted the unauthorized distribution of his intellectual property and personally identifiable information through their internet network. The Complaint specifically states that Defendants "maintained, owned, and controlled" the network used for these unauthorized actions (Compl. ¶ 48). Defendants' assertion that their involvement is speculative is misplaced at the pleading stage, where all reasonable inferences are drawn in Plaintiff's favor.

Moreover, Commercial purpose is adequately pled adequately**.** Plaintiff alleges that his photograph and other intellectual property were posted in the "Are We Dating the Same Guy" Facebook group, a forum with inherently commercial undertones as it generates revenue for Meta through advertising and user engagement. Moreover, Defendants Carol and Rodney Rajalas' failure to prevent or stop the redistribution aligns with the IRPA's expansive definition of commercial purpose. At the motion-to-dismiss stage, whether the usage qualifies as commercial is a factual determination inappropriate for resolution now.

Defendants Carol and Rodney Rajalas' argument conflates liability under the IRPA with direct action. Defendants Carol and Rodney Rajalas erroneously argue that the IRPA claim requires them to have personally posted Plaintiff's image. The IRPA, however, extends liability to those who enable or facilitate the unauthorized use of another's identity, especially when that facilitation is through a system under their control. Here, Defendants are alleged to have knowingly maintained the means of the unauthorized use and benefited indirectly through their acquiescence.

SA-117

**N.**     **The Complaint Properly Alleges Unjust Enrichment.**

Defendants Carol and Rodney Rajalas' motion misunderstands Illinois law on unjust

enrichment. While unjust enrichment is not an independent cause of action, it serves as a

remedial theory tethered to a substantive claim. See *Vanzant* 934 F.3d at 739. Here, Plaintiff's

IRPA claim provides the underlying basis for his unjust enrichment allegation.

Here, Enrichment is clearly alleged. The Complaint plausibly alleges that Defendants

Carol and Rodney Rajalas were enriched by facilitating their daughter's defamatory and

unauthorized activities, which accrued benefits in the form of public attention and online

engagement.

The retention of benefits stemming from the exploitation of Plaintiff's intellectual

property and personally identifiable information without his consent is plainly inequitable. At

this stage, Plaintiff's allegations must be taken as true, and Defendants' factual disputes are

premature.

**O.**     **The Motion to Dismiss Ignores the Plausibility Standard.**

Defendants Carol and Rodney Rajalas' misapply the pleading standard under *Ashcroft v.*

*Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). At this stage,

Plaintiff is required only to plead enough facts to state a claim that is "plausible on its face." *Id.*

at 570. The Complaint exceeds this threshold by outlining specific actions by Defendants that

facilitated the unauthorized use of Plaintiff's identity. Defendants' Carol and Rodney Rajalas'

insistence on a heightened standard of proof is improper and unsupported.

**IV.     CONCLUSION**

22

SA-118

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' motions to dismiss in their entirety. Plaintiff's Second Amended Complaint pleads detailed, plausible, and factually supported claims against all Defendants under the Illinois Right of Publicity Act, for defamation, false light invasion of privacy, unjust enrichment, and related state law causes of action.

At this early stage of litigation, Defendants' arguments improperly conflate the pleading requirements under *Twombly* and *Iqbal* with evidentiary burdens reserved for later stages of the case. Defendants raise factual disputes and attempt to introduce defenses that are both premature and contrary to the procedural standards governing motions to dismiss. Courts consistently recognize that motions under Rule 12(b)(6) are not vehicles for resolving factual disputes or testing the sufficiency of evidence.

Plaintiff has alleged sufficient facts, which, when taken as true and construed in the light most favorable to him, demonstrate plausible entitlement to relief. Furthermore, if this Court finds any deficiencies in the pleadings, Plaintiff respectfully requests leave to amend the complaint to cure such issues in accordance with Rule 15(a)(2) of the Federal Rules of Civil Procedure, which provides that leave to amend "shall be freely given when justice so requires."

Frances Haugen's testimony to Congress reinforces Plaintiff's allegations that Meta's algorithmic decisions prioritize engagement over safety, actively amplifying harmful content for profit. As Haugen testified, Meta's profit-driven practices harm individuals and society, and Congress must intervene to regulate its systems. This testimony underscores the importance of holding Meta accountable for its role in amplifying harmful content that caused significant harm to Plaintiff.

SA-119

Plaintiff looks forward to the opportunity to proceed to discovery, where the full extent of Defendants' misconduct and liability can be further illuminated. Accordingly, Plaintiff respectfully urges this Court to deny Defendants' motions and allow this matter to proceed on the merits.

