In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 25-2231

NIKKO D'AMBROSIO,

*Plaintiff-Appellant,*

*v.*

META PLATFORMS INC., et al.,

*Defendants-Appellees.*

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:24-cv-00678 — **Sunil R. Harjani**, *Judge.*

————————————

ARGUED FEBRUARY 13, 2026 — DECIDED MAY 15, 2026

————————————

Before BRENNAN, *Chief Judge*, and HAMILTON and SCUDDER,
*Circuit Judges.*

HAMILTON, *Circuit Judge*. In this appeal, we affirm dismissal of a litany of claims arising from a few social media posts about the plaintiff's reportedly obnoxious behavior on dates and after a breakup. We also order plaintiff and his attorneys to show cause why they should not face sanctions for frivolously appealing the dismissal of his claims against the author of some of those posts (a woman he briefly dated) and her

parents. Plaintiff failed to offer even colorable grounds for reversing the claims against those defendants. Moreover, his attorney submitted a brief with fictitious quotations, citations, and claims that should have been avoided with routine cite-checking.

I.   *Factual and Procedural Background*

Because we are reviewing a grant of motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), we recount the facts as alleged in plaintiff's Second Amended Complaint and the attached exhibits. See *Thompson v. Illinois Dep't of Professional Regulation*, 300 F.3d 750, 754 (7th Cir. 2002). "Are We Dating the Same Guy? | Chicago" ("the Group") is a Facebook group with around one hundred thousand members in which women discuss their experiences dating Chicago-area men. This case arises from several posts made in the Group about plaintiff-appellant Nikko D'Ambrosio, who alleges that defendant Abbigail Rajala, a woman he briefly dated, and over two dozen unidentified users published photographs of him, made defamatory statements, and invaded his privacy.

The complaint is not always clear about the precise timing and sequence of the relevant posts, but they occurred in November and December 2023. As described in the complaint and according to the attached exhibits, they amount to the following. Ms. Rajala wrote about her unpleasant experience briefly dating D'Ambrosio:

> We met organically in Chicago two and a half months ago. Very clingy [and] very fast. Flaunted money very awkwardly and kept talking about how I don't want to see his bad side,

> especially when he was on business calls. He came to see me yesterday, and I explained how I didn't really want to stay the night[.] I just wanted to spend the day together. And this was his response.

Her next comment was:

> After I blocked his number, he texted me on another one. Which is the other text screenshot[.]

The first message Ms. Rajala referred to is not in the complaint, but the second is as follows, with expletives cleaned up for this opinion:

> Speak for yourself you ugly vial [sic] fake whore. Your ego matches that fake f****** face where you can't even smile in pictures because your teeth are so f*****. The truth hurts b**** and my message will stay with you forever c***.

The manner in which Ms. Rajala took the screenshot did not reveal D'Ambrosio's alternate phone number or any other identifying information. Despite several opportunities, D'Ambrosio never disputed that he sent this last message until oral argument in this appeal.

Several users responded to Ms. Rajala's comments with messages of support and consolation. At least one unidentified user asked for information about D'Ambrosio's employer for the stated purpose of trying to have him fired, but D'Ambrosio does not allege that Ms. Rajala or anyone else disclosed any such information.

Another unidentified user with the screenname "Monica Tska" responded with a link to a news article about a man

charged with sexual assault. The story identified the man as "Anthony LaMonica." A preview of the article, which appears in the exhibit attached to the complaint, shows a mugshot of a man who does not resemble D'Ambrosio. The comment includes the link and preview alone, with no other commentary. Ms. Rajala and some of the unidentified users had posted photographs of D'Ambrosio, each of which showed him dressed in ordinary clothing, facing the camera and smiling.[1]

Once D'Ambrosio became aware of the posts, he demanded—of whom, exactly, was unclear to the district court and remains unclear to us—that they be taken down. The posts remained up, although Ms. Rajala republished her comments anonymously. D'Ambrosio's complaint included sweeping, general allegations of economic, professional, emotional, and reputational harms he has suffered from the posts and their continued visibility.

D'Ambrosio filed this suit in the Northern District of Illinois. He raised several statutory and common-law claims under Illinois law. The gravamen of the allegations against the defendants remaining in this case is that Ms. Rajala made some of the posts about him; that defendants Rodney and Carol Rajala, Ms. Rajala's parents, were complicit in their adult daughter's online activities because she used their home

---

[1] The district court similarly concluded that the mugshot of the man did not resemble D'Ambrosio, citing Exhibit C, page 4 of the operative complaint. Page 1 of that exhibit shows another comment from "Monica Tska" responding to the same post as the link and describing a negative personal experience with D'Ambrosio. The comment is cut off on the right-hand side, but it starts with the words: "He is psycho! I met him . . . ." We ignore this other comment in addressing the defamation claim because D'Ambrosio has never specifically raised it.

internet connection; that the Group's administrators, defendants Blake Millbrand and Paola Sanchez, co-owners of defendant Spill the Tea, Inc. (collectively, the "STT defendants"), encouraged the allegedly tortious conduct of Ms. Rajala and the other users to promote the Group and to boost engagement for purposes of fundraising; and finally that defendant Meta Platforms, Inc., which operates Facebook, used its targeted recommendation algorithm to amplify the posts to drive advertising revenue.

Ms. Rajala, her parents, the STT defendants, and Meta each filed separate motions under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Second Amended Complaint for failure to state a claim. The district court granted the motions, concluded that any further amendment would be futile, and dismissed the case with prejudice.