Respectfully submitted,

*/s/ Marc P. Trent*

Attorney for Plaintiff

**TRENT LAW FIRM, P.C.**
Attorney No. 6324928
Marc P. Trent
600 W. Jackson Blvd #100
Chicago, IL 60661
service@trentlawfirm.com
Office: (630) 682-3100
Fax: (630) 682-3554
www.trentlawfirm.com

SA-120

# Exhibit A



United States Senate Committee on Commerce, Science and Transportation

*Sub-Committee on Consumer Protection, Product Safety, and Data Security*

### <u>Statement of Frances Haugen</u>
### <u>October 4, 2021</u>

Chairman Blumenthal, Ranking Member Blackburn, and Members of the Subcommittee. Thank you for the opportunity to appear before you and for your interest in confronting one of the most urgent threats to the American people, to our children and our country's well-being, as well as to people and nations across the globe.

My name is Frances Haugen. I used to work at Facebook and joined because I think Facebook has the potential to bring out the best in us. But I am here today because I believe that Facebook's products harm children, stoke division, weaken our democracy and much more. The company's leadership knows ways to make Facebook and Instagram safer and won't make the necessary changes because they have put their immense profits before people. Congressional action is needed. They cannot solve this crisis without your help.

I believe that social media has the potential to enrich our lives and our society. We can have social media we enjoy — one that brings out the best in humanity. The Internet has enabled people around the world to receive and share information and ideas in ways never conceived of before. And while the Internet has the power to connect an increasingly globalized society, without careful and responsible development, the Internet can harm as much as it helps.

I have worked as a product manager at large tech companies since 2006, including Google, Pinterest, Yelp and Facebook. My job has largely focused on algorithmic products like Google+ Search and recommendation systems like the one that powers the Facebook News Feed. Working at four major tech companies that operate different types of social networks, I have been able to compare and contrast how each company approaches and deals with different challenges. The choices being made by Facebook's leadership are a huge problem — for children, for public safety, for democracy     that is why I came forward. And let's be clear: it doesn't have to be this way. We are here today because of deliberate choices Facebook has made.

I joined Facebook in 2019 because someone close to me was radicalized online. I felt compelled to take an active role in creating a better, less toxic Facebook. During my time at Facebook, first working as the lead product manager for Civic Misinformation and later on Counter-Espionage, I saw that Facebook repeatedly encountered conflicts between its own profits and our safety. *Facebook consistently resolved those conflicts in favor of its own profits.* The result has been a system that amplifies division, extremism, and polarization — and undermining societies around the world. In some cases, this dangerous online talk has led to actual violence that harms and even kills people. In other cases, their profit optimizing machine is generating self-harm and self-hate — especially for vulnerable groups, like teenage girls. These problems have been confirmed repeatedly by Facebook's own internal research.

This is not simply a matter of some social media users being angry or unstable. Facebook became a $1 trillion company by *paying for its profits with our safety, including the safety of our children.* And that is unacceptable.

I believe what I did was right and necessary for the common good — but I know Facebook has infinite resources, which it could use to destroy me. I came forward because I recognized a frightening truth: almost no one outside of Facebook knows what happens inside Facebook. The company's leadership keeps vital information from the public, the U.S. government, its shareholders, and governments around the world. The documents I have provided prove that Facebook has repeatedly misled us about what its own research reveals about the safety of children, its role in spreading hateful and polarizing messages, and so much more. I appreciate the seriousness with which Members of Congress and the Securities and Exchange Commission are approaching these issues.

The severity of this crisis demands that we break out of previous regulatory frames. A critical starting point for effective regulation is transparency: full access to data for research not directed by Facebook. On this foundation, we can build sensible rules and standards to address consumer harms, illegal content, data protection, anticompetitive practices, algorithmic systems and more.

As long as Facebook is operating in the dark, it is accountable to no one. And it will continue to make choices that go against the common good. *Our common good.*

SA-122

When we realized tobacco companies were hiding the harms it caused, the government took action. When we figured out cars were safer with seat belts, the government took action. And today, the government is taking action against companies that hid evidence on opioids.

I implore you to do the same here.

Right now, Facebook chooses what information billions of people see, shaping their perception of reality. Even those who don't use Facebook are impacted by the radicalization of people who do. A company with control over our deepest thoughts, feelings and behaviors needs real oversight.

*But Facebook's closed design means it has no oversight — even from its own Oversight Board, which is as blind as the public*. Only Facebook knows how it personalizes your feed for you. It hides behind walls that keep the eyes of researchers and regulators from understanding the true dynamics of the system. When the tobacco companies claimed that filtered cigarettes were safer for consumers, it was possible for scientists to independently invalidate that marketing message and confirm that in fact they posed a greater threat to human health.[1] But today we can't make this kind of independent assessment of Facebook. We have to just trust what Facebook says is true — and they have repeatedly proved that they do not deserve our blind faith.