D'Ambrosio appeals. The operative complaint asserts diversity jurisdiction under 28 U.S.C. § 1332(a). D'Ambrosio properly alleged the state citizenship of every named defendant, none of whom are citizens of Illinois (as he is), but he did not allege the state citizenship of twenty-six other unidentified defendants, users of the Group he named as Jane Does, including "Monica Tska." To ensure complete diversity and with this court's leave, he dismissed the appeal as to the Jane Doe defendants so that their unknown state citizenships no longer matter. See *Rao v. J.P. Morgan Chase Bank, N.A.*, 153 F.4th 541, 549 (7th Cir. 2025), *as amended on reh'g*, 2025 WL 2752720; Fed. R. App. P. 42(b)(2). We have appellate jurisdiction under 28 U.S.C. § 1291.

II.  *Standard of Review*

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We accept the complaint's factual allegations as true, but not "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Adams*, 742 F.3d at 728, quoting *Iqbal*, 556 U.S. at 678. We next work our way through the claims argued on appeal and then turn to sanctions.

III. *Statutory Claims*

A.  *Illinois Right of Publicity Act*

This claim runs against all remaining defendants. The Illinois Right of Publicity Act (IRPA) prohibits the "use [of] an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person." 765 ILCS 1075/30(a). A person's "identity" includes, among other things, his or her name, photograph, image, and likeness. 765 ILCS 1075/5. A "commercial purpose" is "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products,

merchandise, goods, or services; or (iii) for the purpose of fundraising." *Id*.[2]

D'Ambrosio's IRPA claims fail because he has not sufficiently alleged that any defendant used his likeness for a commercial purpose. This section of D'Ambrosio's opening brief mentioned Ms. Rajala only once, to note that her "repost was algorithmically amplified precisely because it generated reactions, which Meta then packaged for advertisers," Pl. Br. at 3–6, and it mentioned her parents not at all. D'Ambrosio made no attempt to connect any factual allegation about any of the Rajalas' conduct to a commercial purpose. He also has not identified any products, merchandise, goods, or services any of the Rajalas offered for sale, advertised, or promoted, nor any fundraising campaigns they personally advanced. The IRPA claims fails as to each of the Rajalas.

D'Ambrosio fares little better with the other defendants. First, he argued that Meta "algorithmically amplified inflammatory content, including unauthorized posts featuring his likeness, to maximize user engagement—a core monetization

---

[2] In provisions effective January 1, 2025, after the events alleged in this case, Illinois amended the IRPA to create a claim for unauthorized public use of a "digital replica." 765 ILCS 1075/5, 30(b); 2024 Ill. Laws 7585, 7590. Notably, the digital replica provision does not require a "commercial purpose" and extends liability not only to a principal violator but also to "[a]ny person who materially contributes to, induces, or otherwise facilitates a violation of [§ 30(b)] by another person after having obtained actual knowledge that the other person is infringing upon an individual's rights," with an exception for digital service providers that is itself subject to certain complicated exceptions. See 740 ILCS 1075/30(d)–(e). Contrary to D'Ambrosio's assertion at oral argument and notwithstanding questions of retroactivity, this new provision is irrelevant here because he does not allege the use of a digital replica.

vector for Meta through targeted ad revenue." Pl. Br. at 4. He cited no case law recognizing an IRPA claim for merely displaying unrelated advertisements near an individual's likeness.

In *Huston v. Hearst Communications, Inc.*, we wrote that an IRPA claim requires that the "identity must help sell something—whether it is that product or a separate product or service." 53 F.4th 1097, 1102 (7th Cir. 2022). Examples of using an identity to help sell something, we noted, include using a person's image in a media kit to sell advertising space to advertisers; as a free preview for a subscription background report service; or as a teaser for a license for a higher-resolution, unwatermarked version of the same image. See *id.* at 1100–02, citing first *Trannel v. Prairie Ridge Media, Inc.*, 987 N.E.2d 923, 930, 2013 IL App (2d) 120725, ¶ 22 (media kit); then *Lukis v. Whitepages Inc.*, 542 F. Supp. 3d 831, 837–38 (N.D. Ill. 2020) (free preview of subscription service); and then *Brown v. ACMI Pop Division*, 873 N.E.2d 954, 959–64, 375 Ill. App. 3d 276, 283–89 (2007) (teaser for license). By contrast, the defendant in *Huston*, which sold the names and personal information of nine million *Good Housekeeping* subscribers to direct mailing advertisers, lacked a commercial purpose because it never "held out [the plaintiff's identity] to aid, effectuate, or propose a commercial transaction." *Id.* at 1101–02, 1104. Still, *Huston* is not quite on-point, as there the plaintiff's identity was itself the product being sold, and the sale necessarily *preceded* the disclosure, a point we considered dispositive. *Id.* at 1101.