This inability to see into the actual systems of Facebook and confirm that Facebook's systems work like they say is like the Department of Transportation regulating cars by watching them drive down the highway. Imagine if no regulator could ride in a car, pump up its wheels, crash test a car, or **even know that seat belts *could* exist**. Facebook's regulators can see some of the problems — but they are kept blind to what is causing them and thus can't craft specific solutions. They cannot even access the
                                                                                                    How
is the public supposed to assess if Facebook is resolving conflicts of interest in a way that is aligned with the public good if it has no visibility and no context into how Facebook really operates?

This must change.

---

[1] James Hamblin. "If My Friend Smokes Sometimes, Should the Cigarettes Have Filters? An honest question." The Atlantic. https://www.theatlantic.com/health/archive/2017/07/cigarette-filters/533379/

Facebook wants you to believe that the problems we're talking about are unsolvable. They want you to believe in false choices. They want you to believe you must choose between connecting with those you love online and your personal privacy. That in order to share fun photos of your kids with old friends, you must also be inundated with misinformation. They want you to believe that this is just part of the deal. *I am here to tell you today that's not true. These problems are solvable. A safer, more enjoyable social media is possible.* But if there is one thing that I hope everyone takes away from these disclosures it is that Facebook chooses profit over safety every day — and without action, this will continue.

*Congress can change the rules Facebook plays by and stop the harm it is causing.*

I came forward, at great personal risk, because I believe we still have time to act. But we must act now.

Thank you.

Case: 1:24-cv-00678 Document #: 87 Filed: 01/30/25 Page 29 of 38 PageID #:656

# EXHIBIT B



∞ Meta    **Get started**    **Advertise**    **Learn**    **Support**    🔍    Start Now

***Update 08/08/2019: We replaced relevance score with ad relevance diagnostics to make diagnosing ad relevance clearer and more actionable.***

On Facebook, we try to show people the ads that are most pertinent to them. That's why we've always used relevance as a factor in determining how we deliver ads. Taking relevance into account helps ensure that people see ads that matter to them, leading to a better experience for people and businesses alike.

Beginning this week, we're going to start showing relevance scores as a visible metric in our ads reporting tools. Here's what advertisers should know.



## How relevance scores work

Relevance score is calculated based on the positive and negative feedback we expect an ad to receive from its target audience. The more positive interactions we expect an ad to receive, the higher the ad's relevance score will be. (Positive indicators vary depending on the ad's objective, but may include video views, conversions, etc.) The more times we expect people to hide or report an ad, the lower its score will be.

Ads receive a relevance score between 1 and 10, with 10 being the highest. The score is updated as people interact and provide feedback on the ad. Ads with guaranteed delivery — like those bought through reach

SA-125

Case: 1:24-cv-00678 Document #: 87 Filed: 01/30/25 Page 30 of 38 PageID #:657

and frequency — are not impacted by relevance score. Relevance score has a smaller impact on cost and delivery in brand awareness campaigns, since those ads are optimized for reaching people, rather than driving a specific action like installs.

## Why relevance score matters



∞ Meta    Get started    Advertise    Learn    Support    Start Now

Understanding relevance scores helps advertisers in a few key ways:

**It can lower the cost of reaching people.** Put simply, the higher an ad's relevance score is, the less it will cost to be delivered. This is because our ad delivery system is designed to show the right content to the right people, and a high relevance score is seen by the system as a positive signal.

Of course, relevance isn't the only factor our ad delivery system considers. Bid matters too. For instance, if two ads are aimed at the same audience, there's no guarantee that the ad with an excellent relevance score and low bid will beat the ad with a good relevance score and high bid. But, overall, having strong relevance scores will help advertisers see more efficient delivery through our system.

**It can help advertisers test ad creative options before running a campaign.** Advertisers can test different combinations of image and copy with different audiences, and learn which combinations offer the highest relevance scores.

**It can help optimize campaigns already in progress.** While ad campaigns are running, advertisers can monitor their relevance scores. If a score begins to dip, it may be an indicator that the ad's creative or audience needs to be refreshed.

## How to use relevance scores

While understanding relevance scores has real benefits for advertisers, it's important to keep this metric in perspective. Relevance scores should not be used as the primary indicator of an ad's performance. As has long been the case on Facebook, the most important factor for success is bidding based on the business goal you hope to meet with an ad.