*Trannel*, on the other hand, is more instructive here. *Trannel* actually involved two uses of the image of the plaintiff and her minor daughter, who together won a gardening contest organized by the defendant, a magazine publisher. 987

N.E.2d at 925–26, ¶¶ 3–5. The first use was in the defendant's magazine, *McHenry County Living*, reporting on the winners of the contest, while the second was on the cover of a media kit the defendant used to sell advertising space in later editions of the magazine. *Id.* at 926–27, ¶¶ 6–7. The Appellate Court of Illinois held that while the media kit was for a commercial purpose, the magazine itself was not: "Contrary to defendant's argument, we believe that the two publications of the subject photograph were for entirely different purposes, one covered by the Act, one not." *Id.* at 931, ¶ 25. The publisher could not be deemed to have had a commercial purpose for using the plaintiff's photograph in the magazine merely because virtually all of the magazine's revenue came from advertisements displayed in the magazine. See *id.* at 925, 927, ¶¶ 3, 12.[3]

A free-floating profit motive is not enough. We assume Meta made money from displaying advertisements to people who viewed the posts. According to D'Ambrosio, advertising accounts for more than 98% of Meta's revenue. But a newspaper or magazine that prints a story featuring a photograph of the subject, as in *Trannel*, does not act with a "commercial purpose" and thereby open itself to potential liability under the

---

[3] The court in *Trannel* went on to conclude that the magazine story was "news," which the IRPA specifically lists as one of several "noncommercial purposes." 987 N.E.2d at 931, ¶ 25; 765 ILCS 1075/35(b)(2). We do not decide whether the posts alleged in this case were "news," and we do not read *Trannel* to suggest that the publisher would have had a commercial purpose for using the photograph in the magazine if the story did not qualify as "news," which it defined as a "report of a recent event: new information: fresh tidings." 987 N.E.2d at 931, ¶ 25. The point is that the mere display of advertisements next to a person's identity does not create a commercial purpose under IRPA.

IRPA merely because advertisements unrelated to the story appear in the same publication. Likewise, Meta did not have a commercial purpose in terms of the IRPA merely because it displayed advertisements for products or services unrelated to the posts on the same page with them.

As to the STT defendants, nothing in the complaint supports D'Ambrosio's assertion in his brief that his "identity and the surrounding controversy were engineered into a spectacle that drove traffic, galvanized support, and served as the emotional and narrative hook for soliciting funds." Pl. Br. at 5. As D'Ambrosio appears to concede, his image "was not literally displayed on these fundraising pages," nor were the posts linked to or from them. *Id*. Rather, he points to the "overall marketing scheme," drawing on *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014).

In *Jordan*, a basketball star asserted several state and federal law claims, including the IRPA, against a Chicago-area grocery chain that ran a full-page advertisement in *Sports Illustrated Presents* "congratulating" him for his induction into the Hall of Fame and prominently featuring the store's logo. *Id.* at 512, 518. We rejected the store's First Amendment defense as to all claims. Looking to the "content and context" of the advertisement, it had an "implicit but easily inferred," "dominant," "unmistakable commercial function" and was therefore commercial speech for First Amendment purposes, even though the advertisement did not itself propose a commercial transaction. *Id.* at 518, 520. Critically, we expressed no opinion on the merits of any of the claims, including under the IRPA. *Id.* at 522. Indeed, on remand the district court denied Jordan's motion for summary judgment on the IRPA claim because "the Seventh Circuit twice made clear it was *not*

No. 25-2231                                          11

saying" that speech qualifying as "commercial speech" for First Amendment purposes means the speaker has a "commercial purpose" under the IRPA. *Jordan v. Jewel Food Stores, Inc.*, 83 F. Supp. 3d 761, 769–70 (N.D. Ill. 2015).

*Jordan* does not support the conclusion that the STT defendants' solicitation of funds in a manner not directly connected to the posts about D'Ambrosio, merely a few of thousands concerning many other men, could amount to the "public use or holding out of" his identity "for the purpose of fundraising." 765 ILCS 1075/5. The case addressed a completely different issue, and D'Ambrosio's name and likeness do not have the marketing value remotely comparable to Michael Jordan's.[4]

B. *Civil Liability for Doxing Act*

The Doxing Act claim runs against Ms. Rajala and the STT Defendants, but not against Ms. Rajala's parents or Meta. Illinois' Civil Liability for Doxing Act took effect in 2024, and this court has not addressed it before. The Act allows a plaintiff to obtain damages, injunctive relief, and attorney fees for "doxing," defined as follows:

> An individual engages in the act of doxing when that individual intentionally publishes

---

[4] Because D'Ambrosio has not sufficiently alleged any defendant had a "commercial purpose," we do not address whether the posts fall into the IRPA exception for the "use of an individual's identity in an attempt to portray, describe, or impersonate that individual in a live performance, a single and original work of fine art, play, book, article, musical work, film, radio, television, or other audio, visual, or audio-visual work, provided that the performance, work, play, book, article, or film does not constitute in and of itself a commercial advertisement for a product, merchandise, goods, or services." 765 ILCS 1075/35(b)(1).

another person's personally identifiable information without the consent of the person whose information is published and:

(1) the information is published with the intent that it be used to harm or harass the person whose information is published and with knowledge or reckless disregard that the person whose information is published would be reasonably likely to suffer death, bodily injury, or stalking; and

(2) the publishing of the information:

(i) causes the person whose information is published to suffer significant economic injury or emotional distress or to fear serious bodily injury or death of the person or a family or household member of the person; or

(ii) causes the person whose information is published to suffer a substantial life disruption; and

(3) the person whose information is published is identifiable from the published personally identifiable information itself.

740 ILCS 195/10(a), 15(b), 20. We read a Doxing Act claim to have six elements: (1) intentional publication of personally identifiable information; (2) the published information identifies a person without reliance on extrinsic sources; (3) lack of consent to the publication; (4) intent to harm or harass; (5) knowledge or reckless disregard of a reasonable likelihood of death, bodily injury, or stalking to the person whose

information is published; and (6) one or more of the listed harms results.