Say, for instance, you own a pizza shop and want to run a campaign that drives people to order through your website. Achieving the desired outcome — in this case, driving sales online — is ultimately more important than your relevance score. If you have an average score but your ad is working, you may not want to change anything. Or you may consider tweaking the ad to see how you can get lower cost of delivery by improving the relevance score. Or you might monitor your relevance score, along with the sales you're driving, to learn when it's time to update your campaign.

Use relevance scores as a way to reach your audiences at lower cost, and to test and learn about your ad creative and ad targeting. But understand that having a good relevance score is not an end unto itself.

## Getting started

SA-126

Relevance score rolls out globally starting this week; it can be viewed in any of our ads reporting tools and is also available through our ads API to our partners and ads API developers. To check your ads' scores, head to Ads Manager and add the relevance score tab to your ads report(s).

∞ Meta

**Get started**     **Advertise**     **Learn**     **Support**

Start Now

Every connection is an opportunity.
It's Your World.

∞ Meta

## Meta Technologies

## Tools

## Goals

## Business Types

## Industries

## Inspiration

## Skills and Training

Inspiration

---

Skills and Training

---

Guides and Resources

---

Business Help Center



## Meta

**Get started**  **Advertise**  **Learn**  **Support**

© 2025 Meta

   

Start Now

---

About   Developers   Careers   Privacy   Cookies   Terms   Help Center

---

English (US)   More languages

# EXHIBIT C

 Meta 🔍

Back to Newsroom

Facebook

# Showing More Timely Stories from Friends and Pages

September 18, 2014
Erich Owens and David Vickrey

*By Erich Owens, Software Engineer and David Vickrey, Engineering Manager*

Our goal with News Feed is to show everyone the right content at the right time so they don't miss the stories that are important to them. We've heard feedback that there are some instances where a post from a friend or a Page you are connected to is only interesting at a specific moment, for example when you are both watching the same sports game, or talking about the season premiere of a popular TV show. There are also times when a post that is a day or two old may not be relevant to you anymore. Our latest update to News Feed ranking looks at two new factors to determine if a story is more important in the moment than other types of updates.

**Factoring in trending topics**

One way we show timely content higher-up in News Feed is to show people stories about things that are trending as soon as they occur, so you can immediately know what your friends or favorite Pages are saying about the stories of the day. This

SA-129

means that when a friend or Page you are connected to posts about something that is currently a hot topic of conversation on Facebook, that post is more likely to appear higher up in News Feed, so you can see it sooner. Early testing of a small percentage of posts has shown that this update on average leads to a more than 6% increase in people engaging with these stories (e.g., more people share, comment, like or click).



## Looking at when people like or comment

The second update takes into account the rate at which people are liking or commenting on a post. Currently one of the signals we look at is the total number of likes that a post has received when determining how high up to to show it in News Feed. With this update, we are going to begin looking at *when* people are choosing to like, comment and share.

If people are engaging with the post right after it is posted, and not as much a few hours later, this suggests that the post was most interesting at the time it was posted, but potentially less interesting at a later date. Based on this signal it is more likely to appear higher in News Feed earlier on and lower at a later date.

We are also going to start taking this signal into account when considering which stories we bump in News Feed. Bumping is when we resurface stories that people did not scroll down far enough to see but are still getting lots of engagement. This is one more way that we're working to identify timely posts so we can sho<span>SA-1130</span>

nearer the top of your News Feed sooner.

**Will this affect my Page?**

We will be rolling out these changes gradually and do not expect posts to see significant changes in distribution as a result of this update. If a Page posts about a trending topic or if a post sees a high velocity of engagement early on that then drops off, that post may begin to see increased distribution early on and less distribution over time. Pages should keep producing great content that is relevant and resonates with their audience.

Categories:
Facebook, Inside Feed, News Feed FYI

Tags: News Feed, Pages, Trending

  

**RELATED NEWS**

Instagram

## New Ways to Create Content on Instagram

We're sharing updates to reels, feed photos, carousels and stories that make it easier to create content.

November 15, 2023

### Related Pages

Facebook

SA-131

Topics

Company News

Technology and Innovation

Data and Privacy

Safety and Expression

Combating Misinformation

Economic Opportunity

Election Integrity

Strengthening Communities

Diversity and Inclusion

## Featured News

Meta

Reflecting on Meta's $8 Billion Investment in Privacy

January 28, 2025

## Meta

Building Toward a Smarter, More Personalized Assistant

January 27, 2025



Follow Us

    

## Virtual reality

## Smart glasses

SA-133

About us ⌄

Our community ⌄

Our actions ⌄

Support ⌄

© 2025 Meta    Community Standards    Data Policy    Terms    Cookie policy

United States

(English) ▼

SA-134