"Stalking" is defined by reference to the Illinois Criminal Code (with an additional exception for protected protest activity not relevant here), which states:

> (a) A person commits stalking when he or she knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to:
>
>> (1) fear for his or her safety or the safety of a third person; or
>>
>> (2) suffer other emotional distress.
>
> . . .
>
> (c) Definitions. For purposes of this Section:
>
>> (1) "Course of conduct" means 2 or more acts, including but not limited to acts in which a defendant directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to or about, a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet. A course of conduct may include contact via electronic communications.
>>
>> . . .
>>
>> (3) "Emotional distress" means significant mental suffering, anxiety or alarm.

740 ILCS 195/5; 720 ILCS 5/12-7.3(a) & (c). In two cases preceding the enactment of the Doxing Act, the Illinois Supreme Court had struck "communicates to or about" from this statute as facially overbroad under the First Amendment and interpreted "threatens" to cover only true threats of unlawful violence. *People v. Relerford*, 104 N.E.3d 341, 356, 2017 IL 121094, ¶¶ 63, 65; *People v. Ashley*, 162 N.E.3d 200, 218, 2020 IL 123989, ¶ 73, *as modified on denial of reh'g*.

The required state of mind for a Doxing Act violation is "knowledge or reckless disregard that the person whose information is published would be reasonably likely to suffer death, bodily injury, or stalking," where stalking requires two or more acts in which a person "directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, [or makes a true threat of unlawful violence about] . . . a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet." 740 ILCS 195/5, 10(a); 720 ILCS 5/12-7.3(a), (c); *Relerford*, 104 N.E.3d at 356, ¶¶ 63, 65; *Ashley*, 162 N.E.3d at 218, ¶ 73.

D'Ambrosio's allegations do not meet that high standard. Because he has engaged in classic "shotgun pleading," parsing what exactly he alleges as to each particular defendant's state of mind is not easy. See *SEC v. Winemaster*, 529 F. Supp. 3d 880, 906 (N.D. Ill. 2021) (defining shotgun pleading). The complaint makes and reincorporates into each count several sweeping allegations about "Defendants" without qualification, a category that includes not only Ms. Rajala and the STT defendants but also Ms. Rajala's parents, Meta, and, at the time, all twenty-six Jane Does. Among the undifferentiated allegations as to the states of mind of all defendants are "actual

knowledge of intellectual property violations" and "encourage[ment]" of both those violations and the publication of "men's personally identifiable information and potentially defamatory statements," as well as acting "for financial gain."

Specific to the Doxing Act claim, the most relevant allegation as to Ms. Rajala and the STT defendants is:

> That the Defendants published said information with knowledge and/or reckless disregard to the fact that the publishing of defamatory statements accusing someone of horrific crimes such as criminal sexual assault alongside personally identifiable information to an online platform of over 100,000 individuals would cause Plaintiff to be reasonably likely or otherwise have reasonable fear that he is likely to suffer significant injury, including risk of death, bodily injury, or stalking.

D'Ambrosio alleges even further as to Ms. Rajala that she acted "with the *intent* of causing him reputational harm and putting him in reasonable fear of bodily harm to himself or his family at the hands of any of the 100,000 unidentified women involved in the unlawful conduct apparent in the 'Are We Dating the Same Guy?' communities." (Emphasis added.)

D'Ambrosio makes no effort to explain how someone could reasonably infer from Ms. Rajala's alleged conduct that she intended to put him in reasonable fear of death, bodily injury, or stalking. Nor does he explain how posting her impressions of D'Ambrosio as a date and a screenshot of a vile text message he sent her to a Facebook group of women sharing stories about men they have dated accomplishes that

purpose. None of the posts attributed to Ms. Rajala contain a call to action, much less a call to action for the Group's members or anyone else to harm D'Ambrosio or his family.

Nor does D'Ambrosio explain how we could reasonably infer that, even if Ms. Rajala lacked *intent*, she nonetheless knew of or recklessly disregarded a reasonable likelihood of death, bodily injury, or stalking. We emphasize, once again, that D'Ambrosio never alleged that he was actually stalked or subjected to bodily injury, nor that anyone attempted to do so. D'Ambrosio identified no past incidents of physical harm or stalking directed against men discussed in the Group. The Group's rules prohibit sharing screenshots with other people, and its administrators warn users about the risks of confronting men they personally know whom they see posted on it. The allegation that Ms. Rajala made "100,000 unidentified women" become aware of his conduct does not, without more, support an inference that she recklessly disregarded a reasonable likelihood that one of those women would physically harm D'Ambrosio or stalk him. Recall that the purpose of this online group was to help women identify men to *avoid*.

The same holds true for the STT defendants. To be clear, D'Ambrosio's allegations reasonably support an inference that the STT defendants recklessly encourage users to post sensational content regardless of its potentially tortious nature and that they take measures to prevent the subjects of such posts from becoming aware of their existence and to assist users in avoiding legal responsibility when they cross the line. Notwithstanding efforts to prevent information posted on the Group (and the others nationwide) from leaving the platform, nothing can really stop allegations of anything from rudeness to serious felonies from spreading elsewhere, as

other courts that have addressed these groups have noted. See *Doe v. Weston & Sampson Engineers, Inc.*, 743 F. Supp. 3d 751, 758–61, 765 (D.S.C. 2024) (denying anonymity because plaintiff posted in an "Are We Dating the Same Guy" group under her own name about subject matter of the lawsuit); *Acosta v. Vann*, No. 614173/2023, 2024 WL 3035174, at *4–7 (N.Y. Sup. Ct. June 17, 2024) (granting defendant's anti-SLAPP motion because her statements in an "Are We Dating the Same Guy" group took place in a "public forum" despite vetting of prospective users). We find no allegations in this case, however, from which we could reasonably infer that the STT defendants knew of or recklessly disregarded a risk to D'Ambrosio of death, bodily injury, or stalking.

Having dispensed with the merits of this claim, we can now turn to some serious problems with D'Ambrosio's opening brief. These are not the only problems, but we focus on the Doxing Act claim because that section seemed to have the highest density of them.

D'Ambrosio's attorney Aaron Walner wrote in his opening brief that Section 10 of the Doxing Act defines the term "personally identifiable information" to include: "Name, address, telephone number, email address, social security number, or any other information that can be used to identify a specific individual." Pl. Br. at 14, 20. But the definition comes in Section 5, not Section 10, and despite the use of quotation marks, that's somewhat close but not quite right.[5]

---

[5] In the Doxing Act:

"Personally identifiable information" means any information that can be used to distinguish or trace a person's identity, such as name, prior legal name, alias, mother's

We see such sloppy work in briefs fairly often, and almost always let it pass without comment as we try to focus on the merits of appeals. But the next sentence in attorney Walner's opening brief for D'Ambrosio said: "First, Illinois courts have consistently recognized that 'any other information that can be used to identify a specific individual' must be understood contextually." Pl. Br. at 14. No citation followed that claim about what the Illinois courts have actually done. We were not surprised to find no cases supporting the proposition. In fact, we found, as of the date of the opening brief, only one Illinois court decision indexed on Westlaw or Lexis even citing this statute. To the extent that decision is relevant at all, it seems to suggest the opposite of what D'Ambrosio asserted. See *Younge v. Berman*, 267 N.E.3d 346, 358–59, 2025 IL App (2d) 240354, ¶ 35 (publishing photograph of government official's

---

maiden name, and date or place of birth in combination with any other information that is linked or linkable to a person such as:

(1) social security number, home address, phone number, email address, social media accounts, or biometric data;

(2) medical, financial, education, consumer, or employment information, data, or records;

(3) any other sensitive or private information that is linked or linkable to a specific identifiable person, such as gender identity, sexual orientation, or any sexually intimate visual depiction; or

(4) any information that provides access to a person's teleconferencing, video-teleconferencing, or other digital meeting room.

740 ILCS 195/5.

house did not violate Doxing Act since nothing in photograph directly suggested the identity of the owner).[6]

The next paragraph was worse:

> Moreover, screen names, location tags, and group context provide the connective tissue that transforms partial identifiers into actionable disclosures. This view is supported by broader federal data privacy standards, which recognize [personally identifiable information] to include "any unique identifier that permits the physical or online contacting of a specific individual." (*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009)).

Pl. Br. at 14. The cited *Accusearch* case is real, but the quotation is not. *Accusearch* concerned the disclosure of "individually identifiable customer proprietary network information" as that term is used in the federal Telecommunications Act, 47 U.S.C. § 222. 570 F.3d at 1192. The words "unique," "identifier," and "contacting" do not appear in the opinion, nor does the phrase "specific individual."

In the next paragraph, attorney Walner's brief for D'Ambrosio misstated the standard for liability under the Doxing Act and once again misstated the relevant section as follows:

---

[6] D'Ambrosio's reply brief, also apparently written by Walner, admitted: "No reported appellate decision has yet construed the statute." Pl. Reply Br. 4, 10. We say "apparently" because while Walner signed the certificates of compliance and service, the brief itself is unsigned. See Fed. R. App. P. 32(d).

    1.  Publication of [personally identifiable infor-
mation];

    2.  With the intent to cause or reckless disregard
of the risk of causing: (a) stalking, harassment,
physical harm, or emotional distress.

Pl. Br. at 14. Once again, that's not the standard. See 740 ILCS 195/10(a)(1). In the following paragraphs, the brief applied this inaccurate standard and concluded as follows:

> This is precisely the type of "amplified exposure
> and endangerment" that the Act was designed
> to prevent. As the Illinois General Assembly ex-
> plained in its legislative findings, the doxing
> statute addresses the growing problem of
> "cyber vigilantism" that results in victims being
> targeted, harassed, and shamed in their real
> lives.

Pl. Br. at 15. The brief included no citation to any legislative findings, let alone any including the statute's targets as the brief asserted. We could not find any reference to the phrases "amplified exposure and endangerment" or "cyber vigilan-tism" within the Doxing Act. There also are no legislative findings included in the codification of the Doxing Act, 740 ILCS 195/1 et seq., the session law, 2023 Ill. Laws 8103–07, or any publicly available version of the bill.

These mistakes and fictitious quotations bear the hall-marks of the misuse of generative artificial intelligence. See, e.g., *Jones v. Kankakee County Sheriff's Dep't*, 164 F.4th 967, 969–70 (7th Cir. 2026) (summarizing potential and problems with use of generative artificial intelligence in briefing). The web-site of Trent Law Firm, P.C., where D'Ambrosio's attorneys

both practice, boasts of the firm's extensive incorporation of artificial intelligence into all areas of its representation. See *How Marc Trent Uses AI to Deliver Cutting-Edge Legal Solutions*, MarcTrent.ai (Dec. 3, 2025), https://perma.cc/6UHF-ABK2**.** Without making any broad judgments about the use of artificial intelligence for help in drafting briefs, however, regardless of how these particular errors came about, "submission of a brief with numerous fictitious citations and quotations is a serious dereliction of counsel's duty to serve as an officer of the court. 'Citing nonexistent case law or misrepresenting the holdings of a case is making a false statement to a court. It does not matter if [generative AI] told you so.'" *Prososki v. Regan*, 32 N.W.3d 593, 607, 321 Neb. 38, ___ (2026) (alteration in original), quoting Maura R. Grossman et al., *Is Disclosure and Certification of the Use of Generative AI Really Necessary*, 107 Judicature 68, 75 (2023), citing in turn Model Rule of Professional Conduct 3.3 (ABA 1983).

Submitting fictitious quotations to a court, regardless of how they are generated, is obviously inconsistent with the standards of conduct this court expects from attorneys practicing in this court and the standards of appellate briefing imposed by Federal Rule of Appellate Procedure 28. See *McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783, 791 (7th Cir. 2019); see also *Dec v. Mullin*, 171 F.4th 940, 947–48 (7th Cir. 2026) (under circuit's standards of professional conduct, attorneys promise they will "not knowingly misrepresent, mischaracterize, misquote, or miscite facts or authorities in any oral or written communication to the court").

IV. *Common-Law Claims*

   A. *Defamation*

The defamation claims run against Ms. Rajala, the STT defendants, and Meta. D'Ambrosio's opening brief focuses on the comment made by "Monica Tska," which he claims created a "clear" (and false) implication that he is the sex offender discussed in the article. D'Ambrosio does not allege that Ms. Rajala made this statement or is the same person as "Monica Tska." Rather, he seeks to hold the STT defendants and Meta liable as publishers or re-publishers. Illinois law, with some wrinkles, imposes liability on authors, publishers, and re-publishers of actionable defamatory statements. See *Catalano v. Pechous*, 419 N.E.2d 350, 361, 83 Ill. 2d 146, 168 (1980) (republisher liability); *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201, 204, 154 Ill. 2d 1, 5–6 (1992) (defamation suit against radio hosts and broadcasting company); *Bryson v. News America Publications, Inc.*, 672 N.E.2d 1207, 1212, 174 Ill. 2d 77, 83 (1996) (defamation suit against writer and publisher of magazine article).[7]

Under Illinois law, "words that impute the commission of a criminal offense" are "considered actionable *per se* and give rise to a cause of action for defamation without a showing of special damages." *Bryson*, 672 N.E.2d at 1214, 174 Ill. 2d at 88. However, Illinois applies the innocent construction rule, under which a statement "will not be actionable *per se* if it is reasonably capable of an innocent construction." *Tuite v. Corbitt*,

---

[7] We do not address Section 230 of the Communications Decency Act, 47 U.S.C. § 230, an affirmative defense raised in the alternative by both the STT defendants and Meta. See *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 565–67 (7th Cir. 2023); *Huon v. Denton*, 841 F.3d 733, 741–42 (7th Cir. 2016).

866 N.E.2d 114, 121, 224 Ill. 2d 490, 502 (2006). The question is whether, "in context, giving the words, and their implications, their natural and obvious meaning," the statement "may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff." *Bryson*, 672 N.E.2d at 1215, 174 Ill. 2d at 90, quoting *Chapski v. Copley Press*, 442 N.E.2d 195, 199, 92 Ill. 2d 344, 352 (1982). The innocent construction rule does not apply to an action for defamation *per quod*, which under Illinois law requires a plaintiff to plead and later to prove special damages. *Tuite*, 866 N.E.2d at 121, 123, 224 Ill. 2d at 501, 504.

On defamation *per se*, we agree with the district court that the comment made by "Monica Tska" is reasonably susceptible to an innocent construction, namely that it refers to someone else entirely, one Anthony LaMonica, and does not equate LaMonica and D'Ambrosio as the same person. Even if a user did not click the link to read the story, the string of characters "anthony-lamonica" is clearly visible in the comment itself. By contrast, D'Ambrosio was identified in the thread as "Nikko." Furthermore, appearing immediately below the link is a teaser of the article which shows a mugshot of a man who does not resemble D'Ambrosio. (Recall that his likeness was shared by other users who responded to the post.) In sum, the names and faces of the two men do not match, "Monica Tska" did not say they are the same person, and there is no indication in the complaint or exhibits that any other user responded to her comment in any way, much less to suggest such an identification. D'Ambrosio's last argument is that the comment must be read to imply he is LaMonica because it was posted in response to a call for information about himself. See *Tuite*, 866 N.E.2d at 127, 224 Ill. 2d at 512 (noting in innocent construction case that "the context of a statement is critical in

determining its meaning"). But the innocent construction is reasonable, so the defamation *per se* claim based on this comment must fail.

As for defamation *per quod*, Illinois law requires pleading special damages, so in federal court such damages sought must be "specifically stated." Fed. R. Civ. P. 9(g); *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003). D'Ambrosio did not "itemize his losses or plead specific damages of actual financial injury." *Muzikowski*, 322 F.3d at 927. Instead, he alleged in support of his defamation *per quod* claim only generally and without elaboration, "emotional distress, emotional loss, loss of professional opportunities, and damage to his reputation and relationships." The damages alleged as to his other claims and incorporated by reference in this claim were similarly vague, and equally unsupported by factual allegations. Nowhere did D'Ambrosio "identify a concrete loss," for example, specific professional opportunities denied to him because of the statements. See *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013); see also *Action Repair, Inc. v. American Broadcasting Cos.*, 776 F.2d 143, 150 (7th Cir. 1985) ("Although an estimation of final total dollar amounts lost is unnecessary, the pleadings must demonstrate some actual pecuniary loss.") (citation omitted). That omission dooms any defamation *per quod* claim.

Questioned at oral argument about the basis of any defamation claim against Ms. Rajala, D'Ambrosio's other attorney, Marc Trent, for the first time disputed the authenticity of the text message Ms. Rajala attributed to him and asserted it was "plausible" that she made it up. That message, recall, calls her an "ugly vial [sic] fake whore," a "b****," and a "c***." Despite having every incentive and multiple

opportunities to do so, D'Ambrosio never disputed the authenticity of the text or its attribution to him before the district court, nor in his opening or reply briefs on appeal. At oral argument, attorney Trent could identify no evidentiary basis for disputing his client sent the message. "Arguments raised for the first time at oral argument are forfeited." *Marvin v. Holcomb*, 72 F.4th 828, 833 n.6 (7th Cir. 2023). Every other statement attributed to Ms. Rajala is an opinion protected by Illinois defamation law and the First Amendment. See *Law Offices of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1129 (7th Cir. 2022). And regardless, D'Ambrosio has never alleged or argued that anything else she said is false. The defamation claim fails.[8]

B.  *False Light & Civil Conspiracy*

The false light and civil conspiracy claims also run against Ms. Rajala, the STT defendants, and Meta. Illinois recognizes the common law tort of false light invasion of privacy. *Lovgren v. Citizens First National Bank of Princeton*, 534 N.E.2d 987, 989, 126 Ill. 2d 411, 418 (1989). Decisions by Illinois courts and this court consistently conclude that the innocent construction rule in Illinois law applies to a false light claim unless the plaintiff has met the requirement for pleading special damages. See *Muzikowski*, 322 F.3d at 927 ("The 'of and

---

[8] Falsely attributing a text message of that nature does not fall into any of the categories of defamation *per se* recognized by Illinois law, but we assume it could give rise to a plausible claim for defamation *per quod*. It's not hard to understand that being identified as the author of such a text "is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Green v. Rogers*, 917 N.E.2d 450, 459, 234 Ill. 2d 478, 491–92 (2009).

concerning' requirement is basically the same as the innocent construction rule. If the statements can reasonably be construed as referring to somebody other than Muzikowski, then they are not 'of and concerning him,' and cannot state a false light claim.") (citation omitted), citing *Harte v. Chicago Council of Lawyers*, 581 N.E.2d 275, 280, 220 Ill. App. 3d 255, 263 (1991); see also *Benton v. Little League Baseball, Inc.*, 181 N.E.3d 902, 934, 2020 IL App (1st) 190549, ¶¶ 87–88; *Schaffer v. Zekman*, 554 N.E.2d 988, 993 & n.2, 196 Ill. App. 3d 727, 734 & n.2 (1990); *Gracia v. SigmaTron International, Inc.*, 244 F. Supp. 3d 762, 771 (N.D. Ill. 2017) (dismissing false light claim because defamation claim failed due to reasonable construction), *aff'd*, 986 F.3d 1058, 1066 (7th Cir. 2021) ("The district court . . . rightly saw SigmaTron's SEC disclosures as subject to an innocent construction."). The failure of D'Ambrosio's defamation *per se* claim on innocent construction grounds dooms his false light claim.

A civil conspiracy claim is not an independent tort under Illinois law, so when "a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails." *Chamara*, 24 F.4th at 1133, quoting *Indeck North American Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662, 316 Ill. App. 3d 416, 432 (2000). D'Ambrosio pleaded only the false light claim in support of the civil conspiracy claim, so the claims fall together.

C. *Negligence & Products Liability*

The claims for negligence, negligent entrustment, and strict products liability run against Meta alone. In its motion to dismiss, Meta argued that D'Ambrosio failed to state a claim on which relief could be granted because his own allegations (or lack thereof) foreclosed, as a matter of law, an

essential element of each claim. D'Ambrosio did not respond at all as to products liability. His response on the two negligence-based claims consisted of only one paragraph that made sweeping assertions that did not actually address the elements of the claims Meta argued his own allegations foreclosed and did not support his assertions with citations to any authorities whatsoever. The district court held that D'Ambrosio waived these claims by failing to respond meaningfully to Meta's arguments. In the alternative, the court also ruled for Meta on the merits of each claim.

D'Ambrosio addressed the merits of these claims in his opening brief—appropriate given the district court's alternative holdings—but he did not address the district court's first basis for dismissing each claim, its conclusion that he waived them. Whether or not we agree precisely with the district court's waiver analysis, on appeal the appellant bears the burden of advancing reasons for reversal. See *Rahn v. Board of Trustees of Northern Illinois University*, 803 F.3d 285, 291 (7th Cir. 2015); see also *Dotson v. Faulkner*, 138 F.4th 1029, 1031 (7th Cir. 2025) ("[W]hen the district court decides a case on a particular ground, that subject must be addressed in the appellant's opening brief, if appellant wants it reviewed."). We could not reverse dismissal of these claims without rejecting the district court's conclusion that they were waived, and D'Ambrosio missed his chance to argue why we should do so. We therefore affirm without addressing the merits of these claims.

## V. *Sanctions*

This is a relatively rare appeal in which sanctions appear to be appropriate. This court may, in its discretion and upon notice and a reasonable opportunity to respond, impose

sanctions for a frivolous appeal by awarding just damages and single or double costs to the appellee, which may include an award of an appellee's attorney fees "limited to work defending the appeal." Fed. R. App. P. 38; *Quincy Bioscience, LLC v. Ellishbooks*, 967 F.3d 613, 616 (7th Cir. 2020).

"An appeal is frivolous if the appellant's claims are cursory, totally undeveloped, or reassert a previously rejected version of the facts. An appeal is also frivolous if it presents arguments that are so insubstantial that they are guaranteed to lose." *McCurry*, 942 F.3d at 791 (citation omitted); see also *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 938 (7th Cir. 1989) (en banc) ("An appeal is 'frivolous' when the result is foreordained by the lack of substance to the appellant's arguments."). Sanctions may be imposed "for the part of an appeal that is frivolous even if the presence of a colorable ground prevents the entire appeal from being adjudged frivolous." *Hill v. Norfolk & Western Railway Co.*, 814 F.2d 1192, 1200 (7th Cir. 1987), *as amended*. Both the party and his attorney may be sanctioned under Rule 38, and they may be held jointly and severally liable. See *Upchurch v. O'Brien*, 111 F.4th 805, 814 (7th Cir. 2024).

Separate from Rule 38, when "a judgment is affirmed by the Supreme Court or a court of appeals, the court in its discretion may adjudge to the prevailing party just damages for his delay, and single or double costs." 28 U.S.C. § 1912; see also § 1927 ("Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.").

The federal rules allow this court to discipline an attorney who comes before it:

> A court of appeals may discipline an attorney who practices before it for conduct unbecoming a member of the bar or for failure to comply with any court rule. First, however, the court must afford the attorney reasonable notice, an opportunity to show cause to the contrary, and, if requested, a hearing.

Fed. R. App. P. 46(c). Such discipline may include a monetary fine. See *Camacho-Valdez v. Garland*, 30 F.4th 675, 680 (7th Cir. 2022). Federal courts also possess the inherent authority to sanction bad faith conduct, even conduct that also may be sanctioned under a statute or the federal rules. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49–50 (1991).

This appeal was entirely frivolous at least as to each of the Rajalas. Outside of the statement of the case, the Rajalas were mentioned only once in D'Ambrosio's opening brief. Even that was only a passing reference in a paragraph arguing why the IRPA claim against Meta should go forward. Pl. Br. at 6. For the IRPA claim, despite sections addressing the supposed "commercial purposes" of the STT defendants and Meta, D'Ambrosio conspicuously did not address the Rajalas, even though the district court concluded that his allegations as to them were insufficient. IRPA was the *only* claim on appeal against Ms. Rajala's parents.

For the Doxing Act claim against Ms. Rajala, D'Ambrosio's arguments can plausibly be read to apply to her. Yet, as discussed above, that section of his brief is replete with fictitious

quotations and misstatements of law, matter that cannot form the basis of a non-frivolous appeal. See *id*. at 13–16.

Finally, D'Ambrosio's attorney Trent asserted that the basis for the defamation and false light claims (and therefore also the civil conspiracy claim) against Ms. Rajala were her posts and her attribution of the text message to D'Ambrosio. But D'Ambrosio's opening brief focused on the comment made by "Monica Tska," not any of Ms. Rajala's own posts, and in no way addressed the district court's conclusion that everything she allegedly said was either a fact not in dispute or an opinion. Moreover, D'Ambrosio had not alleged or even suggested he did not send the vile text until oral argument in this appeal, meaning any potential claim based on that statement was doomed as well.

In short, D'Ambrosio and his attorneys failed to advance any conceivable reason for this court to reverse the dismissal of any of his claims against any of the Rajalas. D'Ambrosio and his attorneys, Walner and Trent, are ORDERED to show cause why this court should not impose the following sanctions:

- Against D'Ambrosio and attorneys Walner and Trent, jointly and severally, attorney fees the Rajalas incurred defending this appeal and double costs, payable to the Rajalas, for frivolously appealing the dismissal of the claims against them. Fed. R. App. P. 38; 28 U.S.C. §§ 1912, 1927.

- Against attorney Walner, a fine payable to the clerk of court for misrepresentations of law in the section of the opening brief concerning the Doxing Act claim. Fed. R. App. P. 46(c).

- Against attorney Trent, a fine payable to Ms. Rajala for disputing at oral argument without any evidentiary basis that his client sent the text message she attributed to him. Fed. R. App. P. 46(c); *Chambers*, 501 U.S. at 49–50.

We will use the following procedure. No later than Monday, June 1, 2026, the Rajalas (Abbigail, Rodney, and Carol) may submit a statement of their costs and attorney fees incurred in this appeal. No later than Tuesday, June 16, 2026, D'Ambrosio and attorneys Walner and Trent may file statements as to whether and to what extent the court should impose the sanctions proposed above, and they may make any objections they might have to fees and costs claimed by the Rajalas. The attorneys may also request an evidentiary hearing as to individual attorney sanctions. The Rajalas may then file a reply no later than fifteen days after D'Ambrosio and his attorneys respond.

VI. *Conclusion*

For the foregoing reasons, the judgment of the district court is AFFIRMED. D'Ambrosio, Walner, and Trent are ORDERED to show cause regarding possible sanctions as set forth above. Single costs are awarded to Meta and the STT defendants. Fed. R. App. P. 39(a)(2). Costs as to the Rajalas shall be addressed in a subsequent order after they and plaintiff have submitted their post-opinion statements. The clerk of court shall forward a copy of this opinion to the Attorney Registration and Disciplinary Commission of the Illinois Supreme Court for any action it deems appropriate. To be clear, however, regardless of how the Illinois authorities assess and respond to circumstances like these, this court expects members of our bar to exercise diligence to ensure the accuracy of all

factual and legal representations in briefs and other filings. Briefs and other court submissions that include fictitious quotations—inaccuracies discoverable with elementary professional care—are unacceptable and unbecoming members of our bar.